UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------X

JACOB SCHONBERG, BINYOMIN SCHONBERG, BINYOMIN
HALPERN AND RAPHAEL BAROUCH ELKAIM, et al.,

                           *Plaintiffs*,

          -against-

YECHEZKEL STRULOVICH a/k/a CHASKIEL STRULOVICH,
YECHIEL OBERLANDER a/k/a MICI OBERLANDER a/k/a MIHAY
OBERLANDER, et al.,

                          *Defendants*.

------------------------------------------------------------------------------X

Case No. 17-cv-2161
(CBA)(RML)

**PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO MOTION TO VACATE
<u>NOTICES OF PENDENCY AND TO DISMISS THE AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................... iii

PRELIMINARY STATEMENT .............................................................................................. 1

COUNTERSTATEMENT OF FACTS ...................................................................................... 3

SUMMARY OF ARGUMENT................................................................................................ 3

ARGUMENT ..................................................................................................................... 4

    I.      DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1)
           FAILS BECAUSE THE CLAIMS IN THIS LAWSUIT ARE NOT ARBITRABLE ................... 4

          1.    As a Threshold Matter, Binding Second Circuit Precedent Absolutely
               Bars the Remedy of Dismissal on the Grounds of an Allegedly
               Binding Arbitration Agreement ................................................................. 6

          2.    As Another Threshold Matter, the Dismissal Motion
               Fails Because Strulovitch Has Failed to Demonstrate that Claims
               Related to All 22 Investment Properties Are Arbitrable............................ 7

          3.    The Sham Operating Agreements Are Not Effective Because
               They Are Not Fully Executed and Were Confirmed to Be Ineffective
               By Strulovitch Himself When He Defrauded the Mortgage Banks............ 8

               i.    Signatures from All of the Investors Were Required to Make
                    the Sham Operating Agreements Effective....................................... 9

               ii.    Strulovitch's Sworn Statements and Conduct for Four
                    Years Confirms that these Sham Operating Agreements
                   Are Not in Effect........................................................................... 15

               iii.    Strulovitch Has No Authority to Bind the LLC Plaintiffs
                   to the Sham Operating Agreement or the Arbitration Clauses ...... 18

          4.    Regardless of Whether "Some" Investors Signed the
               Sham Operating Agreements, the Claims in this Lawsuit
                Are Still Not Arbitrable as Against the Non-Signatories.......................... 21

          5.    The Arbitration Clauses in the Sham Operating Agreements
                Do Not Encompass All of the Claims in this Lawsuit .............................. 26

          6.    The Arbitration Clauses in the Sham Operating Agreements Are
                Unenforceable Because They Are an Integral Part of
                Defendants' Scheme to Defraud ............................................................ 27

II.    THE DEFENDANTS' MOTIONS TO VACATE THE
       NOTICES OF PENDENCY SHOULD BE DENIED ........................................................29

III.   DEFENDANTS' MOTION TO DISMISS THE
       FIRST CAUSE OF ACTION FOR SECURITIES FRAUD MUST BE DENIED ...................36

       1.    "Group Pleading" of Two People Who Committed the Fraud
             Can Be Referred to Collectively But for the Sake of Judicial
             Resources, this Alleged "Defect" is Cured ................................................37

       2.    Defendants' Contention that Because "Some" of His Alleged
             Representations Were True He Cannot Be Liable For Fraud Is
             Spurious ................................................................................................39

       3.    The General Disclaimers that the Individual Defendants
             Unilaterally Imposed in the Sham Operating Agreements
             Do Not Inoculate Their Fraudulent Misrepresentations ...........................40

             i.    Defendants Cannot Use the Sham Operating
                   Agreements on a Rule 12(b)(6) Motion .......................................40

             ii.   Legally, the So-Called Disclaimers in the Sham
                   Operating Agreements Cannot Bar a
                   Securities Fraud Claim of This Magnitude ..................................42

             iii.  The Disclaimers Do Not Apply to the
                   Misrepresentations Pleaded in this Lawsuit .................................43

IV.    THE MOTION TO DISMISS THE SECOND CAUSE OF ACTION FOR CANCELLATION
       OF THE UNAUTHORIZED REAL ESTATE CONTRACTS MUST BE DENIED .................45

V.     PLAINTIFFS HAVE PROPERLY STATED CLAIMS FOR UNJUST ENRICHMENT AND
       A CONSTRUCTIVE TRUST ...............................................................................48

       1.    The Complaint Does Not Plead the Existence of Any Contracts and
             Defendants Are Not Permitted to Rely Upon the Sham Operating
             Agreements to Bar Equitable Claims .......................................................48

       2.    The Constructive Trust Claim Is Properly Pleaded ..................................49

VI.    PLAINTIFFS HAVE PROPERLY STATED A CLAIM FOR AN ACCOUNTING .................53

VII.   DEFENDANTS' MOTION TO DISMISS THE FIFTH AND SIXTH CAUSE OF ACTION
       IS MOOT, AND MUST BE DENIED .....................................................................54

CONCLUSION..................................................................................................55

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*551 Chelsea Partners LLC v. 556 Holding LLC*,
    40 A.D.3d 546 (1st Dep't 2007) ....................................................................30

*Abbey v. Fortune Drive Assocs.,*
    No. A124684, 2010 Cal. App. Unpub. LEXIS 2860
    (Cal. App. 1st Dist. Apr. 10, 2010)..........................................................19, 20

*Am. Mfgs. Mut. Ins. Co. v. Payton Lane Nursing Home Inc.*,
    704 F. Supp. 2d 177 (E.D.N.Y. 2010) ...........................................................17

*Amaker v. Weiner*,
    179 F.3d 48 (2d Cir. 1999)......................................................................41-42

*Anwar v. Fairfield Greenwich, Ltd.*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010).............................................................43

*Arrow Comm'n Labs., Inc. v. Pico Prods., Inc.*,
    219 A.D.2d 859 (4th Dep't 1995) ............................................................53-54

*Bitumenes Orinoco, S.A. v. New Brunswick Power Holding Corp.*,
    No. 05 Civ. 9485 (LAP), 2007 U.S. Dist. LEXIS 10138 (S.D.N.Y. Feb. 13, 2007)........11

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d Cir. 2002).......................................................................44

*Carter v. Stanton*,
    405 U.S. 669 (1972).................................................................................41

*Century Indem. Co. v. Certain Underwriters at Lloyds's*,
    584 F.3d 513 (3d Cir. 2009).....................................................................4-5

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)...............................................................40, 41, 42

*City of Providence v. Aeropostale, Inc.*,
    No. 11 Civ. 7132 (CM) (THK), 2013 U.S. Dist. LEXIS 44948
    (S.D.N.Y. Mar. 25, 2013) .....................................................................36, 39

*Cohen v. McMunn*,
    No. 105941/2007, 2008 N.Y. Misc. LEXIS 10101
    (Sup. Ct. N.Y. County Aug. 1, 2008) ...........................................................33

*Cohen v. Treuhold Capital Grp., LLC (In re Cohen)*,
    422 B.R. 350 (E.D.N.Y. 2010) ...................................................................46, 47

*Color-Web, Inc. v. Mitsubishi Heavy Indus. Printing & Packaging Mach., Ltd.*,
    No. 16 Civ 1435 (DLC), 2016 U.S. Dist. LEXIS 160982
    (S.D.N.Y. Nov. 21, 2016) .............................................................................26

*Deloitte Noraudit A/S v. Deloitte Haskins & Sells*,
    9 F.3d 1060 (2d Cir. 1993)..........................................................................26

*DLJ Mortg. Capital, Inc. v. Kontogiannis*,
    No. 08 Civ 4607 (ENV)(RML), 2009 U.S. Dist. LEXIS 46857
    (E.D.N.Y. June 4, 2009) ...............................................................................49

*Ehlinger v. Ruberti, Girvin & Ferlazzo, P.C.*,
    304 A.D.2d 925 (3d Dep't 2003) .................................................................31

*Evvtex Co., Inc. v. Hartley Cooper Assocs. Ltd.*,
    102 F.3d 1327 (2d Cir. 1996).......................................................................46

*Farago Adver., Inc. v. Hollinger Int'l, Inc.*,
    157 F. Supp. 2d 252 (S.D.N.Y. 2001)...........................................................11

*Felske v. Bernstein*,
    173 A.D.2d 677 (2d Dep't 1991) ...........................................................34, 35

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995)......................................................................................4

*Friedl v. City of New York*,
    210 F.3d 79 (2d Cir. 2000)...................................................................... 41-42

*Granite Rock Co. v. Int'l Brotherhood of Teamsters*,
    561 U.S. 287 (2010)......................................................................................4

*Groden v. Random House, Inc.*,
    61 F.3d 1045 (2d Cir. 1995).........................................................................42

*Guyden v. Aetna, Inc.*,
    544 F.3d 376 (2d Cir. 2008).........................................................................7

*Hard Rock Café Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC*,
    808 F. Supp. 2d 552 (S.D.N.Y. 2011)...........................................................7

*Housekeeper v. Lourie*,
    39 A.D.2d 280 (1st Dep't 1972) ..................................................................27

*HSBC Bank USA, N.A. v. Adelphia Comm'ns Corp.*,
　　No. 07-CV-553A, 2009 U.S. Dist. LEXIS 10675 (W.D.N.Y. Feb. 12, 2009) .................17

*Hullum v. Sherbondy*,
　　No. 90-55826, 1991 U.S. App. LEXIS 7826 (9th Cir. 1991) ...........................................28

*In re High Crush Partners, L.P. Sec. Litig.*,
　　No. 12 Civ. 8557 (CM), 2013 U.S. Dist. LEXIS 171110
　　(S.D.N.Y Dec. 2, 2013)...................................................................................................37

*In re Nigeria Charter Flights Contract Litig.*,
　　520 F. Supp. 2d 447 (E.D.N.Y. 2007) .............................................................................46

*Jacobs v. Abramoff*,
　　148 A.D.2d 497 (2d Dep't 1989) .....................................................................................35

*Karp v. Twenty Three Ryer Corp.*,
　　185 Misc. 440 (Sup. Ct. Bronx County 1945) .................................................................33

*Katz v. Cellco P'Ship*,
　　794 F.3d 341 (2d Cir. 2015)......................................................................................5, 6, 7

*Keen v. Keen*,
　　140 A.D.2d 311 (2d Dep't 1988) ............................................................................ *passim*

*Kermanshah v. Kermanshah*,
　　580 F. Supp. 2d 247 (S.D.N.Y. 2008).............................................................................53

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
　　560 F.3d 156 (3d Cir. 2009)...............................................................................................4

*L. Smirlock Realty Corp. v. Title Guar. Co.*,
　　70 A.D.2d 455 (App. Div. 1979) .....................................................................................46

*Latham v Father Divine*,
　　299 N.Y. 22 (1949) ..........................................................................................................51

*Lipton v. Donnenfeld*,
　　5 A.D.3d 356 (2d Dep't 2004) .........................................................................................51

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
　　797 F.3d 160 (2d Cir. 2015)............................................................................................44

*MAG Portfolio Consultant, GmBH v. Merlin Biomed Group LLC*,
　　268 F.3d 58 (2d Cir. 2001)........................................................................................23, 24

*Matter of Belzberg v. Verus Invs. Holdings Inc.*,
    21 N.Y.3d 626 (2013) ................................................................. 22, 23-24, 25

*McHugh v. Belmonte*,
    No. 100660/07, 2007 WL 4788454
    (Sup. Ct. Richmond County Oct. 2, 2007) ................................................. 51-52

*Mfgs. Hanover Trust Co. v. Yanakas*,
    7 F.3d 310 (2d Cir. 1993) ........................................................................44

*Morelli v. Cedel*,
    141 F.3d 39 (2d Cir. 1998) ........................................................................41

*Moseley v. Electronic & Missile Facilities*,
    374 U.S. 167 (1963) ................................................................................27

*Murphy v. Cadillac Rubber & Plastics, Inc.*,
    946 F. Supp. 1108 (W.D.N.Y. 1996) ...........................................................42

*Nantucket Indus. v. Varon*,
    No. 97-7467, 1997 U.S. App. LEXIS 33142 (2d Cir. Nov. 19, 1997) ............................27

*Nastasi v. Nastasi*,
    26 A.D.3d 32 (2d Dep't 2005) ...............................................................30, 51

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*,
    861 F. Supp. 2d 344 (S.D.N.Y. 2012) ...........................................................11

*NEM Re Receivables, LLC v. Fortress Re, Inc.*,
    173 F. Supp.3d 1 (S.D.N.Y. 2016) ...............................................................53

*Oldroyd v. Elmira Sav. Bank*,
    134 F.3d 72 (2d Cir. 1998) ...................................................................... 6-7

*One Comm'ns. Corp. v. JP Morgan SBIC LLC*,
    381 Fed. App'x 75 (2d Cir. 2010) ...............................................................45

*Oppenheimer & Co. v. Deutsche Bank AG*,
    No. 09 Civ. 8154, 2010 U.S. Dist. LEXIS 19655 (S.D.N.Y. Mar. 2, 2010) ...................21

*Ostad v. Nehmadi*,
    31 Misc. 3d 1211(A) (Sup. Ct. N.Y. County 2011)....................................... 34-35

*Peterson v. Kelly*,
    173 A.D.2d 688 (2d Dep't 1991) ................................................................31

*Primavera Familienstiftung v. Askin*,
    130 F. Supp. 2d 450 (S.D.N.Y. 2001)..................................................................44

*Rasool v. Gohar*,
    40 A.D.3d 727 (2d Dep't 2007) ....................................................................52

*Robert Fiance Hair Design Inst. v. Concourse Props. Co.*,
    130 A.D.2d 564 (2d Dep't 1987) ..................................................................30

*Shrifter v. Goldman*,
    23 Misc. 3d 1120(A) (Sup. Ct. N.Y. County 2009)........................................51

*Sierra Rutile Ltd. v. Katz*,
    937 F.2d 743 (2d Cir. 1991)........................................................................ 6-7

*Sim v. Edenborn*,
    242 U.S. 131 (1916)....................................................................................46

*Sokoloff v. Harriman Estates Devel. Corp.*,
    96 N.Y.2d 409 (2001) .................................................................................46

*Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*,
    383 F.2d 428 (S.D.N.Y. 2003) .....................................................................11

*Steelworkers v. Warrior & Gulf Nav. Co.*,
    363 U.S. 574 (1960)....................................................................................22

*Telesco v. Neuman*,
    No. 14 CV 3480 VB, 2015 U.S. Dist. LEXIS 66008
    (S.D.N.Y. Mar. 11, 2015) ........................................................................ 53-54

*Thomson-CSF, S.A. v. American Arbitration Ass'n*,
    64 F.3d 773 (2d Cir. 1995)...........................................................................23

*Trs. Of the Int'l Union of Op. Eng'rs Local 30 Benefits Funds v. Nyack Hosp.*,
    975 F. Supp. 2d 365 (S.D.N.Y. 2013)............................................................22

*Tutak v. Tutak*,
    123 A.D.2d 758 (2d Dep't 1986) ..................................................................52

*United States v. Angelilli*,
    660 F.2d 23, 37 (2d Cir. 1981)................................................................. 39-40

*Wells Fargo Bank Northwest N.A. v. Taca Int'l Airlines*,
    247 F. Supp. 2d 352 (S.D.N.Y. 2002)............................................................45

*Worldwide Servs. v. Bombardier Aero. Corp.*,
    No. 14 Civ. 7343 (ER), 2015 U.S. Dist. LEXIS 130974
    (S.D.N.Y. Sept. 22, 2015) .......................................................................11

## **Statutes**

15 U.S.C.S. § 78u-4 ...................................................................................37

Federal Arbitration Act § 9 .........................................................................6

Fed. R. Civ. P. 12 Advisory Committee's Note to 1946 Amendment .................... 40-41

Fed. R. Civ. P. 12 .......................................................................... *passim*

Fed. R. Civ. P. 56 ................................................................................41, 42

Fed. R. Civ. P. 8 .......................................................................................40

Fed. R. Civ. P. 9 ................................................................................37, 50

N.Y. General Obligations Law § 5-703 ........................................................ 45-46

N.Y. Limited Liability Company Law § 402 ......................................................18

N.Y. CLS Real P. Article 15 .........................................................................33

N.Y. C.P.L.R. § 6515 ..................................................................................35

Securities Exchange Act of 1934 Section 10(b)(5)........................................36, 45

## **Other Sources**

5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366
(2d ed. 1990 & Supp. 2001) .................................................................. 40-41

Plaintiffs respectfully submit this memorandum of law in opposition to the motion filed by Defendants Yechezkel Strulovitch, CSRE LLC, and various limited liability company defendants represented by the law firms of Herrick Feinstein LLP and other limited liability companies represented by Cohen, LaBarbara and Landrigan LLP[1], which seek to: (i) dismiss Plaintiffs' Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (6), (ii) compel arbitration, if the Court deems it necessary; and (iii) cancel the Notices of Pendency (the "Dismissal Motion").[2]

## PRELIMINARY STATEMENT

47 individual investors and twenty-two separate limited liability companies made up of over 180 individual Investors have now come before this Court seeking relief from the massive and elaborate fraudulent scheme perpetrated by Defendant Strulovitch and Defendant Oberlander using Prospectuses that were rife with misrepresentations to fraudulently induce them into investing over $20,000,000 in 22 separate Investment Properties primarily located in Brooklyn, New York.  The Investors expected that the Individual Defendants would develop the Investment Properties, return their initial investments and rent them out to commercial and residential tenants, and collect 45% of the profits.  But as the Investors would discover, the entire process was nothing more than an elaborate fraud to personally enrich the Individual Defendants and their wholly owned entities, such as CSRE, at the Investors' expense.

As the mortgage banks who are presently foreclosing or defaulting these Investment Properties have stated in their default letters and foreclosure complaints, once Defendant

---

[1] Because the two memorandums of law submitted by these law firms are almost identical, Plaintiffs are responding to them in the same memorandum.  References to the memorandum of Herrick Feinstein LLP shall be styled "Def. Mem. p. __" and references to the memorandum of Cohen Labarbara and Landrigan LLP shall be styled "Landrigan Br.__".

[2] Unless otherwise noted, all capitalized terms used herein shall have the same meaning ascribed to them in the Second Amended Complaint, dated July 14, 2017 (the "SAC").  References to the SAC shall be styled SAC __.

Strulovitch received the Investors' money, he immediately began to commit bank fraud, fraudulently swearing to banks that he was the sole member of each of these companies, concealing from banks that he had any partners at all and withdrawing over $35,000,000 in mortgage proceeds.  Instead of using the $20 million in investment funds and $35,000,000 in mortgage funds to develop the Investment Properties as Defendants promised, the Individual Defendants secretly diverted these funds for their exclusive benefit, including to purchase and develop different properties for the Individual Defendants' personal enrichment to the total exclusion of the Investors.

The vast majority of the Investment Properties that the Individual Defendants purchased on behalf of the Investors are languishing, undeveloped and dilapidated, and accruing millions of dollars in default interest.  Absent immediate judicial intervention, these innocent investors are facing a total loss from both the foreclosures and defaults resulting from the Individual Defendants' fraud and the disrepair of the Investment Properties.

Defendants' Motion is yet another deceptive tactic to deny to Investors, who never signed any arbitration agreements, the judicial forum to which they are entitled to seek redress for their disputes.  Instead, using Sham Operating Agreements that were never executed by all of the Investors and which Strulovitch himself, by his own conduct and representations to banks personally confirmed were never in effect, Defendants are attempting compel these Investors to arbitrate complex securities fraud claims before the Individual Defendants' personal Rabbi in Monsey, New York, who will likely afford Plaintiffs no discovery and will have no experience in matters of New York law or securities law.   For the reasons set forth below, Defendants' motion should be denied in its entirety and this case should proceed to discovery immediately.

## COUNTERSTATEMENT OF FACTS

Rather than recite a detailed and lengthy counter-narrative to the statement of "facts" offered in Defendants' moving briefs, Plaintiffs respectfully refer the Court to the Second Amended Complaint, which is being filed concurrently herewith.

## SUMMARY OF ARGUMENT

As set forth in Point I, *infra*, the Defendants' motion to dismiss the Amended Complaint and compel arbitration must be denied.

Moreover, as set forth in Point II, *infra*, there is no merit to Defendants' motion to vacate the notices of pendency on four of the Investment Properties and the Schedule B Properties, and this must also be denied.

In Point III, *infra*, Plaintiffs explain why Defendants' motion to dismiss the securities fraud claim must be denied.

As set forth in Point IV, *infra*, Defendants' motion to dismiss Plaintiffs' claim for cancellation of the contracts of sale on certain properties (Count II) must be denied.

As set forth in Point V, *infra*, the Defendants' motion to dismiss the Fourth and Ninth Causes of Action, which seek the imposition of constructive trusts, and the Seventh Cause of Action for unjust enrichment, must be denied.

Similarly, as explained in Point VI, *infra*, Defendants' motion to dismiss the Eighth Cause of Action seeking an accounting, must also be denied.

Finally, in Point VII, *infra*, Plaintiffs explain why Defendants' attempts to dismiss Counts Five and Six of the Amended Complaint for breach of fiduciary duty are now moot.

## ARGUMENT

**I.    DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1)
FAILS BECAUSE THE CLAIMS IN THIS LAWSUIT ARE NOT ARBITRABLE**

"Arbitration is strictly a matter of consent, and thus is a way to resolve those disputes –
*but only those disputes* – that the parties have agreed to submit to arbitration." *Granite Rock Co.
v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 299 (2010) (emphasis in original).  As such, a
court may order arbitration of a particular dispute only where the court is satisfied that the parties
to the lawsuit have all agreed to arbitrate *that dispute*.  "To satisfy itself that such agreement
exists, the court must resolve any issue that calls into question the formation or applicability of
the specific arbitration clause that a party seeks to have the court enforce." *Id.*  It is the burden of
the party seeking to remove allegedly-arbitrable claims from court to prove that they are, in fact,
arbitrable.  Additionally, to obtain the remedy of dismissal based upon an arbitration agreement,
which is the only remedy that Defendants seek in this Motion, Defendants bear the burden of
proving that all of the claims in the lawsuit are arbitrable.

To determine whether the parties have agreed to arbitrate, the Court applies "ordinary
state-law principles that govern the formation of contracts." *Kirleis v. Dickie, McCamey &
Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (*quoting First Options of Chicago, Inc. v.
Kaplan*, 514 U.S. 938, 944 (1995)).  A party moving to dismiss on the grounds of arbitration is
akin to a party seeking summary judgment.  It must prove that there is no genuine issue of
material fact regarding the existence of the arbitration agreement and the arbitrability of all of the
claims. *Id.* at 160 n.3; *see also Century Indem. Co. v. Certain Underwriters at Lloyds's*, 584
F.3d 513, 528 (3d Cir. 2009) ("[T]the district court's order compelling arbitration is in effect a
summary disposition of the issue of whether or not there had been a meeting of the minds on the
agreement to arbitrate." (citation omitted)).

Here, Defendants' motion claims that all of the claims in this lawsuit should be dismissed because the Court purportedly lacks "subject matter jurisdiction" over them by virtue of the alleged arbitration agreements contained in 19 operating agreements (the "Sham Operating Agreements") attached to the Declaration of Defendant Yechezkel Strulovitch (the "Strulovitch Dec."). *See* Def. Mem. at p. 15. Defendants argue that these 19 Sham Operating Agreements make each and every claim in the Complaint arbitrable, which merits dismissal under Fed. R. Civ. P. 12(b)(1). As detailed *infra*, this portion of the Dismissal Motion must be denied for six separate and independent reasons. These six reasons are as follows:

(1)    As a threshold matter, under the Second Circuit's holding in *Katz v. Cellco P'Ship*, 794 F.3d 341 (2d Cir. 2015), dismissal is not available as a remedy even where there is a binding arbitration clause that applies to all claims, which is not even the case here;

(2)    As yet another threshold matter, Strulovitch fails to include any arbitration agreement for 3 of the 22 Investment Properties for which claims are pleaded in the Amended Complaint and in the Second Amended Complaint, and as such, claims related to those Investment Properties are not arbitrable;

(3)    It is undisputed that none of the 19 Sham Operating Agreements were ever fully executed by the investors in each of the respective Investment Properties governed by that alleged Agreement, nor has Strulovitch demonstrated that he has the authority to sign them on behalf of the LLC Plaintiffs. As such, by their plain terms, these Sham Operating Agreements were never in effect. **Strulovitch himself confirmed that the Sham Operating Agreements were ineffective in his own sworn statements and dealings with mortgage banks and the Internal Revenue Service. To permit him to enforce the Sham Operating Agreements would ratify Strulovitch's fraud on the investors, the banks, and the government**;

(4)    Regardless of whether some investors signed the Sham Operating Agreements, Strulovitch cannot bind the non-signatory investors to arbitration;

(5)    On their face, the arbitration clauses in the Sham Operating Agreements do not encompass all of the claims in this lawsuit, and in particular the claims against the Secret LLC Defendants or the John Doe Defendants in contract to purchase Investment Properties who are not parties to the alleged arbitration agreements; and

(6)      Regardless of who did or did not sign the Sham Operating Agreements, the fraud allegations in this lawsuit directly implicate the arbitration clause itself, which Strulovitch is tactically attempting to misuse to block Plaintiffs from obtaining any discovery and continue the fraud he has committed.

1.      As a Threshold Matter, Binding Second Circuit Precedent Absolutely Bars the <u>Remedy of Dismissal on the Grounds of an Allegedly Binding Arbitration Agreement</u>

As Plaintiffs will establish *infra* in Sections 3-6, the 19 Sham Operating Agreements, which were never executed by all of the investors, were never effective, and do not mandate arbitration of any claims in this lawsuit. Further, Strulovitch himself made sworn statements to mortgage banks, signed mortgage documents, and filed tax returns that confirm the ineffectiveness of the Sham Operating Agreements.

However, prior to addressing those issues in detail, there is a threshold issue that mandates denial of Strulovitch's motion to dismiss this lawsuit. In *Katz*, the Second Circuit expressly held that the plain text of Section 9 of the FAA bars the Court from dismissing a lawsuit, <u>even where the defendant proves that all of the claims are subject to a binding arbitration agreement</u>. *Katz*, 794 F.3d at 343-46. At most, a defendant can obtain a stay, provided that the defendant makes an application for a stay and satisfies all of the conditions for obtaining the stay.

Here, Defendants claim that all of the claims in this lawsuit are arbitrable under Section 9 of the FAA. They do not seek a stay in their memorandum of law or in their notice of motion. Under the Second Circuit's holding in *Katz*, even if all of the claims in this lawsuit were arbitrable, which they are not, Defendants are not entitled to dismissal. Additionally, in as much

as Defendants have not requested a stay of these proceedings pending arbitration, they are not entitled to one.  Accordingly, Defendants' motion should be denied for this threshold reason.[3]

2.      As Another Threshold Matter, the Dismissal Motion Fails Because Strulovitch Has Failed to Demonstrate that Claims Related to All 22 Investment Properties Are Arbitrable

Leaving aside the holding in *Katz* that bars the Court from dismissing this action, there is another threshold issue that bars Defendants' motion to the extent that it seeks to compel arbitration of *all* claims in this lawsuit.  There are 22 Investment Properties identified in this lawsuit.  SAC ¶ 2.  Each of the 22 LLC Plaintiffs, in which the investors hold an interest in the Investment Properties, is pleading its own claims, has a separate ownership structure, and comprises a different group of investors than the others.  SAC ¶¶ 15-21.  Strulovitch's Dismissal Motion fails to attach any arbitration agreements with respect to the Investment Properties located at 8 Maple Avenue, 1301 Putnam Avenue, and 348 St. Nicholas Avenue.  *See generally* Strulovitch Dec.  Thus, Defendants failed to demonstrate that any of the claims of 8 Maple Avenue Operations LLC, 1301 Putnam Operations LLC and 348 St. Nicholas Avenue LLC are arbitrable.  Additionally, there are at least 15 Individual Plaintiffs pleading claims in connection with their investments in these 3 Investment Properties.[4]  Defendants have failed to demonstrate

---

[3] Moreover, if a court determines "that some, but not all, of the claims in [a] case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration."  *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008) (*quoting Oldroyd v. Elmira Sav. Bank*, 134 F.3d 72, 75-76 (2d Cir. 1998)).  "The party seeking a stay 'bears a heavy burden of showing necessity' by demonstrating that a stay will not 'hamper the progress of the arbitration proceeding,' that the arbitration is 'expected to conclude within a reasonable time,' and that there will be no 'undue harship' imposed on the opposing party."  *Hard Rock Café Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F. Supp. 2d 552, 564 (S.D.N.Y. 2011) (*quoting Sierra Rutile Ltd. V. Katz*, 937 F.2d 743, 750 (2d Cir. 1991).  Thus, where a party does not meet the "heavy burden" to justify a stay, the balance of an action not referred to arbitration should proceed rather than be stayed.  *Id.*  Inasmuch as Defendants do not even *ask* for a stay of this action, they cannot have met the "heavy burden" they are required to satisfy to obtain such relief.  Accordingly, even were the Court to stay this action with respect to a portion of the claims (which it should not), the action must proceed with respect to all non-arbitrable claims.

[4] As set forth in Schedule A to the Second Amended Complaint, Plaintiffs Shimon Asulin, Yaakov Ben-Shimon, Netanel Cohen-Arazi, Raphael Barouch Elkaim, Itamar Shaya, Shimon  Shenker, Elyashiv Menachem Weil, Yaakov

*Continues on following page . . .*

that their claims are arbitrable, either.  Accordingly, Plaintiffs have failed to establish any right to compel arbitration of all of the claims in this lawsuit.  This is just another attempt to delay discovery, which will reveal the massive fraud and self-dealing that Strulovitch and Oberlander engaged in.

3.     The Sham Operating Agreements Are Not Effective Because
        They Are Not Fully Executed and Were Confirmed to Be Ineffective
        By Strulovitch Himself When He Defrauded the Mortgage Banks

Leaving aside the previous threshold issues, the Sham Operating Agreements do not provide a basis to compel arbitration of any of the claims in this lawsuit because it is undisputed that these Sham Operating Agreements were not signed by all of the investors in the Investment Properties.  Each of the Investment Properties had at least 10 investors.  *See* SAC, Schedule A. In the case of the larger Investment Properties such as 720 Livonia Avenue, there are at least 25 separate investors, and in the case of 855 DeKalb Avenue, there at least 35 separate investors. *Id.*

For each of the 19 Sham Operating Agreements annexed to his declaration in support of this Dismissal Motion, which Strulovitch declares to be "true and correct copies" of the Operating Agreement for the Holding Company Defendants, Strulovitch attaches the signature page of just one of the many investors in each company.  *See generally* Strulovitch Dec.  Other than one investor's signature, the only signatures that appear on the Sham Operating Agreements are Strulovitch's.  Strulovitch purports to have signed (1) on behalf of the Holding Companies, (2) on behalf of his own entity, CSRE, as a member of the Holding Companies, and (3) on behalf of the LLC Plaintiffs, which is the entity that holds the interest of all of the investors.  To be

---

*. . . continued from preceding page.*
Wizman, Avraham Zakuta, Binyomin Mordechai Halpern, Benjamin Schonberg and Jacob Schonberg are all asserting claims with respect to these 3 Investment Properties.

clear, based solely on his own signatures and the signature of one "super-minority" investor in each Investment Property, Strulovitch attempts to bind all of the Plaintiffs, both the 180 individual investors and all 22 of the limited liability companies, to the arbitration clauses contained in the Sham Operating Agreements. Notably, Strulovitch does not attach to his declaration any resolution or any other document purporting to give him the authority to execute these Sham Operating Agreements or to bind the LLC Plaintiffs to the arbitration clauses contained in them. Instead, Strulovitch simply argues that the LLC Plaintiffs are bound to the Sham Operating Agreements and the arbitration clauses contained therein not because they agreed to them, but solely because Strulovitch signed the Sham Operating Agreements on their behalf as "Managing Director."

As demonstrated below, Strulovitch cannot misuse these Sham Operating Agreements to force this lawsuit to arbitration for the following three reasons:

(i)     by their plain terms, the Sham Operating Agreements needed to be signed by each and every investor to be effective, which they are not;

(ii)    for four years Strulovitch made sworn statements and representations to banks and the IRS confirming the ineffectiveness of these Sham Operating Agreements, demonstrating that he never believed these agreements were effective, and to now permit him to benefit from these Sham Operating Agreements would amount to the Court ratifying bank fraud and tax fraud; and

(iii)   Strulovitch did not have the right to cloak himself with the authority to execute the Sham Operating Agreements on behalf of the LLC Plaintiffs, particularly given the fact that they contain onerous arbitration clauses designed to frustrate the ability of his investors to obtain discovery by relegating them to be arbitrated by his personal rabbi in the event of a dispute.

i.      Signatures from All of the Investors Were Required
        to Make the Sham Operating Agreements Effective

The plain terms of the Sham Operating Agreements show that **all** of the investors' signatures were required before they could be effective. Each Sham Operating Agreement

required the signature of four distinct groups of parties to be effective: (1) the Holding LLC Defendant itself (*i.e.* the company that held title to the Investment Property); (2) CRSE LLC, an entity controlled exclusively by Strulovitch and Oberlander; (3) each respective LLC Plaintiff; and (4) **each and every one of the individual members of each of the LLC Plaintiffs in their individual capacities who were to sign on the signature pages provided for them in Schedule B**. *See* Strulovitch Dec. Exs. 1-19.

By way of example, for the Investment Property located at 853 Lexington Avenue, the Sham Operating Agreement states as follows:

> This Limited Liability Company Operating Agreement ("Agreement") is effective as of June 3, 2013 and entered into by and among 853 Lexington LLC (the "Company") and CSRE LLC ("CSRE") the owner of fifty-four percent (54%) of the Company, and 853 Lexington Operations LLC ("Investors LLC") the owner of forty-six percent (46%) of the Company **and the members of 853 LEXINGTON OPERATIONS LLC (hereinafter referred to as the "Members").**

Strulovitch Dec. Ex. 2.

Schedule A to all 19 of the Sham Operating Agreements specifically mandates that there be signatures from "each" of the individual investors in every LLC Plaintiff to evidence a meeting of the minds as to the terms of these Sham Operating Agreements. *See* Strulovitch Dec. Exs. 1-19. Specifically, Schedule A states, in pertinent part, as follows in bold and all capital letters:

> **THE DETAILS OF UNDERLINE EACH OF THE MEMBERS OF INVESTORS LLC [*i.e.*] THE LLC PLAINTIFF] ARE TO BE … ANNEXED HERETO IN SCHEDULE B ON INDIVIDUAL SIGNATURE PAGES.**

*See, e.g.*, *id.* Ex. 2. In other words, it was the expectation and intent of any of the investors that did sign Schedule B, that without signatures pages executed by all of the other investors (not just one), there could not be a meeting of the minds between all of the parties to these Sham

Operating Agreements as to its terms.  Strulovitch's blithe assertion on the second page of his memorandum of law stating that only "some" of the investors signed the Sham Operating Agreements is fatal to his motion.  Accordingly, inasmuch as it is undisputed that not all of the investors signed these Sham Operating Agreements, the Sham Operating Agreements and their arbitration clauses are not effective and cannot be used to compel arbitration of any of the disputes in this lawsuit.  *See Bitumenes Orinoco, S.A. v. New Brunswick Power Holding Corp.*, No. 05 Civ. 9485 (LAP), 2007 U.S. Dist. LEXIS 10138, *42 (S.D.N.Y. Feb. 13, 2007) (just as here, "courts have interpreted 'blank signature lines with an open agreement date' to 'reflect a mutual intent on the part of both parties not to be bound to the terms of the agreement until the agreement was executed'") (*quoting Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F.2d 428, 442 (S.D.N.Y. 2003)); *Farago Adver., Inc. v. Hollinger Int'l, Inc.*, 157 F. Supp. 2d 252, 259 (S.D.N.Y. 2001) (holding that non-signatory to contract could not be bound where the language of the contract itself indicated that signing was the means to accept the contract); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 358 (S.D.N.Y. 2012) (holding that parties were not bound by unsigned contract even in the face of evidence of partial performance); *Worldwide Servs. v. Bombardier Aero. Corp.*, No. 14 Civ. 7343 (ER), 2015 U.S. Dist. LEXIS 130974, *45 (S.D.N.Y. Sept. 22, 2015) (holding that the language of an unexecuted agreement did not bind parties).

This is not only the plain meaning of the Sham Operating Agreements, but requiring signatures from all of the named parties to the Sham Operating Agreements, which includes all of the investors in each LLC Plaintiff, is the only practical and logical way to interpret what any investor would have expected to occur in order for the Sham Operating Agreements to be enforceable.  Without the consent of all of the investors, enforcement would create chaos.  Non-

signatories would claim that they did not agree to anything contained therein and they would sue Defendants and each other, believing that different terms applied to different investors anytime they believed they were wronged.

The purported arbitration clause in each of the Sham Operating Agreements amplifies this fact.[5] A partially executed arbitration clause would create disparity and chaos between parties who were supposed to be similarly situated in the event of a dispute. Some investors could proceed to Court and litigate, while others would risk inconsistent rulings in front of Strulovitch's own rabbi and all parties would face the dangers of litigating similar claims in different forums. Economically, it would also make no sense that any investor would agree to being bound by an arbitration clause that was not agreed to by dozens of other investors. In Rabbinical Court, as in AAA arbitration and JAMS, the investors who agreed to arbitration would then have to bear the enormous expenses of filing the arbitration and paying the arbitrators disproportionately from their respective investments.[6]

---

[5] The arbitration clauses themselves also implicitly acknowledge the fact that the Sham Operating Agreements had to be fully executed by all of the investors before being enforceable. These arbitration clauses state, in pertinent part, as follows:

> In the case of any doubt, question, or other disagreement **among the parties to this agreement** about anything pertaining to this Agreement, **all of the parties to the disagreement** shall choose a third party that is acceptable to all of them as Arbitrator (the "Arbitrator"), and ask for his ruling on [this] point, and his ruling shall be accepted by all parties to the disagreement . . .In any case, however, **all the parties to this agreement** agree not to bring any matter relating to this Agreement to a secular Court for a resolution unless instructed to do so by the Arbitrator or to enforce the Arbitrator's ruling.

*See generally* Strulovitch Dec. Exs. 1-19. On its face, the arbitration clause purports, in three different places, to bind all "parties to this agreement." "All parties to this agreement" would necessarily include each and every investor. Absent their signatures, there could be no meeting of the minds as to any arbitration clause. Accordingly, in the absence of the signatures of all of the investors, this lawsuit cannot be compelled to arbitration based on the Sham Operating Agreements.

[6] Making each individual investor a party and a required signatory, in his individual capacity, is also logical and necessary for many reasons unrelated to the arbitration clauses. Aside from a broad arbitration clause, these Sham Operating Agreements provide for different membership percentages from those contained in the <u>Prospectuses relied upon</u> by the investors, and contained operational and other distribution terms not contained in the Prospectuses

*Continues on following page . . .*

In order to sidestep the fact that the Sham Operating Agreements were not fully executed and are thus ineffective, the second paragraph of Defendants' moving memorandum attempts to mislead the Court and give it the misimpression that these Sham Operating Agreements were "the very agreements by which the LLC Plaintiffs, of which the [investors] are super minority members, acquired interests in the Holding Company Defendants." Def. Mem. at p. 2. But this is yet another falsehood designed to further Defendants' fraud and deny Plaintiffs' access to the Courts, to the financial records and QuickBooks files of their partnerships, and to the discovery and other rights they will not obtain in Rabbinical Court before Strulovitch's own personal rabbi.

The investors acquired their interests in the LLC Plaintiffs by transferring money to the Individual Defendants after receiving a fraudulent Prospectus from them that set forth the terms and conditions of the investment and requested money. SAC ¶ 5. None of those fraudulent Prospectuses contained arbitration clauses. SAC ¶ 44. No operating agreements were presented for signature to any investor contemporaneously with his investment or even in the months thereafter. SAC ¶ 41. Even Strulovitch is forced to concede in his own papers that these Sham Operating Agreements were not generated until long after the fraudulent Prospectuses were circulated and monies were transferred. *See* Def. Mem. at pp. 6-7 (Prospectus for 853 Lexington Avenue sent on July 16, 2012 and Operating Agreements "effective date" of June 3, 2013).

Indeed, further undercutting Defendants' narrative is that the Sham Operating Agreements do not even purport to reflect the dates when they were executed by Strulovitch, the dates when any investors signed them, or when, if at all, they were presented to any nonsignatory investors or rejected. The only date contained on any of these Sham Operating Agreements is an

---

. . . *continued from preceding page.*
relied upon by each individual member, including a method for demanding capital contributions and diluting members.

arbitrary, so-called "Effective Date" in the first paragraph.  *See* Strulovitch Dec. Exs. 1-19. There is no proof, or even an offer of proof, from Defendants that these "effective" dates have any relation to when they were actually prepared or signed.  At best, they are backdated, in an attempt to make the Sham Operating Agreements retroactively effective as of a certain date once they were fully executed.

Again, the only "agreements" by which the LLC Plaintiffs and the individual investors "obtained their interests" in the Holding Company Defendants were the representations of the Individual Defendants set forth in the fraudulent Prospectuses explaining how their respective partnerships would operate, which happened long before Defendants concocted the Sham Operating Agreements.  For any matter not set forth in the fraudulent Prospectuses of the Holding Company Defendants, they were governed by the New York Limited Liability Company Law (the "LLC Law"), not by these Sham Operating Agreements.  Not even Strulovitch alleges in his declaration that the Sham Operating Agreements were the "very agreements by which the LLC Plaintiffs [and the investors] acquired interests in the Holding Company Defendants."  That is an uncorroborated and bald assertion by Strulovitch's attorneys. A bald conclusion by Defendants' attorneys in a memorandum of law is not sufficient to carry the evidentiary burden necessary to eliminate all issues of fact such that 180 investors, 47 Plaintiffs, and 22 limited liability companies are denied their right to pursue their claims in a judicial forum.

Accordingly, in as much as these Sham Operating Agreements are not effective, they cannot be used to deprive the investors and the LLC Plaintiffs of prosecuting their claims in Court and to deny them the right to discovery and a public trial – rights that they never agreed to

forfeit and rights that they will be deprived of if they are forced to arbitrate this case before Strulovitch's hand-picked rabbi against their will.

      ii.     Strulovitch's Sworn Statements and Conduct for Four
                <u>Years Confirms that These Sham Operating Agreements Are Not in Effect</u>

Further underscoring the fact that these Sham Operating Agreements are not effective is Strulovitch's own conduct for four years, including the sworn statements he has made to mortgage banks, his own signatures on mortgage documents, and his own tax reporting to the IRS, all of which confirm the ineffectiveness of the Sham Operating Agreements.

As was pleaded in the Amended Complaint and as is pleaded in more detail in the Second Amended Complaint, Strulovitch repeatedly swore to facts under oath to lenders and signed mortgages with the banks that loaned him money in which he directly confirms that these Sham Operating Agreements do not exist.  Am. Compl. ¶ 71; SAC ¶ 92.  According to Strulovitch's statements, at least six of the Holding Companies that own the Investment Properties were sole member LLCs that were owned by him and no one else.  In at least five other cases, in contravention to the Sham Operation Agreements, Strulovitch also falsely held himself out to be a "member" or "managing member" of the Holding Companies.

For example, Strulovitch purports to attach a Sham Operating Agreement for the Holding Company Defendant 657-665 5th Avenue LLC effective as of September 9, 2013.  *See* Strulovitch Dec. Ex. 15; Def. Mem. at p. 8.  The Sham Operating Agreement naturally does not state that he is the sole member.  *See generally* Strulovitch Dec. Ex. 15.  Yet on June 30, 2014, almost a year later, Strulovitch executed a "Section 255 Tax Law Affidavit," which provides in pertinent part, as follows:

      Chaskiel Strulovitch ("Deponent") <u>being duly sworn deposes and says: Deponent
      is the sole member of 657-665 5th Avenue, LLC</u> (the "Owner"), the owner in fee

simple of certain premises encumbered by mortgage in the amount of $5,778,820.00.

Wipper Dec., Ex. 8 (emphasis added).  Strulovitch signed similar affidavits and made similar statements in connection with the mortgages on the Individual Properties located at 74 Van Buren Street, 106 Kingston Avenue, 325 Franklin Street, 369 Gates Avenue, 525 Willoughby Ave, 618 Lafayette Avenue, 762 Willoughby Avenue, 853 Lexington Avenue, 855 DeKalb Avenue, and three different times over the course of three years on 901 Bushwick Avenue.  *Id.* at Exs. 1-12.

As yet another example of Strulovitch's deception and confirming the ineffectiveness of these Sham Operating Agreements are the mortgages he signed in connection with the Holding Company Defendants 1078 DeKalb LLC and 618 Lafayette LLC.  There, he signed the mortgages and averred, contrary to the terms of the Sham Operating Agreements he is seeking to enforce, that he was a "Member" of these entities.  *Id.* at Exs. 1-12.  However, none of these sworn statements are consistent with the Sham Operating Agreements Defendants now seek to enforce.  According to the Sham Operating Agreements: (i) Strulovitch is not, nor has he ever been, the sole member of the Holding Company Defendants; (ii) Strulovitch also is not a "member" of the Holding Company Defendants – he is only the managing member of CSRE LLC; and (iii) likewise, Strulovitch is not the "managing member" of the Holding Company Defendants – according to the Sham Operating Agreements, CRSE LLC purports to be the managing member.  To be clear, Defendants are lying to someone – the Court, the banks, or both.  In either case, Defendants cannot now make the self-serving statement that these Sham Operating Agreements bind Plaintiffs when Strulovitch has already derived numerous material benefits and advanced his fraudulent scheme by confirming that they are ineffective and are not the governing documents.

Indeed, discovery will undoubtedly show that in order to borrow the $35 million in mortgage proceeds he ultimately diverted to himself from these Investment Properties, Strulovitch must have transmitted operating agreements to each of these banks to prove that what he swore to under oath was true, *i.e.*, that he was the sole member, member, or managing member of all of these Holding Company Defendants.  Permitting Defendants to enforce these Sham Operating Agreements without the benefit of discovery would reward Defendants for their own misconduct and would ultimately endorse Strulovitch's own bank and wire fraud.[7]

Not only is Strulovitch's conduct evidence that he has never believed that these Sham Operating Agreements were ever in effect, but as a matter of law, Strulovitch is not permitted to simultaneously confirm the ineffectiveness of the Sham Operating Agreements to obtain loans and then to reap the benefits of enforcing these Sham Operating Agreements when it suits him. *See HSBC Bank USA, N.A. v. Adelphia Comm'ns Corp.*, No. 07-CV-553A, 2009 U.S. Dist. LEXIS 10675, *51 (W.D.N.Y. Feb. 12, 2009) (It is "unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced, or of which he accepted a benefit." (citation and internal quotation marks omitted)); *Am. Mfgs. Mut. Ins. Co. v. Payton Lane Nursing Home Inc.*, 704 F. Supp. 2d 177, 193 (E.D.N.Y. 2010) ("Courts have regularly found that quasi-estoppel bars a party from adopting a factual position in court that is contrary to a position previously taken on a tax return.").

---

[7] Just as Strulovitch confirmed the ineffectiveness of the terms of the Sham Operating Agreements to the banks from which he borrowed money, he also confirmed the ineffectiveness of the Sham Operating Agreements when he reported income to the IRS.  In the tax returns filed with the IRS (and consistent with each of the Prospectuses), Strulovitch reported to the IRS that CSRE, and in some instances Strulovitch individually, held a 55% interest in the Holding Company Defendants.  Likewise, in each tax return filed with the IRS, Strulovitch consistently reported to the IRS that the LLC Plaintiffs were a 45% member of the Holding Company Defendants.  The cover letter from Strulovitch's accountant, Hutton and Hutton LLP, which was sent to Strulovitch's office, reflects that Strulovitch himself supplied this information.  As is evident, the position taken by Strulovitch, CSRE and the Holding Company Defendants in their tax returns directly contradicts the terms of the Sham Operating Agreements.  These tax returns reflect a different ownership structure for the Holding Company Defendants than the Sham Operating Agreements, where Strulovitch asserts that the ownership structure is 54-46 and not 55-45.

      iii.     Strulovitch Has No Authority to Bind the LLC Plaintiffs
                to the Sham Operating Agreement or the Arbitration Clauses

In addition to the fact that the Sham Operating Agreements are of no force and effect because they were not executed by all of the investors, there is also no merit to Defendants' assertion that "it is indisputable that the LLC Plaintiffs agreed to arbitrate this dispute" because "the LLC Plaintiffs signed the Holding Company Agreements by way of their managing member, Strulovitch." Def. Mem. at p. 13. Far from being "indisputable," Strulovitch had no legal right to bind the LLC Defendants to the Sham Operating Agreements or to the arbitration clauses contained therein without their express consent.

Factually, Strulovitch is not the "managing member" of the LLC Plaintiffs. In fact, there is no evidence that he is a member of any of the LLC Plaintiffs at all. On that basis alone, Strulovitch's alleged authority to execute the Sham Operating Agreements and the arbitration clauses contained therein on behalf of the LLC Plaintiffs fails as a matter of law.

Legally, unless the LLC Plaintiffs themselves have a prior operating agreement, which they do not, all decisions of the company are governed by the LLC Law. Under LLC Law 402, Strulovitch needed the consent of a majority of the members of the LLC Plaintiffs before he could have authority to execute the Sham Operating Agreements on their behalf. Specifically, LLC Law 402(c)(3) provides that "except as provided in the operating agreement, whether or not a limited liability company is managed by the members or by one or more managers, the vote of a majority in interest of the members entitled to vote thereon shall be required to adopt, amend, restate or revoke the articles of organization or operating agreement…" Additionally, nowhere in his declaration does Strulovitch state, much less demonstrate, that a majority of members owning more than a 50% interest in the LLC Plaintiffs authorized him to sign the Sham Operating Agreements on the LLC Plaintiffs' behalf. Nor does he produce signatures from a

majority of members on any other documents.  As he failed to demonstrate that he obtained a majority vote, Strulovitch had no right to cloak himself with the authority to execute the Sham Operating Agreements for the LLC Plaintiffs.  Accordingly, for this separate and independent reason, the claims in this lawsuit are not arbitrable as against the LLC Plaintiffs solely because Strulovitch signed on their behalves, and the Dismissal Motion must be denied.

Moreover, even if, *arguendo*, Strulovitch were the "managing manager" of either the Holding Company Defendants or the LLC Plaintiffs, or both, as he contends, and even if he had the right to execute an operating agreement on their behalves, that did not also give him the right to unilaterally impose an arbitration agreement on the LLC Plaintiffs without obtaining the express authority and consent of the investors who were members of the LLC Plaintiffs.  Under circumstances like those presented here, a Court has rejected this exact type of underhanded misconduct by members of a limited liability company who sought to abuse their power to impose an arbitration agreement on other members to deny their partners a judicial forum.  *See Abbey v. Fortune Drive Assocs.*, No. A124684, 2010 Cal. App. Unpub. LEXIS 2860 (Cal. App. 1st Dist. Apr. 10, 2010).

In *Abbey*, all of the members of a limited liability company had unanimously executed an operating agreement that did not contain any arbitration clause.  The operating agreement also permitted a majority of the members to amend the company's operating agreement without obtaining the consent of any minority members who did not agree.  Later, the majority of the members attempted to abuse their power to amend the operating agreement to "impose arbitration on unwilling [minority] members."  *Id.* at *24-25.

In holding that the arbitration provision imposed by the majority was void, the Court stated that even where one individual or the majority of members have the unfettered right to

impose operating agreements, there are still constraints on that power.  *Id.*  Specifically, "the members' expectations constrain the changes that can be made to an agreement without the consent of all members.  In addition, the requirement of definiteness and the obligation of parties to act in good faith and deal fairly limit the scope of amendments."  *Id.* at *24.  The *Abbey* Court concluded that "the arbitration provision was beyond the intent of the parties in permitting majority amendment of the Operating Agreement."  *Id.* at *25.  Thus, the Court decided that it could not be enforced to deprive any non-consenting member of his right to a judicial forum.  *Id.*

Just as in *Abbey*, Strulovitch and Oberlander circulated the fraudulent Prospectuses setting forth the terms of the investments.  None of those Prospectuses contained arbitration clauses or even referenced arbitration. SAC ¶ 44.  The Prospectuses merely empowered Strulovitch and Oberlander to manage all aspects of the project to ensure that it would be successful and profitable.  *Id.*  Just as in *Abbey*, no matter what authority or power Strulovitch may have had or believed that he had to unilaterally execute an operating agreement containing terms that were different from those that were contained in the Prospectuses, **<u>nothing empowered Strulovitch to foist arbitration clauses on overseas investors or the LLC Plaintiffs without obtaining the express consent of their members</u>**.  Any such arbitration provisions, which deprive the investors and the LLC Plaintiffs of a judicial forum, and direct them to a Rabbinical Court of Strulovitch's own choosing, where they will not have the same rights (or any rights whatsoever) to discovery, go well beyond the intent of the parties in permitting Strulovitch and Oberlander to manage the project.  Accordingly, for this additional reason, the motion to dismiss fails.[8]

---

[8] Also similar to *Abbey* is that Strulovitch attempted to foist these arbitration agreements on the LLC Plaintiffs and the Individual Plaintiffs already knowing that he had committed the acts of securities fraud and breach of fiduciary duty set forth in the Complaint.  *See generally,* SAC.

4.      Regardless of Whether "Some" Investors Signed the
        Sham Operating Agreements, the Claims in this Lawsuit
        <u>Are Still Not Arbitrable as Against the Non-Signatories</u>

Strulovitch's admission that the Sham Operating Agreements are not executed by all of the investors is fatal to his attempt to compel this case to arbitration for the separate and independent reason that there are many non-signatory Plaintiffs who cannot be bound to arbitration.  This is true even if Strulovitch's massive bank fraud and sworn statements to the contrary are overlooked and if the Court chose to selectively enforce the arbitration clauses in the Sham Operating Agreements as against the signatories.

Based upon the signatures submitted by Strulovitch, almost none of the 47 Individual Plaintiffs named in the Second Amended Complaint are signatories to the Sham Operating Agreements.  *See* Strulovitch Dec. Exs. 1-19.  Moreover, when Defendants made their Dismissal motion, they were attacking the Amended Complaint, in which there were only four Individual Plaintiffs:  Binyomin Halpern, Binyomin Schonberg, Raphael Barouch Elkaim, and Jacob Schonberg.   Despite the fact that these four Individual Plaintiffs are investors in all 22 Investment Properties, none of the Sham Operating Agreements in the Strulovitch Declaration attaches any signatures for Binyomin Halpern or Binyomin Schonberg.  *Id.*  Once again, the Court cannot deprive these two Individual Plaintiffs, who are nonsignatories to the Sham Operating Agreements, of the right to full discovery and to redress their grievances against Defendants in a judicial forum.   On this basis alone, their claims are not arbitrable and the Dismissal Motion fails.  *See Oppenheimer & Co. v. Deutsche Bank* AG, No. 09 Civ. 8154, 2010 U.S. Dist. LEXIS 19655 (S.D.N.Y. March 2, 2010).

In the Second Amended Complaint, there are now 47 Individual Plaintiffs.  *See generally* SAC.  Not surprisingly, the Sham Operating Agreements do not bear any signatures from 43 of

them on any of the 19 Sham Operating Agreements attached to Strulovitch's Declaration.  *See* Strulovitch Dec. Exs. 1-19.  Accordingly, those are yet more claims in this lawsuit that are not arbitrable and further mandates denial of the Dismissal Motion.  *See Matter of Belzberg v. Verus Invs. Holdings Inc.*, 21 N.Y.3d 626, 630 (2013) ("[N]otwithstanding the public policy favoring arbitration, nonsignatories are generally not subject to arbitration agreements." (*citing Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960) ("a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit")); *accord Trs. Of the Int'l Union of Op. Eng'rs Local 30 Benefits Funds v. Nyack Hosp.*, 975 F. Supp. 2d 365, 375 (S.D.N.Y. 2013) ("ordinarily, binding a non-signatory to an arbitration agreement runs afoul of the fundamental premise that 'a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit'").

In fact, the only signatures Strulovitch has attached from any named Plaintiff are three acknowledgements by Jacob Schonberg solely for 1213 Jefferson, 618 Lafayette, and 325 Franklin and two signed acknowledgement for Raphael Barouch Elkaim solely relating to 73 Empire Development Operations LLC and 657 Fifth Avenue.  *See* Strulovitch Dec. Exs. 8, 12, 14, 15.  Even if the Court did conclude that these Sham Operating Agreements are enforceable despite not being fully executed by all of the investors – which it should not – Jacob Schonberg and Elkaim's claims with respect to the other Investment Properties where they did <u>not</u> sign a Sham Operating Agreement are still not arbitrable.  *See* Schedule A.

Knowing that the arbitration cannot be forced upon non-signatories to arbitration agreements, Defendants argue that "even if not every individual investor signed the Sham Operating Agreements, the LLC Plaintiffs and the Individual Plaintiffs should be estopped from refusing to arbitrate."  Def. Mem. at pp. 13-14.  Defendants disingenuously argue that Plaintiffs

have somehow "accepted the benefits" of the Operating Agreements "by having their money invested into the [Investment] Properties" via the Holding Company Defendants. *Id.* Misciting the applicable case law, Defendants attempt to shoehorn allegations in the Amended Complaint into their own false narrative by stating that Plaintiffs purportedly "relied on [the Sham Operating Agreements] in setting forth causes of action for breach of fiduciary duty against the Individual Defendants and CSRE who are alleged to be Managers of the Holding Company Defendants." *Id.* at p. 14. Defendants falsely argue that the very right to sue Defendants "is derived from each of the [Sham] Operating Agreements." *Id.* But this argument is false on the facts and fails on the law.

As a matter of law, under the direct benefits theory of estoppel, a nonsignatory may be compelled to arbitrate only where the nonsignatory "knowingly exploits" the benefits of an agreement containing an arbitration clause, and receives benefits flowing directly from the agreement. *MAG Portfolio Consultant, GmBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 62 (2d Cir. 2001). Where the benefits are merely "indirect," a nonsignatory cannot be compelled to arbitrate a claim. *Id.*

A benefit is indirect where the non-signatory to the arbitration agreement exploits the contractual relation of the parties, but not the agreement itself. *See id.* at 61-62. As the court held in *MAG Portfolio*, "[t]he benefits must be direct—which is to say, flowing directly from the agreement. . . . By contrast, the benefit derived from an agreement is indirect where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *Id.* at 61 (*citing Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 778-79 (2d Cir. 1995)). The guiding principle is whether the

benefit gained by the nonsignatory is one that can be traced directly to the agreement containing the arbitration clause.  *Id.*; *Matter of Belzberg*, 21 N.Y.3d at 626.

Here, none of the Plaintiffs are seeking to derive any direct or indirect benefit from the Sham Operating Agreements, nor do any of Plaintiff's claims derive from these Sham Operating Agreements as Defendants contend.  Plaintiff's pleadings never mentioned any of these Sham Operating Agreements – not even once.  They do not invoke these Sham Operating Agreements anywhere in Amended Complaint or in the Second Amended Complaint, nor have Plaintiffs sought benefits thereunder.

In fact, the Second Amended Complaint makes clear that no Operating Agreements were presented to any of the investors at the time they made their investments, nor were the investors' signatures required on any operating agreements to obtain their respective membership interests in the Holding Company LLCs.  SAC ¶ 41.  On the contrary, all of the claims in the Original Complaint, the Amended Complaint and the Second Amended Complaint solely seek to exploit the promises and representations communicated to the Plaintiffs <u>in the Prospectuses</u> they received from Strulovitch and Oberlander and nothing more.

Likewise, there is no merit to Defendants' claim that suing CSRE, Strulovitch, and Oberlander for breach of fiduciary duty or pleading that they are "managers" of the Holding Company LLCs is akin to deriving a direct benefit from the Sham Operating Agreements simply because the Sham Operating Agreements also describes them as members or managers.  *See* Def. Mem. at pp. 13-14.  **<u>These allegations do not derive from the Sham Operating Agreements, they derive solely from each of the Prospectuses.</u>**  On their face, each Prospectus states, that the Individual Defendants undertook to be managers of the Holding Company Defendants in writing that each would "attend to, **<u>manage</u>**, and worry for the project in its formation,

continuation, rental, and sale all attention necessary for the success of the business."  SAC ¶ 46.

That is exactly the role of the "Manager" of a limited liability company and exactly the kind of

relationship that gives rise to a fiduciary duty to investors.

All that Defendants have proffered is a partially executed agreement that happens to

contain some terms that were already set forth in the fraudulent Prospectuses provided to

investors, *i.e.* that the Individual Defendants are "managers" of the Holding Company

Defendants.  As a matter of law, just because Plaintiffs are pleading a fact that happens to be

true, independent of the fact that it is also in an agreement containing an arbitration clause, does

not mean that the Plaintiffs are seeking to derive direct benefits from that agreement.  *See Matter*

*of Belzberg*, 21 N.Y.3d 626.  The doctrine of estoppel is reserved for nonsignatories seeking to

enforce benefits that they would not have had but for the agreements containing the arbitration

clause.  Because none of the Plaintiffs, including the nonsignatories, rely on the Sham Operating

Agreements for the derived benefit, *i.e.*, the right to sue Defendants for breaching their fiduciary

duties, they cannot be bound to an arbitration agreement that they did not sign under an estoppel

theory.  Indeed, none of those Prospectuses, which were provided to the investors approximately

one year earlier, contained arbitration clauses.  SAC ¶ 44.  Strulovitch concedes in his own

moving papers that the Sham Operating Agreements were not generated until well-after the

Prospectuses had been circulated and monies were transferred.  Specifically, he admits that many

Sham Operating Agreements contained "effective dates" that preceded the corresponding

Prospectus.  Def. Mem. at pp. 6-7.  For example, the Sham Operating Agreement for 853

Lexington LLC was effective "as of" June 3, 2013, but the Prospectus for that investment was

transmitted on or about July 16, 2012.  Similarly, the LLC Agreement for 73 Empire

Development LLC was made effective "as of August 14, 2013," but the corresponding Prospectus was sent months later – on October 15, 2013.

Not surprisingly, the two principal cases on which Strulovitch relies to bind non-parties to the Sham Operating Agreements are inapposite. In *Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, 9 F.3d 1060 (2d Cir. 1993), the party compelled to arbitrate, a Norwegian affiliate of the defendant, received the benefit of using the trade name "Deloitte" directly from a settlement agreement between the defendant and another affiliate, which was provided to the plaintiff, and to which plaintiff was given the opportunity to object. *See id.* at 1061. Here, the Plaintiffs did not derive benefits from the Sham Operating Agreements themselves, nor is there any evidence that a majority of the individuals whom Strulovitch seeks to bind even saw – let alone approved – of the Sham Operating Agreements. Accordingly, *Deloitte Noraudit* does not apply.

Nor does *Color-Web, Inc. v. Mitsubishi Heavy Indus. Printing & Packaging Mach., Ltd.*, No. 16 CV 1435 (DLC), 2016 U.S. Dist. LEXIS 160982, (S.D.N.Y. Nov. 21, 2016) apply. That case presents the exact opposite scenario of what occurred here. There, the plaintiff first executed a sales agreement and then consummated the transaction in question. *Id.* at *2-11. Here, the Plaintiffs never had any expectation that there would be an operating agreement that bound their investments. They relied on the Prospectuses and transferred money based on the representations made therein. SAC ¶ 82. Accordingly, this lawsuit cannot be compelled to arbitration as against the numerous non-signatories.

5.   The Arbitration Clauses in the Sham Operating Agreements
     Do Not Encompass All of the Claims in this Lawsuit

A separate and independent basis for denying this portion of the Dismissal Motion is that the arbitration clauses contain two critical limitations that make many of the claims pleaded in the Second Amended Complaint non-arbitrable. The arbitration clauses are limited to

disagreements among "the parties to this agreement."  Strulovitch Dec. Exs. 1-19.  Nothing in

the Sham Operating Agreements reflects any agreement to arbitrate with adversaries who were

not parties to these Sham Operating Agreements.  There are four sets of Defendants who are

undisputedly not parties to the Sham Operating Agreements: (i) the Secret LLC Defendants;

(ii) the Additional Secret LLC Defendants; (iii) the individuals or entities listed as John Does

who are presently in contract to purchase the four Investment Properties on which there are

currently Notices of Pendency; and (iv) the other Strulovitch-owned entities through which

Strulovitch diverted funds belonging to Plaintiffs.  As such, the Second, Fourth, and Eighth

Causes of Action are not arbitrable, and dismissal must be denied.  *See Nantucket Indus. v.*

*Varon*, No. 97-7467, 1997 U.S. App. LEXIS 33142, *6-8 (2d Cir. Nov. 19, 1997).

6.     The Arbitration Clauses in the Sham Operating Agreements Are Unenforceable
       <u>Because They Are an Integral Part of Defendants' Scheme to Defraud</u>

Where, as here, the arbitration clauses were part and parcel of defrauding Plaintiffs, they

are unenforceable.  As Chief Justice Warren of the Supreme Court of the United States wrote:

> [F]raud in the procurement of an arbitration contract, like fraud in the
> procurement of any contract, makes it void and unenforceable and . . . this
> question of fraud is a judicial one, which must be determined by a court.  To
> allow this question to be decided by arbitrators would be to that extent to enforce
> the arbitration agreement even though steeped in the grossest kind of fraud.

*Moseley v. Electronic & Missile Facilities*, 374 U.S. 167, 172 (1963) (Warren, C.J., concurring).

While the fraudulent inducement of an agreement containing an arbitration clause is arbitrable, if

the circumstances demonstrate that the arbitration clauses themselves were inserted for a

fraudulent purpose, the issue of fraud is an issue for the Court to determine, not for an arbitrator.

*See Housekeeper v. Lourie*, 39 A.D.2d 280, 284-86 (1st Dep't 1972) (Where the arbitration is

induced for a fraudulent purpose, there is no agreement to arbitrate notwithstanding a written

document containing an arbitration clause).

In *Hullum v. Sherbondy*, the Ninth Circuit refused to enforce an arbitration clause as procured by fraud in similar circumstances to those present here. *See Hullum v. Sherbondy*, No. 90-55826, 1991 U.S. App. LEXIS 7826, at *4 (9th Cir. 1991). There, the defendant, who was the plaintiffs' investment manager, masterminded a fraudulent scheme of soliciting money from the plaintiffs for the express purpose of investing their funds when, in fact, he had no intentions of doing so. *Id.* As part of the scheme, the defendant drafted and convinced the plaintiffs to execute a management agreement with many terms, including an arbitration clause. *Id.* The Court held that the plaintiffs' claims were not arbitrable. *Id.* Instead, the Court held that the arbitration clause was unenforceable because the clause itself was a product of fraud "designed to prevent investors from inquiring into the [defendants'] fraudulent scheme." *Id.*

Again, here the Prospectuses govern. That was what Strulovitch used to get money. Only after the fraud was perpetrated and the money given over, did Strulovitch attempt to get operating agreements signed.

Defendants are attempting to do exactly what the defendants did in *Hullum* in fraudulently inserting an arbitration clause into an operating agreement. According to the allegations in the Amended Complaint, at the time that these alleged Operating Agreement were made effective, Defendants knew they had engaged in and were continuing to engage in a scheme to defraud Plaintiffs, but the Plaintiffs had not agreed to arbitrate any disputes. *See generally* SAC. As part of this scheme, just as in *Hullum*, Defendants circulated complicated Sham Operating Agreements to unsophisticated investors, many of whom do not even speak English containing terms "designed to prevent investors from inquiring into the [defendants'] fraudulent scheme." *Hullum*, 1991 U.S. App. LEXIS 7826 at *4. The arbitration clause is a perfect example of a clause inserted for a fraudulent purpose, because it is designed to avoid

discovery and instead have his rabbi, with no background in New York or securities law, address a massive securities fraud scheme and other common law claims.

The Second Amended Complaint detail myriad issues of nondisclosure of financial facts and facts that will only be uncovered once Defendants cannot hide beyond their attempt to compel Plaintiffs to arbitration. Indeed, since 2016, Defendants have frustrated every effort by Plaintiffs to obtain transparency with respect to the financial records for these Investment Entities.

The arbitration clauses in the Sham Operating Agreements attempts to compel already-defrauded Plaintiffs into arbitration of their disputes by Strulovitch's rabbi, an arbitrator that they will have no power to choose. Rabbinical Court is a venue that does not afford litigants the full scope of discovery permissible under the Federal Rules of Civil Procedure, and will almost certainly not provide the right to discovery at all. Not surprisingly, unlike certain of the Schedule B Defendants who were dismissed from this case without prejudice, Strulovitch has refused – under any circumstances – to permit any discovery of his books and records, and instead is pressing to misuse these arbitration clauses as a way to deny discovery. Thus, any such provisions were designed to further the scheme to defraud by denying these Plaintiffs access to the information to which they are entitled, and he continues to delay justice so that he may spoliate evidence, allowing him to continue to hurt the victims in this Madoff-style fraud. Accordingly, this is a separate and independent reason to deny the Dismissal Motion.

## II.    THE DEFENDANTS' MOTIONS TO VACATE THE
## NOTICES OF PENDENCY SHOULD BE DENIED

CPLR 6501 provides that "[a] notice of pendency may be filed in any action in a court of the state or of the United States in which the judgment demanded would affect the title to, or the possession, use or enjoyment of, real property." *Id.* So long as the complaint pleads a claim

where the judgment demanded would "affect the title to or the possession, use or enjoyment of real property" a notice of pendency filed in connection therewith cannot be cancelled *regardless of how credible the court perceives the allegations and regardless of whether the plaintiff has a likelihood of success on the merits*. *See 551 Chelsea Partners LLC v. 556 Holding LLC*, 40 A.D.3d 546, 548 (1st Dep't 2007); *Robert Fiance Hair Design Inst. v. Concourse Props. Co.*, 130 A.D.2d 564, 564 (2d Dep't 1987).  The Court's ability to review a notice of pendency has been strictly <u>circumscribed</u> to analyzing the pleadings for the above purpose, and in doing so, providing the Plaintiffs with every favorable inference stemming from their allegations to determine if, on its face, the Complaint pleads a claim that affects title to or the possession, use, or enjoyment of real property.  *See generally, Nastasi v. Nastasi*, 26 A.D.3d 32, 36 (2d Dep't 2005); *551 Chelsea Partners LLC*, 40 A.D.2d at 548.

Here, Plaintiffs have filed NOPs as against two distinct groups of properties: (1) the Secret Properties and (2) four of the 22 Investment Properties, which are located at 1078 Dekalb Avenue, 657-665 Fifth Avenue, 618 Lafayette Avenue, and 853 Lexington Avenue.  Plaintiffs have filed notices of pendency ("Notices of Pendency" or "NOPs") against all 20 of the Schedule B Properties based upon the Fourth Cause of Action for a constructive trust, which seeks to **<u>reconvey and vest title to the Schedule B Properties</u>** from the present owners, which are the Secret LLC Defendants, to the names of the LLC Plaintiffs, whose funds were fraudulently diverted from the LLC Plaintiffs by Defendants in order to acquire and develop the Schedule B Properties.  Separately, the Notices of Pendency on the four Investment Properties mentioned above are based upon the Second Cause of Action, which seeks to cancel the equitable title conveyed by Strulovitch to certain contract vendees, named herein as John Does, who have acquired equitable title to these four Investment Properties through real estate contracts that

Strulovitch entered into without the consent or authority of Plaintiffs and for the purposes of furthering his own fraudulent scheme.  SAC ¶¶ 114-24.  For the reasons set forth below, the NOPs are valid and cannot be cancelled.

In both the Amended Complaint and the Second Amended Complaint, Plaintiffs allege that the Schedule B Properties were purchased and renovated using funds fraudulently diverted by Strulovitch and Oberlander from the LLC Plaintiffs with title placed in the name of limited liability companies and limited partnerships in which the LLC Plaintiffs and their members had no ownership interest.  *See* Am. Comp. ¶ 7, 60; SAC ¶¶ 9, 90.  The Fourth Cause of Action seeks a constructive trust over the properties themselves and a reconveyance of title to those Secret Properties so that the appropriate LLC Plaintiffs will have title to each Secret Property that was purchased with its funds.  SAC ¶¶ 136-45.

Controlling case law has sustained notices of pendency filed by a plaintiff under exactly the same facts as those alleged here.  In *Keen v. Keen*, 140 A.D.2d 311, 312 (2d Dep't 1988), the Second Department denied a motion to cancel a notice of pendency where the complaint sought "to impose a constructive trust on real property allegedly purchased with funds fraudulently removed from [a corporation] . . . and requests a reconveyance of real property to that corporation."  *Id.*  There, the Second Department held that the complaint "clearly demands a judgment which would affect the title to, or the possession, use or enjoyment of real property. Therefore it justifies the filing of a lis pendens by the plaintiff."  *Id.* (internal citations omitted); *accord Ehlinger v. Ruberti, Girvin & Ferlazzo, P.C.*, 304 A.D.2d 925, 926 (3d Dep't 2003); *Peterson v. Kelly*, 173 A.D.2d 688, 689 (2d Dep't 1991) (holding that plaintiffs properly filed a *lis pendens* and stated a claim for a constructive trust where their funds had been used to make mortgage payments on a property one member of partnership acquired in his individual name).

The Fourth Cause of Action, which seeks a constructive trust over the Schedule B properties, is directly identical to the facts in *Keen* and demands a judgment affecting title to real property. Am Compl. ¶¶ 127-31, SAC ¶¶ 136-45. Specifically, the Amended Complaint and Second Amended Complaint allege that between 2012 and 2015, using fraudulent prospectuses, Defendant Strulovitch and his business associate, Oberlander, coaxed Plaintiffs into investing over $20,000,000 to purchase, develop and manage more than 20 investment properties primarily located in Brooklyn, New York (the "Investment Properties"). Am. Compl. ¶¶ 38-58, 62; SAC ¶¶ 48, 71, 83. Strulovitch and Oberlander systematically overinflated the amounts that would be paid for the subject properties, and failed to disclose that they already owned at least one of the properties, 855 Dekalb Avenue. *See, e.g.*, Am. Compl. ¶¶ 42-43, 51-53; SAC ¶¶ 52-53, 61-63. In addition, Strulovitch and Oberlander overstated construction costs and created artificial deadlines to bilk Plaintiffs out of even more money. Am. Compl. ¶ 66; SAC ¶ 87. The Individual Defendants then fraudulently diverted the funds obtained from the LLC Plaintiffs to purchase the Secret Properties listed on Schedule B. Am. Compl. ¶¶ 61, 68-70; SAC ¶¶ 82, 89-92. They hid this scheme from Plaintiffs and left the Investment Properties undeveloped and dilapidated while the mortgages on the Investment Properties continued to accrue millions of dollars in interest, and, in some cases, enter into default and fall into foreclosure. Am. Compl. ¶ 87; SAC ¶114. Critically, the Amended Complaint and the Second Amended Complaint demand a judgment that a constructive trust be imposed vesting title to these Secret Properties in the LLC Plaintiffs. Inasmuch as the judgment demanded in the Fourth Cause of Action for a Constructive Trust affects title to real property, *i.e.*, it seeks a reconveyance of title to those Secret Properties to the LLC Plaintiffs, there is no merit to the contention that the NOPs on the Secret Properties should be cancelled.

Likewise, the NOPs on 4 of the 22 Investment Properties identified in Schedule A are proper, as they affect real property.  The Amended Complaint and Second Amended Complaint allege that Strulovitch and Oberlander secretly entered into unauthorized contracts to sell those properties out from under the Plaintiffs in order to further their fraudulent Ponzi scheme (the "Unauthorized Contracts").  Am. Compl. at ¶¶ 71, 91-94; SAC ¶¶ 118-21.  If closed upon, the Unauthorized Contracts would completely divest Plaintiffs of all value of their investments in these four Investment Properties.

As a matter of law, these Unauthorized Contracts confer equitable title to these four properties to the contract vendees, which must be cleared through an action to quiet title to these Investment Properties under Article 15 of the New York Real Property and Proceedings Law ("RPAPL").  *See Cohen v. McMunn*, No. 105941/2007, 2008 N.Y. Misc. LEXIS 10101, *10 (Sup. Ct. N.Y. County Aug. 1, 2008) (citing *Karp v. Twenty Three Ryer Corp.*, 185 Misc. 440 (Sup. Ct. Bronx County 1945)).

The Second Cause of Action in the Complaint seeks a judgment setting aside these real estate contracts and to quiet title to these four properties pursuant to RPAPL Article 15 so that title is vested solely in the Holding Company Defendants who should be the sole rightful owners of these parcels of Real Property.  Am. Cmpl. ¶¶ 110-19; SAC ¶¶137-46.  Inasmuch as the Complaint seeks a judgment to "quiet title" to real property, it is plainly one that "affects title" to real property, and Plaintiffs' NOPs on these four Investment Properties are thus valid and cannot be cancelled.  Accordingly, there is no merit to the contention that the NOPs on these four Investment Properties should be cancelled.[9]

---

[9] Strulovitch can cancel the contracts of sale, at which point the Plaintiffs may elect to remove their lis pendens.

In an attempt to sidestep binding case law such as *Keen*,[10] Defendants mischaracterize the Amended Complaint and contend that in the Second Cause of Action, Plaintiffs are "claiming an interest" in a limited liability company rather than pleading a cause of action that affect title to real property. Def. Mem. At p. 29. Then, Defendants cite to completely inapposite case law, such as *Ostad v. Nehmadi*, 31 Misc.3d 1211(A) (Sup. Ct. N.Y. County 2011) and *Felske v. Bernstein*, 173 A.D.2d 677 (2d Dep't 1991) for the proposition that Plaintiffs cannot file a notice of pendency when they are "claiming an interest" in shares of a limited liability company rather than pleading a claim that affects title to real property. Def. Mem. at pp. 29-30.

The fatal flaw in Defendants' argument is that Plaintiffs are not "claiming an interest in an LLC." Plaintiffs already own an interest in an LLC. Instead, Plaintiffs are claiming that the LLC that they already own has the right to obtain judgments (i) affecting title to the Secret Properties and (ii) affecting title to the four Investment Properties whose ownership is currently clouded by the Unauthorized Contracts.

By contrast, the two cases that Defendants rely upon to cancel the notices of pendency involved a plaintiff that was seeking to be included as a partner in a limited liability company or in a joint venture that owned real property. As such, the plaintiffs' claims did not affect title to real property and the notice of pendency had to be cancelled. In *Ostad v. Nehmadi*, 31 Misc. 3d 1211(A) (Sup. Ct. N.Y. County 2011), the plaintiff was seeking to enforce an agreement that afforded him a 10% interest in a partnership that owned 100% of a parcel of real property.[11] *See id.* Inasmuch as title to interests in a partnership are personal property and the lawsuit did not

---

[10] Indeed, Defendants do not even attempt to address *Keen* in their moving briefs despite the fact that Plaintiffs highlighted its applicability in their pre-motion letter to the Court, dated May 22, 2017.

[11] Because the cases the Strulovitch cites in footnote 4 of his moving brief all rely on a similar distinction, *i.e.*, that the dispute concerns interests in a partnership or limited liability company rather than in title to a parcel of real property itself, they are inapplicable. Def. Mem. at pp. 30-31.

plead that plaintiff was entitled to any direct interest in the property, the Court held that the lawsuit did not demand a judgment affecting title to real property and cancelled the notices of pendency. *See id.* Equally inapposite is *Felske v. Bernstein*, 173 A.D.2d 677 (2d Dep't 1991). There, the plaintiff sought specific performance of an agreement to make him part of a joint venture to develop a condominium project. *See id.* at 677. Just as in *Ostad*, the plaintiff was seeking an interest in personal property, *i.e.*, an interest in a joint venture. The plaintiff was not seeking an interest in real property. As is evident, the judgment that Plaintiffs seek here does directly affect title to real property, and Plaintiffs are not "claiming" that they are entitled to an interest in a limited liability company. Accordingly, neither of these cases bar Plaintiffs from filing Notices of Pendency in connection with the Second or Fourth Causes of Action in the Second Amended Complaint.

Nor is there any reason to require Plaintiffs to post an undertaking. The posting of an undertaking is within the Court's sound discretion. *See* CPLR 6515; *Jacobs v. Abramoff*, 148 A.D.2d 497, 499 (2d Dep't 1989). The purpose of an undertaking is to ensure that a party may be compensated for any losses sustained by reason of the notice of pendency. *See* CPLR 6515(1). Here, an undertaking is inappropriate because it presumes that the Individual Defendants, whom Plaintiffs caught engaging in self-dealing by trying to sell the Investment Properties, had the authority to sell the properties. Independently, an undertaking is inappropriate because there are already notices of pendency that have been filed (or will shortly be filed) by the banks on the four Investment Properties that have defaulted on their mortgages. As previously established, however, they lacked such authority. Nor should the court require an undertaking for the Schedule B Properties, as those properties were acquired using Plaintiffs' funds.

III.   **DEFENDANTS' MOTION TO DISMISS THE
FIRST CAUSE OF ACTION FOR SECURITIES FRAUD MUST BE DENIED**

Equally meritless is Defendants' claim that the First Cause of Action for Securities Fraud should be dismissed.[12]   It is undisputed that pleading a private right of action for violation of Section 10(b)(5) in the Securities Exchange Act of 1934 ("the 34 Act") requires only that a plaintiff plead 5 elements.   A plaintiff must allege that "Defendants (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiffs reliance was the proximate cause of its injury."   *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (CM) (THK), 2013 U.S. Dist. LEXIS 44948, at *24 (S.D.N.Y. Mar. 25, 2013).

Defendants' Motion does not dispute that on its face, the Amended Complaint amply pleaded all 5 of these requisite elements.    Instead, Defendants make 3 arguments in support of their Dismissal motion in connection with the First Cause of Action for Securities Fraud.   They are:

1)   Plaintiffs have engaged in improper "group pleading" by collectively defining them as the Individual Defendants instead of pleading that "Oberlander was Strulovitch's partner or agent" (Def. Mem. at p. 19);

2)   Despite Plaintiffs' detailed allegations of the Individual Defendants' fraudulent scheme to defraud by knowingly transmitting prospectuses containing false information, the Securities Fraud claim somehow fails because some of the representations that the Individual Defendants made in the Fraudulent Prospectuses were actually true (Def. Mem. at p. 19); and

3)   That general disclaimers contained in Sham Operating Agreements, which Strulovitch signed on behalf of all parties that preclude the Individual Plaintiffs from pleading justifiable reliance on the representations contained in the Fraudulent Prospectuses.

As demonstrated below each of these 3 arguments fail.

---

[12] To the extent that Defendants seek dismissal of the Third Cause of Action for fraud, that request fails for the reasons set forth herein.

1.    "Group Pleading" of Two People Who Committed the Fraud Can Be Referred
      <u>to Collectively But, for the Sake of Judicial Resources, this Alleged "Defect" Is Cured</u>

Defendants' claim that the "Group Pleading" doctrine bars the Securities Fraud claim

fails on its face.  To fulfill the particularity requirement of Fed. R. Civ. P. 9(b) and the Private

Securities Litigation Reform Act, 15 U.S.C.S. § 78u-4(b)(1)(A), a plaintiff need not enumerate a

specific misleading statement by each individual defendant.  *See In re High Crush Partners, L.P.*

*Sec. Litig.*, No. 12 Civ. 8557 (CM), 2013 U.S. Dist. LEXIS 171110, *56-57 (S.D.N.Y Dec. 2,

2013).  "Group pleading" is only a defect when it renders the Complaint so unclear as to conduct

alleged against the defendant that it impedes his or her ability to defend the case.  The Group

Pleading doctrine does not apply where two people are alleged to have perpetrated a fraud

together.  *Id*.  The group pleading doctrine further permits a presumption that statements in

prospectuses, registration statements, annual reports, press releases, or other group-published

information are the collective work of those individuals with direct involvement in the everyday

business of the company.  *Id.*

Here, the Amended Complaint and the Second Amended Complaint allege in painstaking

detail, a massive and elaborate fraudulent scheme by Defendant Strulovitch and his business

associate Defendant Oberlander that induced Plaintiffs into investing over $20,000,000 to

purchase, develop and manage more than 22 Investment Properties.  *See generally* Amended

Complaint and SAC.  To accomplish this fraudulent scheme, the Complaint alleges that

Strulovitch and Oberlander presented to Plaintiffs, on dates specifically set forth in the

Complaint, numerous fraudulent prospectuses that: (i) knowingly and grossly inflated the prices

that Strulovitch and Oberlander would pay for the Investment Properties; (ii) knowingly made

misrepresentations as to the condition and potential to renovate the Investment Properties; (iii)

grossly inflated construction costs; (iii) manufactured bogus construction deadlines;

(iv) knowingly misrepresented that Strulovitch and Oberlander planned to return Plaintiffs' investments on dates certain; (v) knowingly misrepresented that Strulovitch and Oberlander planned to include Plaintiffs in profits from rent.  Amended Complaint ¶¶ 34-67; SAC ¶¶ 43-88. The allegation that Strulovitch and Oberlander both made the misrepresentations and perpetrated the fraud do not implicate the Group Pleading Doctrine and for this reason alone, Defendants' claim fails on its face.

Naturally, Defendants cite no cases that were dismissed for "group pleading" when the group is all of two people, both of whom are alleged to have prepared the documents that contained the fraudulent statements.   Here, there is no ambiguity as to fraudulent conduct being attributed to each of the Individual Defendants and thus, there is no "group pleading" defect. Moreover, the intimate involvement of Strulovitch, alone, is sufficient to implicate him in the fraud contained in the Fraudulent Prospectuses.  But even more directly, the Complaint also alleges that Individual Defendants jointly prepared and transmitted to Plaintiffs the fraudulent prospectus to the Individual Plaintiffs, which implicates both of them even more directly than would ordinarily be necessary to plead the securities fraud with particularity. Amended Complaint ¶ 34; SAC ¶ 43.

Finally, even though there is no group pleading defect in the Amended Complaint, Defendants have cured the alleged defect in its proposed Second Amended Complaint. To alleviate the Court's burden of addressing this issue, Plaintiffs have added the allegation that Defendants Oberlander and Strulovitch were business partners who worked in concert to further the fraudulent scheme, which is exactly what Strulovitch claims was absent from the Complaint. *See generally*, SAC.  Thus, even if there was a defect, it has been cured.

2.    Defendants' Contention that Because "Some" of His Alleged
      Representations Were True He Cannot Be Liable For Fraud Is Spurious

Equally without merit is Defendants' next contention that the First Cause of Action for Securities Fraud should be dismissed because <u>some</u> of his representations related to certain investment properties are true and thus not actionable.  Def. Mem. at pp. 19-20.  The fact that some of the representations contained in the Fraudulent Prospectuses were true does not vitiate the claim with respect to the numerous misrepresentations that are undisputedly alleged to be false.  *See City of Providence*, 2013 U.S. Dist. LEXIS 44948 at *27 ("Section 10(b) requires a plaintiff claiming securities fraud to allege, *inter alia*, **a material misstatement** or omission in a public disclosure") (emphasis added).   Accordingly, this argument is inherently flawed and should be rejected on that basis.

Moreover, in support of this spurious argument Defendants point to the allegation in the Amended Complaint stating that Defendants renovated some of the Investment Properties as they represented they would.  But this does not vitiate the fraud claim, as the modest return provided for some of the early investments were an integral part of how Individual Defendants furthered their fraudulent scheme.  Def. Mem. at pp. 19-20.  As alleged in the Amended Complaint and the Second Amended Complaint, for few the properties at issue (908 Bergen Street, 1213 Jefferson Avenue, 618 Lafayette Avenue, and 325 Franklin Avenue), Defendants performed minimal construction and provided minimal return in order to create a false sense of security and induce larger and later investments, which is the hallmark of a Ponzi scheme.  Amended Complaint ¶ 66; SAC ¶ 87.  Such conduct, designed to induce further reliance, does not disprove the Plaintiffs' claims; it is further evidence of Plaintiffs' fraudulent scheme.  *See, e.g.*, *United States v. Angelilli*, 660 F.2d 23, 37 (2d Cir. 1981)  (holding that remitting some, but not all of funds

received lulled investors and allowed the fraudulent scheme to continue).  Accordingly, Plaintiffs cannot dismiss the Securities Fraud claim on these grounds.

3.      The General Disclaimers that the Individual Defendants Unilaterally Imposed in the Sham Operating Agreements Do Not Inoculate Their Fraudulent Misrepresentations

Finally, the alleged disclaimers contained in the Sham Operating Agreements annexed to the Motion do not bar Plaintiffs' claims for fraud.  This is true for three reasons.  First, the disclaimers are not referenced or relied upon anywhere in the Amended Complaint or the Second Amended Complaint and cannot be used in support of a Rule 12(b) motion.  Second, even if Defendants could rely on material outside of the pleadings, they cannot avoid a securities fraud claim simply by slipping disclaimers into *post hoc* agreements, not signed by all investors, and circulated for signature after the fraud and at a time when they possessed superior knowledge of the fraud.  Finally, even if these disclaimers were not legally barred, the misrepresentations purportedly disclaimed do not cover misrepresentations made by Strulovitch and Oberlander nor do they disclaim the specific misrepresentations alleged in the Second Amended Complaint.

i.   Defendants Cannot Use the Sham Operating Agreements on a Rule 12(b)(6) Motion

The first fatal flaw in Defendants' attempt to misuse the Sham Operating Agreements to bar the fraud claims is that doing so violates the Second Circuit's restriction on using documents not relied on in drafting the pleadings in a pre-discovery motion brought under Rule 12(b).  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  Specifically, consideration of extraneous material in judging the sufficiency of a complaint is at odds with the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), which requires only that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); *see also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 (2d ed. 1990 & Supp. 2001) (stating that the conversion requirement

of Rule 12(b) was designed to resolve the conflict among those federal courts that favored consideration of extra-pleading material and those that believed the procedure was designed only to test the sufficiency of the pleading); Fed. R. Civ. P. 12 Advisory Committee Notes, 1946 Amendment (reflecting same).

When a district court considers certain extra-pleading materials and excludes others, it risks depriving the parties of a fair adjudication of the claims by examining an incomplete record. In contrast, on summary judgment the court is required to consider all relevant, admissible evidence submitted by the parties and contained in "pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits . . . ." Fed. R. Civ. P. 56(c). "[Plaintiff's] reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis in original).

Once the District Court is presented with matters outside the pleadings, Rule 12(b) affords two options: (1) the court can exclude the extrinsic documents, but if it does not, then (2) it is obligated to convert the motion to one for summary judgment and **give the parties an opportunity to conduct appropriate discovery** and submit the additional supporting material contemplated by Rule 56. *Chambers*, 282 F.3d at 154-55; *see also Carter v. Stanton*, 405 U.S. 669, 671 (1972) (per curiam); *Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000); *Morelli v. Cedel*, 141 F.3d 39, 45-46 (2d Cir. 1998). This conversion requirement is "strictly enforced" whenever a district court considers extra-pleading material in ruling on a

motion to dismiss. *Friedl*, 210 F.3d at 83 (quoting *Amaker v. Weiner*, 179 F.3d 48, 50 (2d Cir. 1999)).[13]

Here, as discussed above in Section I, neither the Amended Complaint nor the Second Amended Complaint rely upon any of the Sham Operating Operating Agreements.  The only documents relied upon in any of the pleadings are the Fraudulent Prospectuses.  Moreover, it is undisputed that these Sham Operating Agreements were never fully executed by any investors. The question of whether these Sham Operating Agreements were ever in effect is at best, an issue of fact that, like so many of the other issues raised in the Dismissal Motion, mandates discovery.  Indeed, as the Second Circuit noted in *Chambers*, unsigned agreements are precisely the kind of documents that courts should exclude from consideration on a motion to dismiss under Rule 12(b).  *Chambers*, 282 F.3d at n.5 (citing *Murphy v. Cadillac Rubber & Plastics, Inc.*, 946 F. Supp. 1108, 1115 (W.D.N.Y. 1996)) (stating that unsigned letter agreement attached to complaint could not be considered on motion to dismiss because it "does not evidence an agreement between the parties").  Accordingly, the Court must exclude these documents from consideration when evaluating Defendants' motion to dismiss under Rule 12(b)(6).

ii.  Legally, the So-Called Disclaimers in the Sham
     Operating Agreements Cannot Bar a Securities Fraud Claim of This Magnitude

Even if Defendants could use the Sham Operating Agreements in a 12(b)(6) motion, they could not rely on them to disclaim the allegations of fraud because it would simply allow them to profit from their own wrongdoing by relying on the Sham Operating Agreements to block Plaintiffs' claims.  As demonstrated above in Section I, these Sham Operating Agreements were

---

[13] If the Court decides to convert the Dismissal Motions to motions for summary judgment, Plaintiffs respectfully reserve their right to submit a motion under Rule 56(f) for additional discovery needed to effectively oppose the Dismissal Motion on the merits.  *See Groden v. Random House, Inc.*, 61 F.3d 1045, 1052-53 (2d Cir. 1995) ("[a] district court may not convert a motion under Fed. R. Civ. P. 12(b)(6) into a Rule 56 motion for summary judgment without sufficient notice to an opposing party and an opportunity for that party to respond.").

undisputedly not signed by all of the investors and Strulovitch's conduct over the last four years confirms they are not in effect.  In the context of a 10(b) claim, the Court should be particularly cautious of disclaimers, and reject dismissal motions relying on such disclaimers that would "allow crafty wrongdoers to avoid liability by slipping all-purpose disclaimers into material provided to investors."  *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 411 (S.D.N.Y. 2010).   This is particularly so here, where the Plaintiffs are overseas investors who were unfamiliar with the New York real estate market, were unrepresented by counsel, and do not speak English as their first language.  SAC ¶ 39. That is exactly what Defendants are attempting to do here.

As alleged in the Second Amended Complaint, the Investors relied totally on the misrepresentations in the Fraudulent Prospectuses, which did not contain any disclaimers and which was circulated well before any operating agreements were allegedly drafted, much less before Defendants allege them to have been in effect.  SAC ¶¶ 42, 45, 83.  By the time Defendants attempted to unilaterally impose these Sham Operating Agreements, the Individual Plaintiffs had already made their investment and thus any disclaimer contained therein cannot conceivably prevented their prior reliance.  By that time, Individual Defendants had already received their money.  This is the prototypical case where the Individual Defendants are attempting to sidestep fraud by retroactively insulating themselves from liability by unilaterally imposing disclaimers in the Sham Operating Agreements while intentionally concealing facts from Plaintiffs. Thus, these alleged disclaimers cannot conceivably be construed as binding on the Individual Plaintiffs, much less sufficient to make the fraud claims implausible as matter of law.

iii.  <u>The Disclaimers Do Not Apply to the Misrepresentations Pleaded in this Lawsuit</u>

*Page 43*

Regardless of whether the disclaimers are legally enforceable, which they are not, they do not disclaim the allegations of fraud in this case.  It is well settled that for a contractual provision to bar a party from relying on a prior fraudulent misrepresentation, it must track and specifically address the misrepresentation alleged so as to make plaintiffs' reliance thereon implausible.  *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 330 (2d Cir. 2002) ("A disclaimer is generally enforceable only if it tracks the substance of the alleged misrepresentation.") (internal quotations omitted); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 186, n.19 (2d Cir. 2015) ("Yet the . . . disclaimers are so general that we cannot be confident they bear on the misrepresentations alleged in the complaint, much less that they render Plaintiffs' fraud claim implausible."); *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 497 (S.D.N.Y. 2001) (The contract must "must contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim.") (quoting and citing *Mfgs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993)).  Further, "the question of what constitutes reasonable reliance is not generally a question to be resolved as a matter of law on a motion to dismiss." *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 25 N.Y. 3d 1043, 1045 (2015).

Here, there are no disclaimers that render Plaintiffs' reliance thereon implausible.  First, on their face, none of the disclaimers apply to misrepresentations made by the Individual Defendants.  Instead, they only address potential representations by CRSE.  *See* Def. Mem. at p. 21 ("CSRE has not made and does not make any representations . . . CRSE is not bound in any manner by expressed or implied warrantees . . .); *see also* Strulovitch Decl. Exs. 1-19 at p. 1.  Accordingly, these disclaimers are inapplicable on their face with respect to any misrepresentations by the Individual Defendants.

Further, the primary misrepresentations alleged in the Amended Complaint and Second

Amended Complaint are the Individuals Defendants' repeated misrepresentations as to the purchase price of the Investment Properties, and the misrepresentation that Plaintiffs' investments would be used toward purchasing those specific properties.  *See generally*, SAC. None of the so-called disclaimers address these types of misrepresentations, nor would any Plaintiff agree to such a provision.  At best, the disclaimers address ordinary course business concerns such as future taxes, mortgages, and zoning issues.  *See* Strulovitch Decl. Exs. 1-19 at ¶ 13(c).  One provision highlighted by Defendants purports to disclaim "representations as to the . . . value of the land or buildings thereon," but that too is inapplicable because it does not address the purchase price, or how Plaintiffs' funds would be used.  Def. Mem. at pp. 21-22.

Finally, the cases that Defendants cite are easily distinguishable.  *One Comm'ns. Corp. v. JP Morgan SBIC LLC*, 381 Fed. App'x 75 (2d Cir. 2010), involved sophisticated parties who negotiated specific disclaimers through counsel.  Here, unrepresented foreign citizens targeted the Individual Plaintiffs, who primarily speak Hebrew, have no background in New York real estate market or law, and did not even agree to the provisions sought to be enforced against them.  *Wells Fargo Bank Northwest N.A. v. Taca Int'l Airlines*, 247 F. Supp. 2d 352 (S.D.N.Y. 2002) involved a run of the mill disclaimer.  The Court held that "maintenance costs" were covered by disclaimers relating to the "condition, durability, and operation or fitness for use" of leased aircraft.  *Id.*  Based on the foregoing, Individual Defendants' contention that disclaimers in the alleged Operating Agreements bar Plaintiffs' claim under the 34 Act must be rejected.

## IV.   THE MOTION TO DISMISS THE SECOND CAUSE OF ACTION FOR CANCELLATION OF THE UNAUTHORIZED REAL ESTATE CONTRACTS MUST BE DENIED

The Second Cause of Action in the Second Amended Complaint seeks to cancel the Unauthorized Real Estate Contracts because they were entered into in violation of New York

General Obligations Law 5-703 because the Individual Defendants' attempts to sell these unrenovated Properties are solely for the purposes of furthering the Individual Defendants' scheme to defraud. Now that the Individual Defendants have fraudulently diverted millions of dollars of mortgage proceeds for themselves and there are no more investors to defraud in order to further their Ponzi Scheme, they are trying to sell off Investment Properties to sidestep the mortgage defaults and the foreclosure actions that have arisen and which will imminently result in personal liability to Strulovitch.

These allegations plead a valid claim to cancel these Unauthorized Contracts because General Obligations 5-703 law does not recognize the validity of any contract for the sale of real property that is not signed by the lawful agent of the seller. Agents, like partners, owe their principals a fiduciary duty not to engage in self-dealing. *Cohen v. Treuhold Capital Grp., LLC (In re Cohen)*, 422 B.R. 350, 368 (E.D.N.Y. 2010). Under New York law, "agency is defined as "a fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *In re Nigeria Charter Flights Contract Litig*., 520 F. Supp. 2d 447, 460 (E.D.N.Y. 2007) (quoting *L. Smirlock Realty Corp. v. Title Guar. Co*., 70 A.D.2d 455, 421 N.Y.S.2d 232, 238 (App. Div. 1979)). An agent is a fiduciary with respect to the matters within the scope of the agency; the agent is thereby bound to exercise the utmost good faith, loyalty, and honesty toward its principal. *Evvtex Co., Inc. v. Hartley Cooper Assocs. Ltd*., 102 F.3d 1327, 1331-32 (2d Cir. 1996); *Sokoloff v. Harriman Estates Devel. Corp*., 96 N.Y.2d 409, 754 N.E.2d 184, 188-89, 729 N.Y.S.2d 425 (2001); *see also Sim v. Edenborn*, 242 U.S. 131 (1916).

Defendants contend that Strulovitch is lawful agent fully entitled to sell any Investment Property he wants because he is allegedly the "managing member" of the Holding Company

*Page 46*

Defendants.  As a matter of law, when an agent engages in any transaction whereby he abuses his agency relationship to engage in self-dealing, the transaction must be reversed because it was not beyond the scope of what his principals authorized him to do as an agent.  *Cohen v. Treuhold Capital Grp., LLC (In re Cohen)*, 422 B.R. 350, 368 (E.D.N.Y. 2010).  *Cohen* was decided on similar facts as this case.  There, the fraudster was appointed as an authorized agent of a corporation, Truehold, with respect to transferring certain parcels of real property for their benefit.  Cohen then misused his authority to transfer certain properties belonging to Truehold for his own benefit and the benefit of third parties with whom he was associated and to the detriment of Truehold.  In reversing the sale of these parcels of real property, District Judge Bianco held as follows:

> When [Cohen] engaged in the transfer of the Properties, [he] was not acting for the benefit of [Treuhold] but for himself and Metropolitan. [Cohen] cannot wrongfully transfer the Properties for his own benefit or the benefit of a third party by cloaking these transfers with actual authorization [Treuhold] gave him with respect to the transfer of other properties.  Whether as a joint adventurer or an agent, Cohen and Metropolitan owed [Treuhold] a fiduciary duty not to engage in self-dealing. Because Cohen's sales of the Brookhaven and Coursen Properties were effectuated for his own benefit--not for Treuhold's benefit--the transfers must be set aside, and Cohen must account for the profits from such unauthorized transfers.

*Cohen v. Treuhold Capital Grp. (In re Cohen)*, 422 B.R. at 368.

 But as in *Cohen*, Strulovitch cannot cloak his attempts to sell property with actual authorization when the sale is being consummated to further his fraudulent scheme.  Strulovitch's unlawful diversion of millions of dollars in mortgage funds and Investors' capital instead of using those funds as intended, which was to renovate the Investment Properties, is the reason that he is presently in default on mortgages and has placed these Investment Properties underwater and severely deteriorating in value.  The true purpose behind these contemplated sales is solely to benefit himself and Oberlander, and is not for benefit the Investors who

originally gave him the authority to sell the Investment Properties.  Liquidating these Investment

Properties now, rather than renovating them as was originally intended, will result in a total loss

to the Investors and allow Strulovitch and Oberlander to reap the benefits of their Ponzi Scheme.

Accordingly the Unauthorized Contracts must be set aside, and the motion to dismiss the Second

Cause of Action to cancel the Unauthorized Contracts fails.

## V.     PLAINTIFFS   HAVE   PROPERLY   STATED   CLAIMS   FOR   UNJUST ENRICHMENT AND A CONSTRUCTIVE TRUST

Defendants seek to dismiss the claims for unjust enrichment (Count 7) and constructive

trusts (Counts 4 and 9) on two baseless grounds.  Def. Mem. at p. 26.  First, Defendants claim

that the Sham Operating Agreements are binding contracts between the LLC Plaintiffs and the

Holding Company Defendants, thus precluding claims for unjust enrichment and constructive

trusts.  Second, Defendants claim that, with respect to constructive trust, these claims are not

adequately pleaded.  Both arguments fail as a matter of law.

1.     The Complaint Does Not Plead the Existence of Any Contracts and Defendants Are Not Permitted to Rely Upon the Sham Operating Agreements to Bar Equitable Claims

Once again, Plaintiffs cannot misuse the Sham Operating Agreements to bar Plaintiffs

from pleading claims in this lawsuit.  As detailed *supra* in Point III, the Court is not permitted to

consider extrinsic evidence, and in particular, unsigned contracts, in deciding a motion to dismiss

under Rule 12(b)(6) unless the claims in the complaint directly rely on them.  None of the

pleadings filed by Plaintiffs in this case has relied upon the Sham Operating Agreements for the

obvious reason that they are not effective for the numerous reasons that are fully set forth in

Point I, *supra*.  Defendants' claim that the Sham Operating Agreements is a basis to assert that

there is a contract between the parties that bars equitable claims is, at best, an issue of fact that

requires discovery and a trial.  Defendants' self-serving comment that "Plaintiffs have chosen not

to bring a breach of contract claim for apparently strategic reasons" is yet another statement intentionally designed to brush past the fact that the Sham Operating Agreements are just that – a sham designed to further a scheme to defraud – and escape discovery.  Def. Mem. at p. 27.

Even the cases that Defendants cite bar their attempt to dismiss the unjust enrichment claims based upon their self-serving contention that the Sham Operating Agreements govern all of the allegations in the Complaint.  For example, Plaintiffs cite *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 2009 U.S. Dist. LEXIS 46857, *13 (E.D.N.Y. June 4, 2009) for the principle that when there is a written agreement a plaintiff cannot sue for constructive trust and unjust enrichment.  *Id.* at p. 26.  But in *DLJ*, as in all of the other cases that Defendants cite, the plaintiffs "conceded" the existence of a valid and enforceable written contract governing a particular subject matter.  *DLJ*, No. 08 CV 4607, 2009 U.S. Dist. LEXIS 46857, *13.  Here, inasmuch as Plaintiffs have not conceded that, and are staunchly challenging it, Defendants motion must be denied.  In fact, even the Individual Defendants renounced the existence of these alleged agreements for the four years leading up to this complaint.

2.    The Constructive Trust Claim Is Properly Pleaded

As demonstrated in Section II, the Second Department, in *Keen v. Keen* upheld a constructive trust claim over title to real properties and the attendant notices of pendency based on facts identical to these.  Specifically, the defendant used proceeds fraudulently diverted from plaintiff's company to purchase other real estate in which the company did not own an interest.  In so alleging, the plaintiff stated a claim for a constructive trust to the title over that real property.  *Keen*, 140 A.D.2d at 312.

In the face of the Second Department's holding in *Keen*, Defendants, in the memorandum submitted by counsel for certain Secret Property Defendants, argue that the Fourth Cause of

Action fails to plead the elements of a constructive trust.  Landrigan Mem. at pp. 8-9.[14] Defendants claim that the elements are:  (1) a confidential or fiduciary relationship, (2) a promise; (3) transfer in reliance thereon, and (4) unjust enrichment.  Then, Defendants claim that "there is no prior relationship of any kind even alleged with any of the" Secret LLC Defendants, "let alone a confidential relationship."  *Id.*  Defendants also argue that because there were allegedly "no dealings of any kind" between Plaintiffs and the Secret LLC Defendants, there could not have been reliance.  *Id.*  But Defendants' arguments miss the mark and are without merit.

Defendants arguments that Plaintiffs have not pleaded the elements of a constructive trust and that Plaintiffs had no "prior relationship" are more misdirection designed to cover up and effectuate the Individual Defendants' fraud.  Contrary to Defendants' false mischaracterization of the allegations in the Amended Complaint and the Second Amended Complaint, the elements of a constructive trust were pleaded.  A confidential relationship exists because the Second Amended Complaint alleges that Strulovitch and Oberlander own and control the Secret LLC Defendants.  SAC ¶¶ 30, 162.  Therefore, Individual Defendants confidential relationship with Plaintiffs extends to those entities.   Thus, Defendants cannot avoid the constructive trust claim by hiding behind the Secret LLC Defendants and claiming that they had no prior dealings or a confidential relationship with Plaintiffs.[15]

---

[14] Knowing that these arguments are meritless, the numerous Secret Property Defendants represented by Herrick Feinstein do not attempt to make these arguments, choosing instead to simply state that the claim should be dismissed because the Complaint purportedly does not plead specifics about the Secret Properties that their clients bought with Plaintiffs' money.  But constructive trust claims are not governed by the heightened pleading standards of Rule 9(b), they are governed by the notice pleading standards of Rule 8.  As such, the allegations that Defendants were using monies belonging to Plaintiffs to buy these properties, combined with the examples given in the Second Amended Complaint, amply satisfy the notice pleading requirements of Rule 8.

[15] Notably, to date, Individual Defendants have refused to provide any documents or information to Plaintiffs regarding their transactions, including any documents relating to how the funds from their investments were

*Continues on following page . . .*

Having established the confidential relationship, it is also undisputed that Plaintiffs transferred money in reliance on promises by Oberlander and Strulovitch that the money would be used to purchase specific parcels of real estate and not other undisclosed properties.  SAC ¶ 163-67.  Finally, the unjust enrichment element is satisfied precisely for the reasons that the Court upheld the constructive trust claim in *Keen v. Keen*, *i.e.* that Defendants should not be able to retain the benefits of moneys that are fraudulently diverted from Plaintiffs.  *Id.*

The shell game Defendants are playing, artificially attempting to separate the Secret LLC Defendants from the people who control it in order to is exactly the reason that Courts have held that there is **no rigid set of elements that must be alleged to plead a construction constructive trust, as "a constructive trust is an equitable remedy, necessarily flexible to accomplish its purpose**."  *McHugh v. Belmonte*, No. 100660/07, 2007 WL 4788454, at *3 (Sup. Ct. Richmond County, Oct. 2, 2007) ("no rigid requirements exist for imposing a constructive trust, and any factors considered relevant to the establishment of a constructive trust are simply guidelines, their rigid application not being required") (emphasis added); *see also Shrifter v. Goldman,* 23 Misc. 3d 1120(A) (Sup. Ct. N.Y. County 2009).  Indeed, pleading a constructive trust "is given broad scope to flex in response to all human implications of the transaction, to remedy whatever knavery ingenious wrongdoers can invent, to give expression to the conscience of equity, and to satisfy the demands of justice."  *Nastasi v. Nastasi*, 26 A.D.3d 32, 38-39 (2d Dep't 2005); *Latham v Father Divine*, 299 N.Y. 22, 27, 29, (1949); *Lipton v. Donnenfeld*, 5 A.D.3d 356, 357-58 (2d Dep't 2004).  Accordingly, even if the elements are not technically satisfied here, which they are, a constructive trust will still be adequately pleaded because the

---

*. . . continued from preceding page.*

allocated to purchase properties.  Defendants should not be permitted to use such document stonewalling and obstructionist tactics as sword to box out Plaintiffs from bringing their claims to the Court.

allegations show that the Secret Properties were acquired "in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest." *McHugh*, 2007 WL 4788454, at *3 ("constructive trust may be imposed whenever necessary to satisfy the demands of justice"); *Rasool v. Gohar,* 40 A.D.3d 727, 727-28 (2d Dep't 2007); *Shrifter*, 23 Misc. 3d at 1120(A).   As previously set forth, the Amended Complaint alleges that the Individual Defendants' pilfered funds from the Investment Properties and defrauding banks, and then used these funds to enrich themselves via buying the properties in Schedule B.[16]   Accordingly, the claim for a constructive trust has been properly pleaded and the motion to dismiss the Fourth Cause of Action for Constructive Trust fails.

Knowing this argument has no merit, Defendants also argue that the statute of frauds bars these constructive trust claims based on the holding in *Tutak v. Tutak*, 123 A.D.2d 758 (2d Dep't 1986).   Landrigan Mem. at p. 8.   But that case was decided on entirely different facts as those in this case and in *Keen*.   There, the plaintiff sought to impose a constructive trust over a house based on her allegation that her family member orally promised to give transfer to her.   Nowhere did the plaintiff allege that her funds were used to purchase the property at issue.   Because oral promises to transfer property are barred by the statute of frauds, the Court dismissed the constructive trust claim.   *Tutak*, 123 A.D.2d at 759-60.   In as much as the statute of frauds does not bar Plaintiffs from obtaining a reconveyance of property bought with their fraudulently diverted funds, this argument fails.

---

[16] The same facts that support the Fourth Cause of Action for a Constructive Trust over the Secret Properties supports the Ninth Cause of Action for a Constructive Trust over the funds diverted by Strulovitch from the LLC Plaintiffs to the Additional Secret LLC Defendants.   As such, Defendants' motion seeking dismissal of the Ninth Cause of Action for Constructive Trust fails.

**VI.   PLAINTIFFS HAVE PROPERLY STATED
        <u>A CLAIM FOR AN ACCOUNTING</u>**

Strulovitch advances two principal arguments in seeking to dismiss Plaintiffs' accounting claim.  Specifically, Strulovitch argues that (i) alternate remedies to an accounting exist because Plaintiffs seek monetary damages, and (ii) that Plaintiffs have not properly alleged a demand. Neither argument has any merit.  Def. Mem. at pp. 25-26.

The argument that Plaintiffs cannot seek an accounting when also seeking monetary damages is unavailing.   The law holds that a plaintiff may maintain both equitable causes of action, such as an accounting, and causes of action that seek remedies at law.  *See, e.g.*, *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 273 (S.D.N.Y. 2008) (denying motion to dismiss claims for a partnership accounting, fraud, and breach of fiduciary duty).   While Strulovitch attempts to sidestep this case law by claiming that the primary thrust of the accounting claim is to use the books and records sought to quantify its monetary damages, this is merely more misdirection.  An accounting claim seeks to uncover what exactly transpired within a partnership when a party has denied his partner access to books and records.  It logically follows that once Plaintiffs have complete disclosure of the LLC Defendants' books and records – to which they are entitled as Defendants' partners– they may ascertain that they have additional remedies available to them.  The fact that an accounting may assist Plaintiffs in determining their damages does not transform this claim into one that seeks the same remedies as fraud and breach of fiduciary duty.  Otherwise, no accounting claim could ever withstand a motion to dismiss where a complaint also alleged a breach of fiduciary duty.  Clearly, this is not the law.[17]

---

[17] *NEM Re Receivables, LLC v. Fortress Re, Inc.*, 173 F. Supp.3d 1 (S.D.N.Y. 2016) does not apply here.  In that case, the plaintiff was attempting to bootstrap damages from his sole claim – an accounting claim.  *See id.* at 2.  The Court held that the essence of the plaintiff's claim, however, was for damages arising out of a breach of contract. Accordingly, it dismissed the complaint.  *See id.* at 8.  Nor is *Arrow Comm'n Labs., Inc. v. Pico Prods., Inc.*, 219

*Continues on following page . . .*

Finally, with respect to the argument that Plaintiffs have not adequately alleged the circumstances surrounding their making of the demand, that has been amplified in the Second Amended Complaint.  *See* SAC ¶¶ 195-200.  Accordingly, the Court should deny Defendants' motion to dismiss the Eighth Cause of Action.

## VII.   DEFENDANTS' MOTION TO DISMISS THE FIFTH AND SIXTH CAUSE OFACTION IS MOOT, AND MUST BE DENIED

Defendants had moved to dismiss the Fifth Cause of Action for breach of fiduciary duty in the Amended Complaint on the grounds that the Original Plaintiffs impermissibly pleaded direct and derivative causes of action in the same lawsuit.  Defendants also moved to dismiss the Sixth Cause of Action in the Amended Complaint on the grounds that it impermissibly pleaded direct causes of action by the Original Plaintiffs for harms Defendants claimed were purportedly suffered by the LLC Plaintiffs.  Defendants contended that all of these claims had to be brought as direct claims alleging damages to the LLC Plaintiffs to be validly pleaded.  Inasmuch as the Second Amended Complaint now pleads all of the Breach of Fiduciary Claims as direct causes of action by the LLC Plaintiffs, Defendants' motion to dismiss the Fifth and Sixth Causes of Action is moot, and must be denied.

---

*. . . continued from preceding page.*

A.D.2d 859, 860 (4th Dep't 1995) on point, as there the defendant was seeking to use plaintiff's claim for an accounting as a basis to avoid a jury trial where there were other claims that involved monetary damages.  *See id.* at 860.   *Telesco v. Neuman*, No. 14 CV 3480 VB, 2015 U.S. Dist. LEXIS 66008 (S.D.N.Y. Mar. 11, 2015) is also inapposite, as there the accounting claim could not coexist with the breach of contract claim.  *See id.* at *18.  Here, there is no breach of contract being alleged.

## <u>CONCLUSION</u>

For all of the reasons stated herein, the Dismissal Motions should be denied in their

entirety.

Dated: July 14, 2017
　　　New York, New York

                              Respectfully Submitted,

                              OVED & OVED LLP

                    By: <u>/s/Edward C. Wipper       </u>
                          Darren Oved, Esq.
                          Edward C. Wipper, Esq.
                          Andrew J. Urgenson, Esq.
                          *Attorneys for Plaintiffs*
                          401 Greenwich Street
                          New York, New York 10013
                          Tel: 212.226.2376