UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------X

JACOB SCHONBERG, BINYOMIN SCHONBERG, BINYOMIN HALPERN AND RAPHAEL BAROUCH ELKAIM, et al.,

Case No. 17-cv-2161 (CBA)(RML)

*Plaintiffs*,

-against-

YECHEZKEL STRULOVICH a/k/a CHASKIEL STRULOVICH, YECHIEL OBERLANDER a/k/a MICI OBERLANDER a/k/a MIHAY OBERLANDER, et al.,

*Defendants*.

------------------------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' REPLY AND IN FURTHER OPPOSITION TO DEFENDANTS' MOTION TO VACATE <u>NOTICES OF PENDENCY AND TO DISMISS THE AMENDED COMPLAINT</u>

OVED & OVED LLP
*Attorneys for Plaintiffs*
401 Greenwich Street
New York, NY 10013
Tel: 212.226.2376

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT ....................................................................................................................2

I.    DEFENDANTS' ARBITRATION MOTION FAILS ON ITS FACE ........................................2

     A.    Strulovitch's Moving Papers Failed to Meet His Burden of Proof and Cannot Escape His Undisputed Duplicity in Conducting Himself for Years as If These Operating Agreements Were Not the True and Correct Agreements ..........................3

     B.    Even if the Court Considered the Improper Reply Evidence, the Court Would Still Find the Agreements to Be Ineffective ...................6

         1.    The New Reply Exhibits Further Demonstrate that the Sham Operating Agreements Are Ineffective ...................6

         2.    Discrepancies and Inconsistencies in the "True and Correct" Sham Operating Agreements Further Undermine Their Effectiveness .................10

         3.    The Court Cannot Bind Nonsignatory Plaintiffs ..........................12

II.    THE MOTION TO DISMISS THE FIRST CAUSE OF ACTION FOR SECURITIES FRAUD FAILS .................................................14

     A.    The 10(b)(5) Claim Is Pled with Sufficient Particularity ..........................14

         1.    No Further Details About Amounts and Dates of Investments Are Required to Satisfy Rule 9(b) ........................16

         2.    The Fraud Allegations Concerning Strulovitch's Inflation of the Purchase Prices of the Investment Properties Are Amply Pleaded ..............19

     B.    The Statute of Limitations Has Not Run on any of Plaintiffs' Claims ......20

C.    The Disclaimers in the Sham Operating Agreements Do Not Bar the Securities Claim Operating Agreements, But Rather Mandate Discovery ........................... 26

III.    THE NOTICES OF PENDENCY REMAIN VALID AND SHOULD REMAIN ..................... 27

IV.    THE LLC PLAINTIFFS' DIRECT CLAIMS CANNOT BE DISMISSED ........................... 29

CONCLUSION.................................................................................................................. 30

**T**ABLE OF **A**UTHORITIES

| **Cases** | **Page(s)** |
|---|---|

*Arco Capital Corp. v. Deutsche Bank, AG,*
  986 F. Supp. 2d 296, 299 (S.D.N.Y. 2013)............................................................................24

*Azoy v. Fowler,*
  57 A.D.2d 541 (2d Dep't 1977) ...........................................................................................22

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007).............................................................................................................29

*Casey v. Masullo Bros. Builders,*
  218 A.D.2d 907 (3d Dep't 1995) .........................................................................................24

*Chambers v. Time Warner, Inc.,*
  282 F.3d 147 (2d Cir. 2002)............................................................................................ 26-27

*Dekalb Cnty. Pension Fund v. Transocean Ltd.,*
  817 F.3d 393 (2d Cir. 2016).................................................................................................25

*Dimensional Emerging Markets Value Fund v. Petroleo Brasileiro S.A.,*
  152 F. Supp. 3d 186 (S.D.N.Y. 2016).............................................................................. 16-17

*Dreyfuss v. eTelecare Global Solutions-US, Inc.,*
  349 Fed. Appx. 551 (2d Cir. 2009) ................................................................................ 9, 11-12

*Eltman v. Harvey,*
  93 Misc.2d 634 (Sup. Ct. Suffolk County 1978) .................................................................23

*Friedman v. Meyers,*
  482 F.2d 435 (2d Cir. 1977)...........................................................................................22, 23

*Galasso, Langione, & Botter, LLP v. Galasso,*
  No. 010038/2007, 2016 N.Y. LEXIS 3312 (Sup. Ct. Nassau County Sept. 19, 2016) .....28

*Gavin/Solmonese LLC v. D'Arnaud-Taylor,*
  639 Fed. App'x 664 (2d Cir. 2016)...................................................................................21, 24

*Grunwald v. Bornfreund,*
  668 F.Supp. 128 (E.D.N.Y. 1987) .......................................................................................15

*Haberkamp v. Steele,*
  No. 90 Civ. 1383, 1992 U.S. Dist. LEXIS 4917 (S.D.N.Y. Apr. 15, 1992).....................17

*In re Beacon Assocs. Litig.,*
     282 F.R.D. 315 (S.D.N.Y. 2012) ...................................................................25

*In re Cardiac Devices Qui Tam Litig.,*
     221 F.R.D. 318 (D. Conn. 2004) ..............................................................14, 15

*In re Crouse,*
     27 B.R. 284 (Bankr. E.D. Mo. 1983) .............................................................23

*In re Dynex Capital Secs. Litig.,*
     No. 05 Civ. 1897, 2006 U.S. Dist. LEXIS 4988 (S.D.N.Y. Feb. 10, 2006) ....................25

*In re Global Crossing, Ltd. Sec. Litig.,*
     313 F. Supp.2d 189 (S.D.N.Y. 2003) ..............................................................24

*In re Zyprexa Prod. Liab. Litig.,*
     549 F. Supp.2d 496 (E.D.N.Y. 2008) .............................................................24

*Int'l Motor Sports Group, Inc. v. Gordon,*
     No. 98 Civ 5611 (MBM), 1999 U.S. Dist. LEXIS 12610
     (S.D.N.Y. Aug. 16, 1999) .......................................................................18

*Keen v. Keen,*
     140 A.D.2d 311 (2d Dep't 1988) .............................................................27, 28

*Kuczynski v. Ragen Corp.,*
     732 F. Supp. 378 (S.D.N.Y. 1989) ...............................................................18

*Marini v. Adamo,*
     995 F. Supp.2d 155 (E.D.N.Y. 2014) .............................................................21

*Maverick Fund v. Comverse Tech,*
     801 F. Supp. 2d 41 (E.D.N.Y. 2011) .......................................................16, 17, 18

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC,*
     No. 02-Civ. 0767 (LBS), 2003 U.S. Dist. LEXIS 21854 (S.D.N.Y. Dec. 4, 2003) .........20

*Pizurro v. Pasquino,*
     201 A.D.2d 635 (2d Dep't 1994) ............................................................ 27-28

*Plymouth County Ret. Ass'n v. Schroeder,*
     576 F. Supp. 2d 360 (E.D.N.Y. 2008) ............................................................25

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.,*
     No. 00-5965 (JCL), 2005 U.S. Dist. LEXIS 16855 (D.N.J. June 7, 2005) ....................17

*Roni LLC v. Arfa*,
  No. 601224/2013, 2013 N.Y. Misc. LEXIS 2796
  (Sup. Ct. N.Y. County June 27, 2013) .................................................................20

*Rosen v. Mega Bloks Inc.*, No. 06 Civ. 3474 (LTS) (GWG),
  2007 U.S. Dist. LEXIS 48479 (S.D.N.Y. July 6, 2007) ....................................12

*SEC v. Terezakis*,
  1997 U.S. Dist. LEXIS 16227 (E.D.N.Y. Sept. 30, 1997)..................................15

*St. John's Univ. v. Bolton*,
  757 F. Supp. 2d 144 (E.D.N.Y. 2010) ...............................................................22

*Trepuk v. Frank*,
  44 N.Y.2d 723 (1978) ................................................................................... 21-22

*United States ex rel. Bilotta v. Novartis Pharms. Corp.*,
  50 F. Supp. 3d 497 (S.D.N.Y. 2014)..................................................................15

In accordance with the Court's August 3, 2017 Order (Docket No. 209), Plaintiffs respectfully submit this memorandum of law in further opposition to the Dismissal Motion[1] and in response to the reply papers (the "Reply").[2]

## PRELIMINARY STATEMENT

Since Plaintiffs commenced this lawsuit in April, the fraudulent scheme orchestrated by Strulovitch and Oberlander has started to crumble.  With each new default letter and foreclosure complaint, mortgage banks continue to adduce proof that Strulovitch has no regard for the truth or for the gravity of sworn statements he has made to them, and they reaffirm and corroborate the allegations in the SAC that Strulovitch has left these Investment Properties penniless, defaulting on his obligations to make mortgage payments, property tax payments, cure violations, or undertake any of the obligations he and Oberlander represented they would when they duped 180 people to invest more than $20,000,000 with them.

Now Strulovitch comes to this Court, using the same deceptive tactics.  He has falsely declared under penalties of perjury in his moving papers that Sham Operating Agreements were "true and correct."  When exposed, he then submitted a Reply appending a different set of purportedly "true and correct" Sham Operating Agreements.  But these new exhibits establish that Defendants' motion is nothing more than a pile of paper designed to manipulate the Court into the misimpression that these Sham Operating Agreements are enforceable when (i) by their plain terms they are not, (ii) they do not bear the signatures of majority of each and every LLC

---

[1] Unless otherwise noted, all capitalized terms used herein shall have the same meaning ascribed to them in the Plaintiffs' memorandum of law in opposition to the Dismissal Motion (Docket No. 205), dated July 14, 2017 (the "Opp. Br.").

[2] The Reply consists of (i) the reply Declaration of Yechezkel Strulovitch and the exhibits annexed thereto (the "Reply Dec."); (ii) the reply memorandum of law submitted by the law firm of Herrick Feinstein LLP (Dkt. No. 197) ("Reply Br."); (iii) the reply attorney Declaration of Thomas Landrigan ("Landrigan Dec."); and (iv) the reply memorandum of law submitted by the law firm of Cohen Landrigan and Labarbara ("Landrigan Reply") ("Dkt. No. 202").

Plaintiffs, and (iii) Defendants' conduct for four years confirms that these Sham Operating Agreements were never in effect for any of the Investment Properties.  Similarly, recognizing that his efforts to dismiss the claims in the Complaint had no merit, Defendants also came to the Court with new arguments raised for the first time on Reply based on patently false statements about what the SAC alleges, and based on misstatements of the applicable case law.

The Court cannot allow Strulovitch to exploit the judicial system to deny to Plaintiffs the judicial forum to which they are entitled to seek redress for their disputes while Plaintiffs face a total loss of their investment.  For the reasons set forth below, Defendants' motion should be denied in its entirety and this case should proceed to discovery so the truth can be exposed.

<u>**ARGUMENT**</u>

**I.**    <u>**DEFENDANTS' ARBITRATION MOTION FAILS ON ITS FACE**</u>

The Court must deny Defendants' arbitration motion for three reasons:

(A)    Defendants failed to meet their burden of proof to demonstrate in their Moving Papers that there is a binding agreement to arbitrate.  Instead, Strulovitch perjured himself and submitted incomplete, ineffective, and unenforceable Sham Operating Agreements that contradict the sworn statements Strulovitch made to mortgage banks and the operating agreements he gave them to mislead them into believing he was the sole member of these Holding Company Defendants, Strulovitch should not be permitted to cure that on reply;

(B)    Even if the Court were to consider the new set of Sham Operating Agreements and signature pages thrown together by Strulovitch, submitted for the first time on Reply, it would only further reinforce the fact that there was never a meeting of the minds and these Sham Operating Agreements are incomplete, ineffective, and unenforceable against both signatories and nonsignatories;

(C)    There are such a significant number of non-signatories to these Sham Operating Agreements, that even if the Court compelled arbitration of claims with respect to Investment Properties where there were signatures, this case must proceed wherever there is no signed agreement to arbitrate.

**A.      Strulovitch's Moving Papers Failed to Meet His Burden of Proof and
         Cannot Escape His Undisputed Duplicity in Conducting Himself for Years
         As If These Operating Agreements Were _Not_ the True and Correct Agreements**

Despite his misrepresentation that he submitted "true and correct copies" of operating agreements for the Holding Companies, the 56 exhibits Strulovitch held back until Reply constitute an admission that Strulovitch failed to meet his burden in his moving papers.  The Court should not reward Strulovitch for attempting to mislead the Court by holding back evidence in the hopes he would not have to use the alleged signature pages, multiple versions of operating agreements for the same company, and additional Sham Operating Agreements for the three Investment Properties at 1301 Putnam Avenue, 348 St. Nicholas Avenue, and 8 Maple Avenue.  A motion to compel arbitration is adjudicated in accordance with the same standards as motions under Fed. R. Civ. P. 56.  Holding back materials for reply that were undoubtedly in Strulovitch's possession and which were necessary to make out a _prima facie_ case for arbitration must be rejected.

Moreover, nothing in Strulovitch's Reply can avoid the undisputed fact that for the past four years, he has repeatedly sworn under oath to mortgage banks that the Sham Operating Agreements he not submits were <u>not</u> Investment Properties' operating agreements.  Indeed, the evidence of Strulovitch's duplicity continues to mount since this lawsuit was filed.  While the evidence submitted in the opposition papers amply proves this point, there is more.

In paragraph 12 of a foreclosure Complaint filed in New York County Supreme Court by the senior secured lender for the Investment Property located at 525 Willoughby Avenue, entitled _SIII Capital Grp. LLC_ ("S III") _et al. v. Willoughby Estates LLC et al._, Sup. Ct. N.Y. County Index No. 850127/2017, S III states as follows:

> In connection with the origination of the Loans evidenced by each of the Notes, Defendant delivered an operating agreement to [S III] and resolutions with respect

to the authorization of each such loan wherein the Guarantor certified that the operating agreement (setting forth Guarantor as sole member and managing member of Defendant) was, true, correct and complete.

Wipper Reply Dec. Ex. 2. Plainly, the Sham Operating Agreement Strulovitch submitted to the Court for the Investment Property at 525 Willoughby Avenue is not the same "true and correct" version he certified to SIII was the true and correct operating agreement.

Additionally, Plaintiffs recently uncovered yet another operating agreement executed by Strulovitch on the same day he closed on a mortgage loan with the senior secured lender for the Investment Property located at 657 Fifth Avenue, which is another Investment Property presently in foreclosure in an action captioned *Keybank, N.A. et al v. 657-665 Fifth Avenue LLC et al*, Sup. Ct. Kings County Index No. 510712/2017. *See* Wipper Dec. Ex. 1. The operating agreement is dated September 9, 2013, three weeks after the "effective date" of August 14, 2013 contained in the first paragraph of the Sham Operating Agreement Strulovitch attached for 657-665 Fifth Avenue LLC and misrepresented to be the "true and correct" copy. There is no arbitration clause in that operating agreement, nor does it resemble the "true and correct" Sham Operating Agreement for the 657 Fifth Avenue Investment Property annexed to the Strulovitch Dec. as Exhibit 25. *Compare id. with* Wipper Reply Dec., Ex. 1.

And yet again, on July 20, 2017, Strulovitch (represented by J. Michael Gottesman, Esq., who is Oberlander's lawyer in this lawsuit) filed an answer in the *Keybank* foreclosure proceeding admitting that he signed the affidavit to obtain the mortgage application for 657-655 5th Avenue in which he held himself out to be a sole member. Wipper Reply Dec. Ex. 3

But wait, there's more! Brooklyn Lender LLC, the senior secured lender for the Investment Properties located at, *inter alia*, 618 Lafayette Avenue and 106 Kingston Avenue

have defaulted Strulovitch on those mortgages based on the misrepresentation that he is the sole member of these LLCs. Brooklyn Lender LLC has stated as follows:

> The Events of Default also included one more of the following monetary defaults: (i) [Strulovitch's] misrepresentation that he is the sole member of certain limited liability companies in connection with the making of certain mortgage loans, constituting an Event of Default under section 18(g) of the Agreements (citing to Exhibis 16-29 of the Affidavit of David Aviram).

Wipper Reply Dec. Ex. 4. Exhibit 23 to Mr. Aviram's affidavit includes a perjurious sworn statement from Strulovitch that he is the sole member of 618 Lafayette LLC. Wipper Dec. Ex. 5. Exhibit 18 to the Aviram Affidavit contains two perjurious sworn statements from Strulovitch that he is the sole member of 106 Kingston Avenue. Wipper Reply Dec. Ex. 6. Once again, whatever operating agreement he gave to that bank cannot be the same operating agreement he attempted to pass off as "true and correct" in his Moving Papers.

As is evident, Strulovitch has no regard for what it means to swear to anything under oath or under penalties of perjury. This is not surprising given that he swindled Plaintiffs out of more than $20,000,000 and is in the throes of multiple foreclosure proceedings against him by banks alleging fraud. The Court cannot, and should not, give credence, especially at this stage of the proceedings, to Strulovitch's attempt to compel these investors to arbitrate this serious dispute in front of Strulovitch's personal Rabbi where their rights will be abridged based on the self-serving statements of a serial con artist.[3]

---

[3] Consistent with his serial pattern of duplicity, Strulovitch further misrepresents to the Court that "Under no circumstances would or could Strulovitch's Rabbi be selected as the Arbitrator to hear" this dispute. But that is Strulovitch attempting to rewrite the Sham Operating Agreements. The Sham Operating Agreements provide that if the parties cannot select a "third party that is acceptable to all of them as Arbitrator," within 45 days, Rabbi Rosenberg, Strulovitch's personal Rabbi, "shall choose the arbitrator for the parties." Nothing in the Sham Operating Agreements prevents Rabbi Rosenberg from appointing himself as arbitrator. In two separate footnotes in the Reply, Strulovitch states that even though Strulovitch is the manager of the LLC Plaintiffs, he will "give the LLC Plaintiffs the right to negotiate the selection of a neutral without Strulovitch's input on behalf of the LLC Plaintiffs." Reply at pp. 3, 14. But his offer is double-talk, as he still has veto power in the negotiation and the ability to ensure that Rosenberg chooses himself.

**B.      Even if the Court Considered the Improper Reply Evidence,
the Court Would Still Find the Agreements to Be Ineffective**

The new set of "true and correct" Sham Operating Agreements appended to the Reply

Dec. do not cure any of these deficiencies.  On the contrary, they underscore that these Sham

Operating Agreements are not enforceable.  There are three reasons why the Sham Operating

Agreements attached to the Reply Dec. cannot be misused to compel any of the Plaintiffs to

arbitration:

> (1) The Sham Operating Agreements in the Reply Dec., which lack signatures and
> signature pages from more than 130 investors, further underscore that they are not
> "true and correct" on their face, and do not establish any basis for the Court to find
> them to be enforceable and to bind the LLC Defendants or the Individual Defendants
> to them;

> (2) The Sham Operating Agreements attached to the Reply Dec. attach different
> agreements for the same Investment Properties and contain numerous other serious
> discrepancies, another fact which invalidates them on their face; and

> (3) Strulovitch is still improperly attempting to bind nonsignatories.

> 1.  The New Reply Exhibits Further Demonstrate
> that the Sham Operating Agreements Are Ineffective

The new Sham Operating Agreements in the Reply Dec. confirm the most critical fact

that undermines their enforceability: they were not fully executed by all of the "Members" of the

LLC Plaintiffs who were intended to be parties in their individual capacities.  They are missing

signatures from more than 130 investors.  Moreover, as detailed below, Strulovitch has failed to

even attach the blank signature pages he would have been required to prepare for all of the

investors, as is expressly required by the plain terms of the Sham Operating Agreements.

Specifically, the first paragraph the Sham Operating Agreements states all of the

members of the LLC Plaintiffs (a/k/a Investor LLCs) are intended to be parties to these Sham

Operating Agreements in their in individual capacity, stating as follows:

This Limited Liability Company Operating Agreement ("Agreement") is effective as of [date] and entered into by and among the [Holding Company Defendant] (the "Company") and CSRE LLC ("CSRE") the owner of fifty-four percent (54%) of the Company, and [LLC Plaintiff] ("Investors LLC") the owner of forty-six percent (46%) of the Company **and the members of [Investors LLC] (hereinafter referred to as the "Members")**.[4]

The Sham Operating Agreements also state in Section 4 that "[t]he names, addresses and percentage interests of the Members **are listed** on signature pages annexed below." Similarly, Schedule A provides in capital and bold letters that:

**THE DETAILS OF EACH OF THE MEMBERS OF INVESTORS LLC ARE TO BE MAINTAINED IN ACORDANCE [*sic*] WITH THE REQUIREMENTS OF CLAUSE 4 ABOVE AND ANNEXED HERETO IN SCHEDULE B ON INDIVIDUAL SIGNATURE PAGES.**

Most importantly, none of these Sham Operating Agreements are executed by "each of the Members of Investors LLC." This is likely the reason that Strulovitch held back evidence from his Moving Dec., and attempted to slip in a barrage of disorganized and voluminous exhibits on Reply. Had Strulovitch attached all of the signature pages to the Sham Operating Agreements to his Moving Papers or his Reply Dec. he would have had to attach either hundreds of signatures or blank signature pages (to the extent they even exist) from at least 135 investors whose signatures appear nowhere in the Reply Dec. This would have crystalized the fact that there is no binding agreement to arbitrate.

Moreover, in plain contravention of both Section 4 and Schedule A, none of the Sham Operating Agreements in the Reply Dec. list or otherwise contain "the names, addresses and

---

[4] Once again, consistent with his pattern of manipulation, Strulovitch attempts to rewrite these documents to conform to his own self-serving fact, stating that "The Individual Plaintiffs are not parties to the [Sham Operating Agreements]. But the fact that each individual Member, including the Individual Plaintiffs was to intended to be a party to these Sham Operating Agreement is indisputable. The term "Members" is used throughout the Sham Operating Agreements to define only the individual members of the LLC Plaintiffs and not the LLC Plaintiffs themselves. The Sham Operating Agreements use different definitions to describe the LLC Plaintiffs ("Investors LLC"), and the definition "Owners," to describe CSRE and the LLC Plaintiffs collectively. The "Members," as parties, are purportedly granted specific voting rights and are, individually, subject to many of their terms.

percentage interests" of <u>each</u> of the Members of the LLC Plaintiffs – even if the Court cobbles together the signatures pages strewn throughout the Reply Dec.  That, in and of itself, belies Strulvitch's perjurious misrepresentation that these Sham Operating Agreements are "true and correct."  By their plain terms, without these pages, they are not and could never be.

Moreover, there is no evidence that Strulovitch or Oberlander ever bothered to (i) prepare individual signatures pages for each of the "Members of Investors LLC" in accordance with Schedule A or (ii) created a list of the Members and less their ownership percentages, as <u>expressly required</u> by Section 4.  Strulovitch does not even allege, much less demonstrate, that he even presented these Sham Operating Agreements to "each of the Members of Investors LLC" for signature.  Strulovitch's attempt to bind investors to Sham Operating Agreements—that he himself did not even attempt to comply with—is just further evidence that Strulovitch is attempting to punish and tax the same investors he scammed for years by tying them up in meritless motion practice.

Further undercutting the enforceability of these Sham Operating Agreements is that the 43 signatures disclosed by Strulovitch for each LLC Plaintiff are infinitesimal in terms of the percentages of the LLC Plaintiffs they represent.  In fact, there is not a single Sham Operating Agreement that Strulovitch submits that is signed by more than 40% of all of the purported membership interests.  The chart below illustrates this fact by showing each LLC Plaintiff and the purported percentage interests reflected on the signature pages attached to the Reply:[5]

---

[5] The interest percentage contained on the signature pages attached to the Reply reflected each signatory's purported interest in the Property, not the interest in the LLC Plaintiff.  To arrive at the numbers contained in the chart, we assumed, solely for those purposes, that the LLC Plaintiffs owned the 46% membership interest in the Holding Company set forth in the Sham Operating Agreement.  For example if a Member owns 1% of the Holding Company Defendant, that Member would own 2.17% of the respective LLC Plaintiff.

| Plaintiff LLC | Interest % That Allegedly Signed According to Strulovitch's Declarations |
|---|---|
| Jefferson Operations LLC | 2% |
| 720 Livonia Operations LLC | 3% |
| 369 Gates Operations LLC | 4% |
| 945 Park Place Operations LLC | 4% |
| Kingston Operations LLC | 4% |
| 760 Willoughby Operations LLC | 4% |
| Bushwick Operations LLC | 4% |
| Willoughby Estates Operations LLC | 4% |
| 855 Dekalb Avenue Operations LLC | 7% |
| 325 Franklin Operations LLC | 8% |
| 454 Central Avenue Operations LLC | 8% |
| 1301 Putnam Operations LLC | 9% |
| 74 Van Buren Operations LLC | 15% |
| Slope Equities Operations LLC | 15% |
| 980 Atlantic Holdings Operations LLC | 18% |
| 853 Lexington Operations LLC | 20% |
| 348 St. Nicholas Operations LLC | 26% |
| 73 Empire Development Operations LLC | 29% |
| 908 Bergen Operations LLC | 35% |
| 618 Lafayette Operations LLC | 39% |
| 1078 Dekalb Operations LLC | 39% |
| 8 Maple Avenue Operations LLC | 40% |

Once again, a Sham Operating Agreement that was meant to be signed by everyone, but instead was only signed by a tiny fraction of those parties, cannot serve as the basis to compel arbitration. *See, e.g., Dreyfuss v. eTelecare Global Solutions-US, Inc.*, 08 Civ. 1115, 2008 U.S. Dist. LEXIS 96945, *23 (S.D.N.Y. Nov. 19, 2008) (denying motion to compel arbitration where only 6 of the 29 the individuals allegedly bound executed an arbitration agreement)

The fact that Strulovitch does not have signatures from a majority of the membership of any of the LLC Plaintiffs is even more damaging to the arbitration motion because Strulovitch has no authority to bind the LLC Plaintiffs to the Sham Operating Agreements under LLC Law

402.   Defendants argue in Reply that Section 402 does not apply because the Sham Operating Agreements are not the LLC Plaintiffs' own Operating Agreements.   But this argument fails on its face based on the plain text of the Sham Operating Agreements.   On their face, the Sham Operating Agreements contain operational terms for **both** the Holding Company Defendants and the LLC Plaintiffs.   As such, the Sham Operating Agreements were drafted to be the "LLC Plaintiffs' own operating agreement."   They purport to name each LLC Plaintiff's managers and who has the authority to make decisions on their behalves and on what terms.   Accordingly, under Section 402 of the LLC law, Strulovitch needed the authority of the majority of the "Members" of the LLC Plaintiffs to sign the Sham Operating Agreements on their behalf.[6]   His failure to do so leaves him without the power to sign on their behalves.   As such, any effort to compel the LLC Plaintiffs to arbitration also fails.

2.   Discrepancies and Inconsistencies in the "True and Correct" Sham Operating Agreements Further Undermine Their Effectiveness

Further undercutting the effectiveness and enforceability of any of these Sham Operating Agreements, is the fact that the Reply attaches <u>different Sham Operating Agreements for the same Investment Properties,</u> and other documents mashed together by Strulovitch to give the misimpression that these are effective agreements.   For example:

- 618 Lafayette Avenue:   There are two completely different Sham Operating Agreements for the Investment Property at 618 Lafayette Avenue. *Compare* Strulovitch Reply Ex. 22 *with id.* Ex. 23 (containing different front pages, different definitions, different provisions, different signature pages, and mysterious unexplained blue dots on the bottom of one);

- 980 Atlantic Avenue:   There are at least three different versions of this Sham Operating Agreement. *Compare* Strulovitch Dec. Ex. 9 *with* Strulovitch Reply

---

[6] As demonstrated in the Opp. Br., regardless of any authority Strulovitch may have had to impose an operating agreement on either the Holding Company Defendants or the LLC Plaintiffs, Strulovitch still would not have any authority to deprive the LLC Plaintiffs or their members of a judicial forum and foist arbitration on them solely based on his own self-serving signature. *See* Opp. Br pp. 14, 18-20.

Exs. 40, 42-43. Two of these Operating Agreements provide for an effective date of **June 09, 2014** and **Juny [sic] 09, 2014**) and Exhibit 43 states that the LLC Agreement is effective as of **August 14, 2013**. This is especially critical given that Exhibit 45 misstates that it annexes a true and correct copy of the Sham Operating Agreement of 980 Atlantic Holdings LLC, acknowledged by Plaintiff Yaakov Ben-Shimon but includes signature pages with no operating agreement. *See* Strulovitch Reply Ex. 45. There are signatures missing from Exhibit 45, which does not contain a signature of the investor whom it supposedly binds. Finally, Strulovitch has not signed one of purported "true and correct" operating agreements for 980 Atlantic Holdings LLC. *See* Strulovitch Reply Ex. 39.

- 348 St. Nicholas Avenue: Strulovitch declares under oath that **Exhibit 16** is a true and correct copy of the Limited Liability Company Operating Agreement of 348 St. Nicholas LLC, acknowledged by Plaintiff Benjamin Schonberg." *See* Dkt. No. 198 ¶ 18 (emphasis in original). Exhibit 16 is nothing but what appears to be five copies of one signature page and does not contain follow any purported operating agreement – let alone the supposed operating agreement for 348 St. Nicholas LLC. **It is also not signed by Strulovitch.** For Halpern's alleged signature on the Sham Operating Agreement for 348 St. Nicholas, the name of the entity in the Sham Operating Agreement is different from the one on the signature page. *See* Reply Dec. at Exs. 16, 17.

- 1078 Dekalb Avenue: Exhibits 48 and 49 purport to be LLC Operating Agreements for 1078 Dekalb LLC. But there are two different sets of signature pages. One set refers to an entity called "DOL." *See* Strulovitch Reply Exs. 48 at p. 9, 49 at p. 9. "DOL" is not defined anywhere in the Sham Operating Agreements as Exhibits 48 and 49. Exhibits 46 and 47 contain signature pages stating that the signatory is an investor in 1078 Dekalb Operations LLC. *See* Strulovitch Reply Dec. Exs. 46, 47.[7]

In the limited time afforded to them to submit this response, these are but some of examples that Plaintiffs have been able to identify showing that Strulovitch has thrown together whatever he can in the hopes that he can make the arbitration clauses stick. Accordingly, these material and significant discrepancies serve as an independent basis to deny Strulovitch's motion to compel arbitration. *See Dreyfuss*, 2008 U.S. Dist. LEXIS 96945, *23 (discrepancies and

---

[7] Plaintiffs further note that Exhibit 49 to Strulovitch's Reply Declaration has portions cut off and does not appear to be complete. Therefore, it cannot be a "true and correct" copy of anything.

missing pages between different agreements to arbitrate mandates denial of a motion to compel arbitration).

### 3.   The Court Cannot Bind Nonsignatory Plaintiffs

As is evident from all of the foregoing facts and the Declaration of Binyomin Halpern attached hereto, which expressly so states, these Sham Operating Agreements were not effective because the Members could not reach a meeting of the minds. *See* Halpern Dec. ¶ 4. But even if the Court did give credence to these Sham Operating Agreements and conclude that these Sham Operating Agreements are enforceable as to signatories, the signature of an investor on one Investment Property still would not bind him or her to arbitration on other Investment Properties where they did <u>not</u> sign. *See Rosen v. Mega Bloks Inc*., No. 06 Civ. 3474 (LTS) (GWG), 2007 U.S. Dist. LEXIS 48479, *13 (S.D.N.Y. July 6, 2007) (holding that "[p]arties are free to enter into multiple contracts as part of a single transaction without the provisions in one contract governing another contract").

Indeed, as noted *supra*, based on Strulovitch's own exhibits, none of the Sham Operating Agreements bear the signatures of the majority of any of the LLC Plaintiffs. For 1213 Jefferson Ave, 98% of the interests are unsigned and 97% are unsigned for 720 Livonia. Binyomin Schonberg and Binyomin Halpern are investors in 20 of the 22 Investment Properties. They are alleged to have signed, at best, one Sham Operating Agreement in connection with 348 St. Nicholas Avenue. But they did not sign 19 other Sham Operating Agreements, and there are no signature pages acknowledging their interests or otherwise affording them any benefits. The same is true of the other Individual Plaintiffs listed on the chart below, who invested in numerous Investment Properties in which they and the majority of their co-Members are not

signatories to all of these Sham Operating Agreements, and are in the majority <u>for whom there</u> <u>are no signatures</u>.

| Individual Plaintiff | Number of Properties Without Signatures |
|---|---|
| Binyomin Mordechai Halpern | 19 |
| Benjamin Schonberg | 16 |
| Bertha Sara Schonberg | 12 |
| Jacob Schonberg | 11 |
| Pnina Schonfeld | 7 |
| Frieda Karmel | 6 |
| Morris Karmel | 6 |
| David Schonfeld | 6 |
| Clara Grossman | 3 |
| Irving Grossman | 3 |
| Raphael Barouch Elkaim | 2 |

For the Court to stay this litigation in its entirety in favor of arbitration based on Sham Operating Agreements not executed by a majority of any of the LLC Plaintiffs would create manifest injustice and punish the majority of the Members of each LLC Plaintiff who elected not to sign Strulovitch's Sham Operating Agreements. Plaintiffs should not be punished for not signing the Sham Operating Agreements by being barred from litigating while Strulovitch arbitrates with a minority of members before his own Rabbi. Strulovitch cannot deprive the majority of a judicial forum by misusing signatures of the minority.[8]

---

[8] Worse still, doing so would also unnecessarily punish the 20% of the Individual Plaintiffs for whom Strulovitch has not produced any signature pages at all: *viz.* Jacob Elkaim, Shmuel Gabai, Abraham Grossnass, Miriam Lev, Svraham Lev, Yakkov Lev, Pnina Schonfeld, Zevulun Veichelder, Abraham Vinberg, and Avraham Zakuta. Contrary to Defendants' self-serving contention, they cannot be estopped from litigating in Court. Defendants state they "derived a direct benefit from the [Sham Operating Agreements] in that these agreements acknowledged their investment" and provided other alleged benefits to them. But the very fact that there are no signature pages for them demonstrates that no one has "acknowledged their investment" or given them any benefits from these Sham Operating Agreements.

## II.  THE MOTION TO DISMISS THE
## FIRST CAUSE OF ACTION FOR SECURITIES FRAUD FAILS

As he does throughout the Reply, Defendants attempt to rewrite the allegations of securities fraud in the SAC to falsely state that it does not plead any misrepresentations with respect to 10 of 22 Investment Properties.  *See* Reply at 32.  However, the SAC alleges that <u>each</u> of the fraudulent prospectuses for the <u>22</u> Investment Properties inflated the projected costs of construction so that the Individual Defendants could take excessive loans to leverage the investment properties for their own benefit, and induced the Plaintiffs to fund this construction. *See* SAC ¶ 80.  Nevertheless, building on this false premise, Defendants assert three new arguments with respect to the First Cause of Action for securities fraud: (A) Plaintiffs were required to plead additional details such as the exact amount of their respective investments and the dates they made those investments; (B) portions of Plaintiffs' securities claims are allegedly barred by the statute of limitations; and (C) that the disclaimers in the Sham Operating Agreements may be considered on a Rule 12 motion because Plaintiffs have allegedly relied upon them in the SAC.  Each of these arguments is without merit.

### A.  The 10(b)(5) Claim Is Pled with Sufficient Particularity

Plaintiffs have satisfied the pleading requirements to allege a securities fraud violation. The particularity requirement in Fed. R. Civ. P. 9(b) "ensure[s] that the complaint provides a defendant with fair notice of a plaintiff's claim and with adequate information to frame a response."  *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 332-33 (D. Conn. 2004), *rev'd on other grounds sub nom.*, *United States v. Baylor Univ. Med. Ctr.*, 469 F.3d 263 (2d Cir. 2006).  Indeed,

> It is only common sense that the sufficiency of pleadings under Rule 9(b) may depend upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of

> the parties and the determination of how much circumstantial
> detail is necessary to give notice to the adverse party and enable
> him to prepare a responsive pleading.

*In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 334 (D. Conn. 2004) (quoting *United States ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 206-07 (E.D. Tex. 1998)) (citations and internal quotations omitted).  *Accord, e.g.*, *United States ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 508 (S.D.N.Y. 2014).  <u>Where, as here, the pleading notifies the adverse parties and the court of the transactions at issue and whether the injury was suffered in connection with the purchase and sale of securities so that defendants may prepare a responsive pleading, Rule 9(b)'s heightened pleading requirements have been met, and that rule's requirements are tempered.</u>  *See In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 334 (D. Conn. 2004); *see also Grunwald v. Bornfreund*, 668 F.Supp. 128, 131 (E.D.N.Y. 1987) (holding that while "the precise content or dates of the[] misrepresentations is not as clear as it might be, it is adequate to give defendant notice of the claim against him."); *SEC v. Terezakis*, 1997 U.S. Dist. LEXIS 16227, *3-4 (E.D.N.Y. Sept. 30, 1997) (declining to dismiss complaint even though it did not contain exact dates and places of misrepresentations because "given the nature of the alleged scheme," the allegations were "sufficiently outlined to place defendants on notice so that they may frame a responsive pleading").

On Reply, citing only to securities fraud cases involving publicly traded stocks, Defendants contend that Plaintiffs have not satisfied the pleading requirements to state a claim for securities fraud because they have not detailed the amounts invested by each plaintiff, and the dates on which these investments were made.  *See* Reply at pp. 32, 34.  In addition, Defendants contend that they are insulated from claims regarding his intentionally inflating the acquisition

price of the Property, because the representations in the Prospectuses allegedly included "closing costs." *See* Reply at p. 34.  As detailed below, none of these arguments have merit.

1.    No Further Details About Amounts and Dates
      of Investments Are Required to Satisfy Rule 9(b)

Defendants argue that each Plaintiff was required to plead the exact dates and specific amounts of their investment.  They are wrong.  In 2011, Judge Gleeson rejected this exact argument made by a defendant attempting to misuse Fed. R. Civ. P. 9(b) to impose onerous pleading standards on plaintiff in connection with securities fraud.  *See Maverick Fund v. Comverse Tech.*, 801 F. Supp. 2d 41, 53-54 (E.D.N.Y. 2011).  Like here, defendants argued that plaintiffs had to plead precise details about all purchases of the securities. *See id.* at 53.  The *Maverick Fund* court considered and rejected this argument, stating that such details are only relevant to damages and not whether the plaintiffs state a claim for securities fraud.  Judge Gleeson held as follows:

> Defendants rely on several cases where courts have found that plaintiffs failed to satisfy the requirements of Rule 9(b) because they did not plead specific details regarding all purchases and sales of securities.  But in those cases the failure to plead the details of purchases or sales of securities <u>made it impossible for the courts to figure out what conduct was alleged to be fraudulent or whether the injury alleged was suffered 'in connection with the purchase or sale of securities,'</u> as required by Section 10(b) and Rule 10b-5. Here, plaintiffs provide ample details concerning which statements are alleged to be fraudulent and why.  They further allege that they bought and sold shares of the Company's stock on a public exchange over the entire period of the alleged fraud. In the context of this case, I conclude that the plaintiffs are not required to plead the specific details of each purchase and sale of Comverse stock during the relevant period.  <u>The specifics of when plaintiffs made trades and at what prices those trades were made, while relevant to the issue of damages, is not a matter of concern at this stage</u>.

*Id.* at 53-54 (emphasis added).  The Southern District agrees with the Eastern District on this issue. *See Dimensional Emerging Markets Value Fund v. Petroleo Brasileiro S.A.*, 152 F. Supp.

3d 186, 196 (S.D.N.Y. 2016) ("Although plaintiffs' complaints do not tie specific misstatements to specific transactions in securities, such specificity is not necessary . . . when the relevant period is so extensive and plaintiffs allege numerical misstatements and their relevance with such particularity."); *see also Haberkamp v. Steele*, No. 90 Civ. 1383, 1992 U.S. Dist. LEXIS 4917, *27-31 (S.D.N.Y. Apr. 15, 1992) (rejecting argument that plaintiffs' failure to plead specific dates of investments foreclosed reliance on misstatements in an offering document); *Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, No. 00-5965 (JCL), 2005 U.S. Dist. LEXIS 16855, *17-18 (D.N.J. June 7, 2005) (rejecting contention that "more details of plaintiffs' purchases were required to enable defendants to prepare a defense against claims of the individual plaintiffs whose circumstances may differ, in addition to supporting the amount of damages claimed" as plaintiffs sufficiently detailed the time range of the transactions and damages, which could be determined at a later stage) (citation and internal quotations omitted).

Here, as in *Maverick Fund*, the Amended Complaint and the SAC allege in painstaking detail, a massive and elaborate fraudulent scheme by Defendant Strulovitch and his partner Defendant Oberlander that induced Plaintiffs into investing over $20,000,000 to purchase, develop, and manage more than 22 Investment Properties. *See generally* SAC.  To accomplish this fraudulent scheme, the Complaint alleges that Strulovitch and Oberlander presented to Plaintiffs, on dates specifically set forth in the Complaint, numerous fraudulent prospectuses that: (i) knowingly and grossly inflated the prices that Strulovitch and Oberlander would pay for the Investment Properties; (ii) knowingly made misrepresentations as to the condition and potential to renovate the Investment Properties; (iii) grossly inflated construction costs; (iii) manufactured bogus construction deadlines; (iv) knowingly misrepresented that Strulovitch and Oberlander planned to return Plaintiffs' investments on dates certain; and (v) knowingly

misrepresented that Strulovitch and Oberlander planned to include Plaintiffs in the distribution of profits from rents.  Amended Complaint ¶¶ 34-67; SAC ¶¶ 43-88.

In a case like this, with a small group of investors who all purchased their interest from the same two people, Strulovitch and Oberlander, who are intimately familiar with all of the Plaintiffs and when their investments were made, under the holding in *Maverick Fund*, Rule 9(b) does not impose any such onerous pleading requirements to detail each one to the penny.  *See also Kuczynski v. Ragen Corp.*, 732 F. Supp. 378, 385 (S.D.N.Y. 1989) (holding that plaintiffs' claim that they "were persuaded to invest a substantial amount of capital in defendant [company], leading to the loss of at least $1,000,000" was sufficient to meet particularity requirements of Rule 9(b)); *Int'l Motor Sports Group, Inc. v. Gordon*, 98 Civ. 5611 (MBM), 1999 U.S. Dist. LEXIS 12610, *8, 11-12 (S.D.N.Y. Aug. 16, 1999) (declining to dismiss counterclaim plaintiff's securities fraud counterclaim based on a private offering memorandum where the counterclaim did not specify the precise dates, holding that a "plaintiff need not plead dates, times and places with absolute precision," so long as the defendant has "fair and reasonable notice" about the claims being asserted against him).  This is yet another stall tactic by Defendants to delay discovery and tie this case up in motion practice.

Indeed, this is also evident from the cases cited by Strulovitch in his Reply, which do not involve the direct solicitation of a small group of investors in a real estate Ponzi scheme.  His cases involve fraud in connection with publicly traded securities where each plaintiff would have to plead how much money was spent on the securities and the date of the purchase in order to give a defendant fair notice of the claim.  *See* Reply at pp. 32-34; (citing *Garber v. Legg Mason, Inc.*, 537 F. Supp.2d 597, 616-17 (S.D.N.Y. 2008); *D'Addio v. L.F. Rothschild Inc.*, 697 F. Supp. 698, 702 (S.D.N.Y. 1988); *In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*, 995 F.

Supp. 2d 291, 297-98 (S.D.N.Y. 2014), *aff'd sub nom. SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos. L.L.C.*, 829 F.3d 173 (2d Cir. 2016); *Dexia SA/NV v. Deutsche Bank AG*, 11 Civ. 5672 (JSR), 2013 U.S. Dist. LEXIS 3482, *4, 18-19 (S.D.N.Y. Jan. 4, 2013)).  Inasmuch as Strulovitch and Oberlander masterminded a Ponzi Scheme by soliciting individual investors, and are on ample notice of the claims based on the details in the SAC, there is no basis to dismiss the First Cause of Action for Securities fraud.[9]

2.   The Fraud Allegations Concerning Strulovitch's Inflation
     of the Purchase Prices of the Investment Properties Are Amply Pleaded

Strulovitch also contends that by including the words "closing costs" in the Prospectuses, it insulates him from liability for overstating the acquisition cost of the Property <u>by a factor of two</u>.  Reply Br. at p. 34.  This argument fails for several reasons.  First, to even credit this argument, the Court would have to accept that it is plausible that Strulovitch may have paid outlandish amounts of closing costs such as $1,000,000 in costs to acquire an $800,000 property or $200,000 in closing costs to acquire a $200,000 Property.  That is absurd, and given Plaintiffs' entitlement to favorable inferences, the Court could not accept Defendant's contention, even if the numbers could conceivably support Defendants' contention, which they do not.  Accordingly, Defendant's argument that the term "closing costs" insulates him from liability for securities fraud must fail.  At best, this is a question for a jury, and not something that can be addressed before discovery at the pleading stage.

---

[9] Incidentally, Defendants' argument that Plaintiffs have engaged in improper group pleading is undercut by Exhibit 47 of the Reply Dec.  There, Strulovitch's company, CS Real Estate Management purports to be transmitting a Sham Operating Agreement to an investor – this document was also available to Defendants but tactically omitted.  The Hebrew above the CS Management states on its face that the person sending the Sham Operating Agreement is Defendant Oberlander in the name of CS Management LLC.  The fact that Oberlander is sending documents on behalf of Strulovitch's company further underscores the lack of any merit to the disingenuous pleading arguments made by Defendants.

Next, even if the Court entertained the notion that exorbitant closing costs were conceivable, which it should not, Strulovitch would still be liable for fraud because he would have had an obligation to disclose that he was paying "closing costs" that ranged up to 112-118% of the actual price he was paying for an Investment Property. *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02-Civ. 0767 (LBS), 2003 U.S. Dist. LEXIS 21854, *41 (S.D.N.Y. Dec. 4, 2003) (holding that alleged failure to disclose secret commissions that inflated the cost of commissions was misleading despite the fact that the overall cost of the commission was disclosed, and crediting the argument that a reasonable investor would "logically assume" that a $450,000 commissions would be disclosed); *Roni LLC v. Arfa*, No. 601224/2013, 2013 N.Y. Misc. LEXIS 2796 (Sup. Ct. N.Y. County June 27, 2013) (promoters of a real estate syndicate liable for any failure to fully disclose all fees associated with various transactions, particularly ones that are grossly disproportionate and out of the ordinary).

**B.** **The Statute of Limitations Has Not Run on Any of Plaintiffs' Claims**

The statute of limitations for claims under the '34 Act is the earlier of (i) 2 years after the discovery of the facts constituting the violation; or (ii) 5 years after such violation. The SAC expressly pleads that the first time Plaintiffs had even become suspicious of wrongdoing was in the spring of 2016 when they learned that their multi-million dollar investments in properties like 657 Fifth Avenue, 73 Empire Boulevard, and 980 Atlantic Avenue had stalled, the Investment Properties were penniless, and that the Individual Defendants had taken out undisclosed mortgages on certain properties. SAC ¶ 114. As pleaded, that is the earliest date that the 2 year statute of limitations could have conceivably begun to run. In as much as Plaintiffs commenced this action in April of 2017, the First Cause of Action is not barred by the statute of limitations.

In an effort to sidestep the First Cause of Action for Securities Fraud, Defendants focus solely on the representations in the SAC about purchase prices, ignoring the rest of the fraud allegations. Defendants argue that Plaintiffs had "inquiry notice" of certain of the fraud claims because the actual purchase price of each of the Investment Properties was listed on deeds that were filed with the County Clerk's office. Reply at p. 30. According to Defendants, because such information could have been discovered more than two years before the action was filed, Strulovitch argues that the First Cause of Action is time-barred as a matter of law.[10] Reply at pp. 30-31.

The Second Circuit interprets "discovery" under Section 1658(b)(1) as meaning the date when a reasonably diligent plaintiff would have discovered the facts relating to the scienter element of fraud. *See Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 Fed. App'x 664, 666 (2d Cir. 2016) (citing *Merck & Co. v. Reynolds*, 559 U.S. 633 (2009)). Because the question of what constitutes "reasonable diligence" is fact-intensive, it is usually a question for the jury to decide and not appropriate for a motion to dismiss. *Marini v. Adamo*, 995 F. Supp.2d 155, 184 (E.D.N.Y. 2014). For example, the sophistication of the parties is "extremely relevant" to determining reasonable diligence "because the investor's sophistication affects the extent to which a court may properly conclude that a particular event should have influenced the investor to undertake an inquiry." *Marini*, 995 F. Supp. 2d at 184 (holding that coin investors lacked sophistication, and therefore did not have a duty to inquire about activities that would have placed them on notice of securities fraud). Likewise, what an ordinary investor would have done is generally a question of fact for a jury. *Trepuk v. Frank*, 44 N.Y.2d 723, 725 (1978) ("Where it

---

[10] Strulovitch erroneously contends that Plaintiffs have not pleaded a fraud claim with respect to 853 Lexington Avenue because the Plaintiffs supposedly did not invest the $800,000 requested for construction based on fraudulent reports. *See* Reply at p. 29 n.14. However, contrary to Strulovitch's claim, the SAC alleges that the LLC Plaintiffs advanced those funds to 853 Lexington Avenue for construction. *See* SAC ¶52 n.1.

does not conclusively appear that a plaintiff had knowledge of facts from which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of the facts.").

Indeed, courts have repeatedly rejected attempts by defendants to charge plaintiffs with "inquiry notice" of a fraud based solely on a failure to monitor or check public records without more. For example, in *St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144 (E.D.N.Y. 2010), the Court stated that **"Defendants have not directed the court to a reasoned opinion in which a court has found that a 'reasonable person' or a 'person of ordinary suspicion' has a continuing duty to monitor a public record in the absence of any information which should trigger the person's interest in the record, on the off-chance that it might reveal evidence that he has been defrauded."** *St. John's Univ.*, 757 F. Supp. 2d at 192; *see also Azoy v. Fowler*, 57 A.D.2d 541, 542 (2d Dep't 1977) (failure to investigate public records did not constitute failure to exercise reasonable diligence where circumstances would not lead a person of ordinary suspicion to investigate public record).

In *Friedman v. Meyers*, 482 F.2d 435 (2d Cir. 1977), which is remarkably similar to the facts at bar, the Court expressly held that the existence of publicly recorded real estate documents did not put a plaintiff on inquiry notice of any fraud. There, plaintiff purchased $2.8 million in interests in a real estate syndicate based on the "representation that he would purchase the Gair premises for investors in their names," but instead conspired with the other defendants to purchase this and other properties in the name of a different corporation, which he then leased to an individual named Schwartz. *Id.* at 437. The defendants also diverted money raised in excess of the purchase price of the property for their own benefit, and placed mortgages on the property, diluting the value of plaintiff's investment. *See id.* The defendants argued that the

allegations were time barred because the lease to Schwartz was recorded in the County Clerk's office.  *See id.* at 439.  But the Court rejected that proposition and held that the claims were not time barred.

Indeed, the reason that fraud plaintiffs are not charged with a duty to monitor public records is that "New York courts have held, at least since 1865, that constructive notice of facts contained in public real property records will be imputed only to subsequent purchasers and incumbrancers, the stated purpose of the recording acts being to notify those two groups."  *See In re Crouse*, 27 B.R. 284, 286 (Bankr. E.D. Mo. 1983) (holding that plaintiff's fraud claim was thus not barred as untimely under New York law) (citing *Mead v. Bunn*, 32 N.Y. 275, 278 (1865); *see also Eltman v. Harvey*, 93 Misc.2d 634, 638 (Sup. Ct. Suffolk County 1978) ("the recording of an instrument affecting property is constructive notice to all **subsequent** purchasers and lienors of its existence and contents").

To be clear, recording a deed may give constructive notice **prospectively**, but does not provide constructive notice to the parties to the transaction.  Under this longstanding principle and the rationale of *Friedman*, it follows that Plaintiffs were not, as a matter of law, on "inquiry notice" of lower-than-represented purchase prices on the deeds filed with the County Clerk, and did not have any affirmative duty to search for those deeds.

This is particularly so given the allegations in the Complaint regarding Plaintiffs' lack of sophistication in New York City real estate investing.  The SAC expressly alleges that Strulovitch and Oberlander targeted foreign investors for their Madoff-style scheme precisely because they: (i) were unfamiliar with the complexities of New York real estate and construction; (ii) were not residents of the United States, and thus unlikely to visibly inspect the various investment properties; (iii) would not be represented by counsel in these transactions;

and (iv) Plaintiffs entrusted Strulovitch to use his expertise for their benefit.  SAC ¶ 39.  Any attempt to challenge these allegations is a question of fact for a jury and is not suitable for disposition on a motion to dismiss pursuant to 12(b)(6).  *See, e.g.*, *Casey v. Masullo Bros. Builders*, 218 A.D.2d 907, 908 (3d Dep't 1995) (denying summary judgment because where facts are peculiarly within the knowledge of defendant who made willful misrepresentations, a factual question exists as to whether a purchaser of a property had to inspect public records).

None of Strulovitch's case law obligates Plaintiffs to undertake any inquiry into the deeds.  In each case Strulovitch cites, some outside event occurred that that would trigger suspicion on the part of an investor of ordinary intelligence. *See In re Zyprexa Prod. Liab. Litig.*, 549 F. Supp.2d 496, 536 (E.D.N.Y. 2008) (barring securities fraud claim due to "[n]umerous and substantial" publicly available documents like news articles and court litigation documents which presented "facts and theories underlying plaintiffs' claims . . . for years before" plaintiffs' filing); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 200 (S.D.N.Y. 2003) (Fortune magazine article detailed the transactions that put plaintiffs on inquiry notice); *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 Fed. App'x 664, 668 (2d Cir. 2016) (SEC filings and sworn testimony in existence before plaintiffs brought suit contradicted defendants' representations); *Arco Capital Corp. v. Deutsche Bank, AG*, 986 F. Supp. 2d 296, 299, 304 (S.D.N.Y. 2013) (plaintiff had <u>actual notice</u> of financial instruments that entered into default years before bringing suit for securities fraud on related instruments).  Thus, Strulovitch has conflated a duty to inquire triggered by affirmative events with a supposed duty to inquire based on the mere fact that a transaction closed.

Equally meritless is Defendants' argument that the fraud claim with respect to 908 Bergen Street is beyond the 5 year statute of repose.  In 2016, the Second Circuit held that the

statute of limitations does not begin to run until 'the date of the defendant's last culpable act or omission.'" *Dekalb Cnty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 398 (2d Cir. 2016) (quoting *CTS Corp. v. Walkburger*, 134 S. Ct. 2175, 2182 (2014)).  Where a plaintiff claims securities fraud based on an ongoing scheme involving multiple misrepresentations, "the statute of repose first runs from the date of the last alleged misrepresentation regarding related subject matter." *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 325 (S.D.N.Y. 2012) (internal quotation marks omitted); *Plymouth County Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360, 378 (E.D.N.Y. 2008) ("the weight of authority, including in this Circuit, dictates that the five year statute of repose first runs from the date of the last alleged misrepresentation regarding related subject matter"); *accord In re Dynex Capital Secs. Litig.*, 05 Civ. 1897, 2006 U.S. Dist. LEXIS 4988, *13 (S.D.N.Y. Feb. 10, 2006) (statute of repose "'begins when the last alleged misrepresentation was made.'") (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 05 Civ. 1898, 2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. Sept. 6, 2005)), *rev'd on other grounds*, 531 F.3d 190.  Inasmuch as the scheme continued to run through 2015, the five year statute of repose did not begin to run until then.

Specifically, as alleged in the SAC, Defendants engaged in a Madoff-esque Ponzi scheme that layered misrepresentation upon misrepresentation.  Strulovitch misrepresented the purchase price of the Investment Properties in the prospectuses for each of the 22 Investment Properties. *See* SAC ¶ 5, 8-9, 43.  Defendants then provided "fraudulent updates and assurances" about the Investment Properties, and "Defendants' rate of progress" in renovating them.  SAC ¶¶ 6, 10.  As alleged in the SAC, this conduct began with 908 Bergen Street, but did not conclude until 2014. *See* SAC ¶¶ 35, 42.  Accordingly, under well-settled precedent in the Second Circuit, the statute of repose began to run, at the earliest, in 2015, making all of the claims herein timely.

Moreover, even if the statute of limitations affected some of the fraud allegations with regard to the purchase price of the Investment Properties, which it does not, it still does not affect Plaintiffs' claims relating to numerous other misrepresentations having nothing to do with purchase prices.  As such, substantial portions of the First Cause of Action for securities fraud claims would remain, including those representations relating to closings that had not occurred (720 Livonia Avenue), leases that were lost (73 Empire Boulevard), and secret refinancings of the Investment Properties (618 Lafayette Avenue).  *See* SAC ¶ 109, 113, 127.  As only one misrepresentation is needed to sustain the federal securities fraud claim, the First Cause of Action must stand.  Accordingly, Strulovitch's attempt to knock out the federal claim and send this case to Kings County Supreme Court fails.

**C.     The Disclaimers in the Sham Operating Agreements Do Not Bar
the Securities Claim Operating Agreements, But Rather Mandate Discovery**

Once again, Strulovitch resorts to mischaracterizing and distorting the allegations of the SAC to evade the law.  Strulovitch argues that despite the Second Circuit's strict rule that the Sham Operating Agreements cannot be considered on a 12(b)(6) motion, even if Defendant claims that Plaintiffs were aware of them, he can nonetheless rely on them because Paragraph 41 of the SAC alleges that no operating agreements were presented to any of the members of the LLC Plaintiffs nor was the execution made a condition of their investments.  Reply at pp. 37-38. Turning logic on its head, Strulovitch argues that a sentence in the SAC that there were no operating agreements means that Plaintiffs were on notice of the Sham Operating Agreements, purportedly disproving the securities fraud theory, and as such they can be used against Plaintiffs.  *Id.*

This argument – and the cases Defendants cite in support of it has been completely rejected by the Second Circuit's holding in *Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d

Cir. 2002).  There, the Second Circuit held that "[w]e reiterate here that a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; <u>mere notice or possession is not enough.</u>"  *Id.* at 153.  And once again, since it is Plaintiffs who are entitled to favorable inferences on a motion to dismiss, Defendants' conjecture about what Plaintiffs knew or did not know is not sufficient to dismiss a cause of action.[11]

## III.   <u>THE NOTICES OF PENDENCY REMAIN VALID AND SHOULD REMAIN</u>

As set forth in Plaintiffs' Opposition Brief, the Notices of Pendency at issue here directly affect real property.  In particular, the Fourth Cause of Action seeks a constructive trust over the Schedule B Properties themselves, as Strulovitch and Oberlander secretly purchased and renovated these properties with Plaintiffs' funds for their own benefit.  *See* Opp. Br. at pp. 30-31. In a case directly on point, *Keen v. Keen*, 140 A.D.2d 311 (2d Dep't 1988), the court denied cancellation of a notice of pendency where the properties on which the plaintiffs sought to impose a constructive trust were alleged to have been purchased using fraudulently diverted funds.  *See id.* at 312.

In Reply, Strulovitch again attempts to rewrite the case law by citing to *Pizurro v. Pasquino*, 201 A.D.2d 635, 636 (2d Dep't 1994) and falsely stating that *Keen* has been limited to shareholder derivative actions, and has otherwise been distinguished by later cases such that it is no longer good law.  These arguments also fail.

*Pizzuro* does not invalidate *Keen*, it reaffirms that a claim for a constructive trust like the one in this lawsuit, which seeks to impose a constructive trust on real property, states a claim that

---

[11] Indeed, Defendants' papers are full of invective and unsupported allegations targeted at Plaintiffs, none of which are appropriate on a motion to dismiss.  Finally, in response to the other arguments by Defendants made in the Reply, including those that purport to seek dismissal based on the disclaimers in the Sham Operating Agreements, we respectfully refer the Court to the arguments made in Opposition and to the telltale allegations in the SAC.

justifies a *lis pendens*, while, in contrast, a claim for a constructive trust over funds does not. Unlike in *Keen*, the plaintiffs in *Pizurro* sought a constructive trust over <u>money</u> diverted from a realty company. *See id.*

The SAC alleges that Strulovitch and Oberlander used Plaintiffs' fraudulently diverted funds to purchase the Secret Properties, and seeks a constructive trust over the Secret Properties, not over the money used to purchase them. Thus, the facts here are like *Keen*, not like *Pizzuro*, and the Notices of Pendency are valid. *See* SAC ¶ 165. Further, *Keen* is not limited to shareholder derivative litigations nor has it been distinguished out of existence, as Strulovitch contends. In *Galasso, Langione, & Botter, LLP v. Galasso*, No. 010038/2007, 2016 N.Y. LEXIS 3312, (Sup. Ct. Nassau County Sept. 19, 2016), a lawyer purchased a condominium property for a law office with money stolen from client escrow accounts. *See id.* at *105, 122. Plaintiffs, whose money had been converted to fund this purchase and funneled through a holding company called Lawcondo, LLC, sought to impose a constructive trust <u>over the property purchased by Lawcondo, LLC</u>. *See id.* at 122-23. The law firm defendants sought to vacate a notice of pendency on the condominium that had been purchased with these funds. Following trial and a detailed legal analysis, the *Galasso* court imposed a constructive trust on the condominium, and denied the law firm's motion to vacate the *lis pendens*, citing *Keen*. *See Galasso*, 2016 N.Y. LEXIS 3312, at *123, 141-42.

Reaching this outcome required the *Galasso* court to find – at the pleadings stage – that a cause of action for constructive trust over real property purchased with fraudulently obtained funds was sufficient to support the issuance of notices of pendency. The result should not differ here. Plaintiffs have stated a claim for a constructive trust, and the remedy directly affects real

property, justifying the notices of pendency.   Accordingly, the Court should not vacate the notices of pendency.

## IV.     THE LLC PLAINTIFFS' DIRECT CLAIMS CANNOT BE DISMISSED

Finally, Strulovitch argues that the LLC Plaintiffs have somehow "pled themselves out of the case" by withdrawing the derivative claims in lieu of the direct claims asserted in the SAC. Specifically, Strulovitch argues that "Plaintiffs do not assert that they represent a majority membership interest of any specific LLC Plaintiff" given that "[t]here are over 180 separate investors in the Investment Properties."  Reply at p. 26.

This argument is yet another effort by Strulovitch to rewrite the plain language of the SAC to suit his self-serving argument.  The SAC expressly alleges that "[t]he LLC Plaintiffs have resolved to interpose direct claims in this action against all of the Defendants herein."  SAC ¶ 17.  This allegation alone suffices to refute Strulovitch's argument, as it is well-settled that in ruling on a motion to dismiss, the Court must "assume[] that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 589 (2007) (internal quotation marks omitted).

Indeed, Plaintiffs do, in fact, have the authorizations from the majority of the members of the LLC Plaintiffs. *See* Halpern Dec. Ex. A.  Accordingly, Strulovitch's motion seeking dismissal of the LLC Plaintiffs' direct claims for breach of fiduciary duty, unjust enrichment, and constructive trust fails.

## <u>CONCLUSION</u>

For all of the reasons stated herein, the Dismissal Motions should be denied in their entirety.

Dated: August 10, 2017
New York, New York

Respectfully Submitted,

OVED & OVED LLP

By: /s/Edward C. Wipper_____
Darren Oved, Esq.
Edward C. Wipper, Esq.
*Attorneys for Plaintiffs*
401 Greenwich Street
New York, New York 10013
Tel: 212.226.2376