UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------X
JACOB SCHONBERG, BINYOMIN SCHONBERG,
BINYOMIN HALPERN, RAPHAEL BAROUCH ELKAIM,
BUSHWICK OPERATIONS LLC, KINGSTON OPERATIONS
LLC, JEFFERSON OPERATIONS LLC, 369 GATES
OPERATIONS LLC, 1078 DEKALB OPERATIONS LLC, 618
LAFAYETTE OPERATIONS LLC, 74 VAN BUREN
OPERATIONS LLC, 760 WILLOUGHBY OPERATIONS
LLC, 454 CENTRAL AVENUE OPERATIONS LLC, 855
DEKALB AVENUE OPERATIONS LLC, 720 LIVONIA
OPERATIONS LLC, SLOPE EQUITIES OPERATIONS LLC,
WILLOUGHBY ESTATES OPERATIONS LLC, 73 EMPIRE
DEVELOPMENT OPERATIONS LLC, 980 ATLANTIC
HOLDINGS OPERATIONS LLC, 325 FRANKLIN
OPERATIONS LLC, 8 MAPLE AVENUE OPERATIONS LLC
853 LEXINGTON OPERATIONS LLC, 348 ST. NICHOLAS
OPERATIONS LLC, 1301 PUTNAM OPERATIONS LLC, 945
PARK PLACE OPERATIONS LLC, BERTHA SARA
SCHONBERG, SHIMON ASULIN, YECHIEL BEN-DAVID,
YAAKOV BEN-SHIMON, AVRAHAM BEN-ZIMRA,
RACHEL BEN-ZIMRA, NETANEL COHEN-ARAZI, ISAAC
ELKAIM, JAKOB ELKAIM, DAVID DOV ERNSTER,
SHMUEL GABAI, MIKE GENUTH, MIRIAM GENUTH,
RACHEL GOLOMBACK, PINCHAS GROSKOPF, NATHAN
GROSS, CLARA GROSSMAN, IRVING GROSSMAN,
ABRAHAM JOSHUA GROSSNASS, FRIEDA KARMEL,
MORRIS KARMEL, MIRIAM CHAYA LEV (BEN-SIMON),
AVRAHAM YESHAYAHU LEV, OVED LEVI, YAAKOV
LEVIN, SIMHA MAIMON, YOSEF MAIMON, MORDECHAI
YAAKOV MEYER, SARA MEYER, MICHAEL MULLER,
PINHAS DOV NEUFELD, ABRAHAM PASKAS, DAVID
SCHONFELD, PNINA SCHONFELD, ITAMAR SHAYA,
SHIMON SHENKER, YOSSEF SHTERN, ZEVULUN
VEICHELDER, ABRAHAM VINBERG, ELYASHIV
MENAHEM WEIL, YAAKOV WIZMAN, AVRAHAM
ZAKUTA, AND CHAJA CHAVA ZWIEBEL,

**Docket No. 17-CV-2161
(CBA) (RML)**

ECF Case

<u>**NOTICE OF APPEAL**</u>

*Plaintiffs*,

v.

YECHEZKEL STRULOVICH a/k/a CHASKIEL
STRULOVITCH, YECHIEL OBERLANDER a/k/a MICI
OBERLANDER a/k/a MIHAY OBERLANDER, CSRE LLC,
-----------------------------------------------------------------------------X
*- caption continued on next page -*

```
---------------------------------------------------------------------------X
```

CS CONSTRUCTION GROUP LLC, GOOD LIVING
MANAGEMENT LLC, 908 BERGEN STREET LLC, 901
BUSHWICK AVENUE LLC, 106 KINGSTON LLC, 1213
JEFFERSON LLC, GATES EQUITY HOLDINGS LLC, 1078
DEKALB LLC, 618 LAFAYETTE LLC, 74 VAN BUREN
LLC, 762 WILLOUGHBY LLC, 454 CENTRAL AVENUE
LLC, 855 DEKALB AVENUE LLC, 720 LIVONIA
DEVELOPMENT LLC, 853 LEXINGTON LLC, 657-665 5th
AVENUE LLC, WILLOUGHBY ESTATES LLC, 73 EMPIRE
DEVELOPMENT LLC, 980 ATLANTIC HOLDINGS LLC,
325 FRANKLIN LLC, 945 PARK PL LLC, 1301 PUTNAM
LLC, 348 ST. NICHOLAS LLC, APC HOLDING 1 LLC, CSY
HOLDINGS LLC, 53 STANHOPE LLC, 1125-1133 GREENE
AVE LLC, 834 METROPOLITAN AVENUE LLC, 92 SOUTH
4TH STREET, LLC,  THE HOWARD DAY HOUSE LLC, 55
STANHOPE LLC, 599-601 WILLOUGHBY LLC, 1217
BEDFORD LLC, 1266 PACIFIC LLC, CSN PARTNERS L.P.,
196 ALBANY HOLDINGS L.P, FULTON STREET
HOLDNGS LLC, 100 JEFFERSON REALTY LLC, 167 HART
LLC, 741 LEXINGTON LLC, 296 COOPER LLC, 41-49
SPENCER LLC, CS YH CONDOS LLC, GOLD CLIFF LLC,
MYRTLINO HOLDINGS, LLC, WILLTROUT REALTY LLC,
SLOPE OFFICES LLC, STAGG STUDIOS LLC, AND JOHN
DOES 1-10 AND XYZ CORPS. 1-10 SUCH INDIVIDUALS OR
ENTITIES BEING UNKNOWN ENTITIES PRESENTLY IN CONTRACT TO
ACQUIRE THE PARCELS OF REAL PROPERTY LOCATED AT 618
LAFAYETTE AVENUE, 1018 DEKALB AVENUE, 853 LEXINGTON
AVENUE AND 657-665A FIFTH AVENUE,

**Docket No. 17-CV-2161
(CBA) (RML)**

ECF Case

<u>**NOTICE OF APPEAL**</u>

*Defendants.*
```
---------------------------------------------------------------------------X
```
*- caption continued from first page -*

**NOTICE** is hereby given that all Plaintiffs hereby appeal to the United States Court of

Appeals for the Second Circuit from all aspects of the Memorandum & Order (the "Order") of

the Honorable Carol Bagley Amon, entered on November 2, 2017 (Docket No. 257). A true copy

of the Order is annexed hereto. This appeal is taken from each and every part of the Order.

Dated: New York, New York
      November 30, 2017

                                           Respectfully submitted,

                           By:    /s/ Edward C. Wipper       
                                     Darren Oved, Esq.
                                     Edward C. Wipper, Esq.
                                     OVED & OVED LLP
                                     *Attorneys for Plaintiffs*
                                     401 Greenwich Street
                                     New York, NY 10013
                                     Tel.: 212.226.2376

TO:       All Counsel of record (*via* ECF)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

JACOB SCHONBERG, BINYOMIN
SCHONBERG, BINYOMIN HALPERN AND
RAPHAEL BAROUCH ELKAIM, et al,

                    Plaintiffs,

   -against-

YECHEZKEL STRULOVICH a/k/a CHASKIEL
STRULOVICH, YECHIEL OBERLANDER
a/k/a MICI OBERLANDER a/k/a MIHAY
OBERLANDER, et al,

             Defendants.

------------------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  NOV – 2 2017  ★

BROOKLYN OFFICE

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
17-CV-2161 (CBA) (RML)

**AMON, United States District Judge:**

      This dispute concerns serious allegations that defendants engaged in a multimillion dollar fraudulent real estate investment scheme that was allegedly orchestrated by defendants Yechezkel Strulovich and Yechiel Oberlander (the "Individual Defendants"). The crux of plaintiffs' allegations is that the Individual Defendants coaxed unsuspecting foreign investors into investing in twenty-two parcels of real property in New York by promising them a quick and substantial return on investment, only for the Individual Defendants to secretly funnel a substantial portion of plaintiffs' money to themselves and their other properties through a "Bernie Madoff style fraud." (D.E. # 192 ("Am. Compl.") ¶ 1.)[1]

      Presently before the Court are defendants'[2] motions to compel arbitration or, in the alternative dismiss. Also before the Court are defendants' motions to vacate notices of pendency

---

[1] Twenty of the investment properties are located in Brooklyn, New York. 8 Maple Avenue and 348 St. Nicholas Avenue are the two investments not located in Brooklyn—they are located in Suffolk County and Manhattan, respectively. (See Am. Compl. ¶ 23.)

[2] The two sets of defendants moving to compel or dismiss are: (1) the Individual Defendants, CSRE LLC, CS Construction Group LLC, Good Living Management LLC, 908 Bergen Street LLC, 901 Bushwick Avenue LLC, 106 Kingston LLC, 1213 Jefferson LLC, Gates Equity Holdings LLC, 1078 Dekalb LLC,

that plaintiffs have attached to various properties allegedly owned or controlled by the Individual

Defendants.  For the reasons stated below, the Court grants in part and denies in part defendants'

motion to compel arbitration, and grants defendants' motion to dismiss the claims not referred to

arbitration.   The Court further directs that the notices of pendency attached to defendants'

properties be lifted.

## BACKGROUND

### A. Parties

Plaintiffs Jacob Schonberg, Binyomin Schonberg, Binyomin Halpern, and Raphael

Barouch Elkaim (collectively, the "Original Plaintiffs") are residents of Israel and originally

commenced this action in April 2017.  (D.E. # 1.)  They have since been joined as plaintiffs by

forty three other individuals who are also residents of Israel, (together with the Original Plaintiffs,

the "Individual Investors").  (Am. Compl. ¶ 15.)  The other twenty two plaintiffs in this action are

limited liability corporations (the "LLC Plaintiffs") that were incorporated in New York, managed

by Strulovich, and have their principal place of business in Brooklyn, New York.  (Id. ¶ 16.)

Defendant Yechezkel Strulovich allegedly resides in Brooklyn, New York, (id. ¶ 25) and

Defendant Yechiel Oberlander resides in Israel, purportedly traveling to New York for "business,"

(id.).   Plaintiffs have also named as defendants a web of limited liability corporations that are

alleged to have ties to the Individual Defendants, most of which are listed in Schedules A and B

---

618 Lafayette LLC, 74 Van Buren LLC, 762 Willoughby LLC, 454 Central Avenue LLC, 855 Dekalb
Avenue LLC, 720 Livonia Development LLC, 853 Lexington LLC, 657-665 5th Avenue LLC,
Willoughby Estates LLC, 73 Empire Development LLC, 980 Atlantic Holdings LLC, 325 Franklin LLC,
945 Park Pl LLC, 1301 Putnam LLC, 348 St. Nicholas LLC, CSY Holdings LLC, APC Holding 1 LLC,
53 Stanhope LLC, The Howard Day House LLC, 55 Stanhope LLC, 599-601 Willoughby LLC, 1217
Bedford LLC, 1266 Pacific LLC, Fulton Street Holdings LLC, 167 Hart LLC, 741 Lexington LLC, and
296 Cooper LLC ("Schedule A Defendants") and (2) 1125-1133 Greene Ave, LLC, 834 Metropolitan
Avenue, LLC, 92 South 4th Street, LLC, 100 Jefferson Realty, LLC, and Gold Cliff LLC ("Schedule B
Defendants").

of the Amended Complaint.  The LLCs listed in Schedule A include twenty two limited liability corporations (the "Schedule A Defendants" or "Holding Company Defendants"), each of which was incorporated in New York and has its principal place of business in Brooklyn, New York.  (Id. ¶ 18.)  Each Holding Company Defendant's name reflects the address of the property, (e.g., "908 Bushwick Avenue LLC") it owns.  (Id. ¶ 18.)  Plaintiffs have named nineteen other limited liability corporations or limited partnerships as defendants, each of which is listed in Schedule B of the Amended Complaint.  The Schedule B Defendants are holding companies that own title to properties in New York, are allegedly controlled by the Individual Defendants, and received plaintiffs' funds that were claimed to have been diverted from the LLC Plaintiffs and the Holding Company Defendants.  (Id. ¶¶ 29−31.)

Defendants CSRE, LLC, CS Construction LLC, and Goodliving Management LLC (the "Construction Management Defendants") are New York corporations, controlled by the Individual Defendants, and serve as the management companies for properties that are controlled by the Individual Defendants.  (Id. ¶ 28.)  CSRE, LLC ("CSRE") is party to a number of agreements at issue in this case, including agreements between the Holding Company Defendants and the LLC Plaintiffs (the "Holding Company Agreements").  (See, e.g., D.E. # 198-Ex. 1.)  Defendants Myrtlino Holdings, LLC, Willtrout Realty LLC, Stagg Studios LLC, 41-49 Spencer LLC, and Slope Offices LLC are also allegedly controlled by the Individual Defendants and supposedly helped orchestrate the Individual Defendants' fraud.  (Id. ¶¶ 32−33.)  Plaintiffs have also named an additional twenty defendants, stylized as "John Does" and "XYZ Corps," who "cannot be presently be sufficiently identified without further discovery" but allegedly are the "names of the individual and/or entities to which certain investment properties are improperly in contract to be sold."  (Id. ¶ 34.)

## B. Background of Defendants' Purported Fraud and Investment Structure

In 2012, Oberlander allegedly solicited the Original Plaintiffs to invest in a residential property located at 908 Bergen Street, Brooklyn, New York that he was partnering with his "longtime business partner," Strulovich, to rehabilitate and eventually sell at a profit. (Id. ¶ 35.) Plaintiffs allege Oberlander targeted the Original Plaintiffs, each of whom lived in Israel, because they were "well-respected" within their Orthodox Jewish communities and their investment would provide legitimacy to the Individual Defendants' burgeoning real estate investment strategy to others in the Original Plaintiffs' communities. (Id. at ¶ 37.) Plaintiffs also contend the Individual Defendants knew the Original Plaintiffs would likely persuade others in their community to invest in their projects. (Id.) Furthermore, the Individual Defendants allegedly targeted overseas investors similarly situated to the Original Plaintiffs because they knew that they would be unfamiliar with the New York real estate market, were not represented by counsel, and would be unable to inspect the properties prior to investment. (Id. at ¶ 38.) In total, the Amended Complaint alleges that the Individual Defendants persuaded 180 investors to collectively invest over $20 million in twenty two separate parcels of real property. (See id. at ¶ 41.)

According to the Amended Complaint, at the time the Individual Plaintiffs transferred their money, they did so through representations and promises the Individual Defendants made in prospectuses for each of the properties, but they did not receive interests in the Holding Company Defendants or the LLC Plaintiffs at that time. (Id. at ¶ 38.) Along the same lines, at the time each investor allegedly "transferred money for each of the twenty two Investment Properties, no operating agreement was presented to the members of the LLC Plaintiffs for review or signature, nor was the execution of any operating agreement made a condition of making the investment, becoming a member in any of the LLC Plaintiffs, or otherwise acquiring an interest in any of

4

the LLC Plaintiffs, and thus an interest in the Investment Properties." (Id.) Although the Amended Complaint is vague on the mechanics and timing of these investments, it alleges that at some point in time, the Individual Plaintiffs were given interests in the LLC Plaintiffs that were derivatively connected to the Individual Defendants' investments in real estate. (Id. at ¶ 2.)

In fact, the Individual Plaintiffs' interests in the twenty two parcels of real property is alleged to be three steps removed the actual property: taking the Individual Plaintiffs as step one, step two was the twenty two LLC Plaintiffs, which at some point, were given forty five percent interests in one of the Holding Company Defendants. The third step of this investment structure was the Holding Company Defendants, which each allegedly held the title to one of the twenty two investment properties. (Id.) CSRE, an entity that is purportedly wholly owned by defendants Oberlander and Strulovich, owns the remaining fifty five percent in each Holding Company Defendant. (Id.) The Amended Complaint alleges that Strulovich and Oberlander are the managers of the Holding Company Defendants and of the LLC Plaintiffs (id. ¶¶ 26–27), and "own[] and control[]" defendant CSRE, (id. ¶ 28).

The Holding Company Agreements were attached to the Schedule A Defendants' motions. (D.E. # 196, 198.) Each Holding Company Agreement states that the agreement was between the respective Holding Company Defendant, Defendant CSRE, the respective LLC Plaintiff, and the members of that LLC Plaintiff. (See e.g., D.E. #196-1.) In each agreement, Strulovich signed on behalf of CSRE, the LLC Plaintiff (as its alleged manager) and the Holding Company Defendant (as its alleged manager). (Id. at 7.) Although the Holding Company Agreements declare that the members of the LLC Plaintiffs (i.e., the Individual Plaintiffs and approximately 135 non-plaintiff investors) are parties to the Holding Company Agreements, it is unclear whether all of the members of the respective LLC Plaintiff signed the Holding Company Agreements because defendants have

put forward only the signatures of a small minority of the members of the LLC Plaintiffs.  (D.E. #

198, Exs. 1-71.)[3]  For example, for five of the Holding Company Agreements, defendants have

not submitted signatures of any of the individual members of the corresponding LLC Plaintiff.

      In addition to other terms, the Holding Company Agreements contain arbitration clauses

that state:

> In case of any doubt, question or disagreements about anything pertaining to this
> Agreement, the parties will choose a third party that is acceptable to all the parties and ask
> for his opinion, and his ruling shall be accepted. The parties agree to not bring any matter
> relating to this Agreement to a secular court.

(E.g., D.E. #196-1 at § 14(d).)[4]  The Holding Company Agreements also contain merger clauses,

stating that "the terms and conditions of this agreement supersede any prior terms of agreement

between the parties as to the subject matter of this agreement," and that "all understandings and

---

[3] Defendants have put forward the following signatures of the Individual Plaintiffs: Nathan Gross (908
Bergen Street LLC, 325 Franklin LLC, 980 Atlantic Holdings LLC, 720 Livonia Development LLC,
1301 Putnam LLC); Jacob Schonberg (Gates Equity Holdings LLC, 945 Park Place, 1078 DeKalb LLC,
6018 Lafayette LLC, 325 Franklin LLC, 1213 Jefferson LLC); Bertha Sara Schonberg (Gates Equity
Holdings LLC, 1078 DeKalb LLC, 618 Lafayette LLC, 325 Franklin LLC); David Dov Ernster (853
Lexington LLC); Michael Muller (1078 DeKalb LLC, 618 Lafayette LLC, 73 Empire Boulevard); Chaja
Chava Zwiebel (1078 DeKalb LLC, 618 Lafayette LLC); Morris Karmel (74 Van Buren LLC); David
Schonfeld (74 Van Buren LLC); Raphael Barouch Elkaim (657-665 5th Avenue LLC, 73 Empire
Boulevard, 454 Central Avenue LLC); Yechiel Ben-David (657-665 5th Avenue LLC); Avraham Ben-
Zimra (657-665 5th Avenue LLC); Rachel Ben-Zimra (657-665 5th Avenue LLC); Isaac Elkhaim (657-665
5th Avenue LLC); Simha Maimon (657-665 5th Avenue LLC); Yosef Maimon (657-665 5th Avenue LLC);
Mordechai Yaakov Meyer (657-665 5th Avenue LLC); Sara Meyer(657-665 5th Avenue LLC); Pinhas
Dov Neufeld (657-665 5th Avenue LLC); Abraham Paskas (657-665 5th Avenue LLC); Yossef Shtern
(657-665 5th Avenue LLC); Pinchas Groskopf (73 Empire Boulevard LLC, 980 Atlantic Holdings LLC);
Itamar Shaya (73 Empire Boulevard LLC, 980 Atlantic Holdings LLC, CSY Holdings LLC); Clara
Grossman (980 Atlantic Holdings LLC); Oved Levi (980 Atlantic Holdings LLC); Shimon Shenker (980
Atlantic Holdings LLC, CSY Holdings LLC); Shimon Asulin (CSY Holdings LLC); Yaakov Ben-Shimon
(CSY Holdings LLC); Elyashiv Menahim Weil (CSY Holdings LLC); Yaakov Wizman (CSY Holdings
LLC).  (See D.E. # 198) (collectively, the "signatory Individual Plaintiffs").
[4] The clauses that the arbitration clauses appear in are as follows: Ex. 1, § 14(d); Ex. 2, § 13(d); Ex. 3, §
13(d); Ex. 4, § 13(d); Ex. 5, § 13(d); Ex. 6, § 13(d); Ex. 7, § 13(d); Ex. 8, § 13(d); Ex. 9, § 13(d); Ex. 10,
§ 13(d); Ex. 11, § 13(d); Ex. 12, § 13(d); Ex. 13, § 13(d); Ex. 14, § 13(d); Ex. 15, § 13(d); Ex. 16, § 13(d);
Ex. 17, § 13(d); Ex. 18, § 13(d); Ex. 19, § 13(d), (D.E. # 196); Ex. 4 § 13(d); Ex. 16 § 14(d); Ex. 51 §
13(d), (D.E. # 198).

agreement heretofore had between the parties are merged in this Agreement, which alone fully and completely express their agreement." (Id.)

### C. Plaintiffs' Investments and the Individual Defendants' Purported Misrepresentations

Between February 2012 and September 2014, the Individual Defendants allegedly transmitted prospectuses to investors for each of the twenty two investment properties. (Am. Compl. ¶ 42.) Plaintiffs contend that each prospectus, none of which was submitted in connection with this motion or the Amended Complaint, promised the Individual Plaintiffs a quick return on investment and a proportional interest in the revenue stream each property would generate. (Id.) Each prospectus also allegedly provided the purchase price of the underlying property, the mortgage costs, date for completion of construction, and the promise that investors would receive the return of their original investment in a relatively short period through a refinancing of the original bank loan. (Id. ¶ 43.) Unlike the Holding Company Agreements, the prospectuses purportedly did not contain arbitration provisions. (Id. ¶ 44.) According to the Amended Complaint, the Individual Defendants promised to undertake a litany of duties in the prospectuses, including: develop the investment properties by managing the construction process, manage rentals of those properties, and comply with New York and federal tax laws. (Id. ¶ 46.)

The Amended Complaint alleges that a key to defendants' fraud was that the prospectuses misrepresented the purchase price of each Schedule A property. The actual purchase prices paid by defendants were allegedly less than the amounts represented in the prospectuses. (Id. ¶¶ 47–79.) These "inflated" purchase costs purportedly permitted defendants to take out loans valued higher than the investment properties were worth, and that all of these ill-gotten additional funds were misappropriated by the Individual Defendants. (Id. ¶ 81.)   In addition to the common

7

misrepresentations as to the purchase price, the Amended Complaint alleges certain prospectuses contained other misrepresentations. (See, e.g., id. ¶ 62.)

The Amended Complaint also alleges that, in furtherance of their fraud, Oberlander and Strulovich engaged in a number of deceptive acts so that it would appear that their real estate business was legitimate. For example, the Individual Defendants supposedly refinanced loans so that they could return some of the plaintiffs' investments funds in six of the properties, performed light construction on some of the properties, (id. ¶ 86), and provided "hundreds of fraudulent, inaccurate and deceptive updates in the style of Bernie Madoff" to investors regarding the construction and renovation process, (id. ¶ 87).

### D. Defendants' Purported Diversion of Plaintiffs' Funds

Rather than using the funds invested by plaintiffs to develop the Schedule A properties as promised, the Individual Defendants purportedly "diverted the funds for their own personal enrichment." (Id. ¶ 88.) Specifically, the Individual Defendants allegedly used plaintiffs' investments "to support their own lavish lifestyles," purchase and acquire properties held for their benefit or their associates' benefit (the so-called "John Doe" defendants), and purchase and develop the Schedule B Properties—properties that plaintiffs held no interests in. (Id. ¶ 89.) According to the Amended Complaint, the equity that plaintiffs invested in the Schedule A Properties was used to make the Schedule B Properties profitable, (id. ¶¶ 111–13) while fourteen of the twenty two Schedule A properties "remain in various states of disrepair" and that three of those properties are presently in foreclosure, (id.). Additionally, the Individual Defendants purportedly have attempted to sell several of the Schedule A properties without informing plaintiffs. (Id. ¶¶ 119–121.) The Individual Defendants also allegedly improperly used the investment properties as collateral to secure loans defendants gave to the Schedule B properties,

8

(id. ¶ 91), and that "Strulovich . . . falsely swore" to banks that "he was the sole member of the Holding Companies" so that he could position himself to secretly divert the proceeds to himself and Oberlander, (id. ¶ 92). To illustrate, the Amended Complaint alleges "many banks and lending institutions have commenced foreclosure actions against Strulovich and the Holding Compan[ies]" for misrepresenting to them that Strulovich was the sole member of the Holding Companies. (Id. ¶¶ 94−95.)

Based on these allegations, plaintiffs raise a number of claims against the various groups of defendants. In the sole federal cause of action in this lawsuit, plaintiffs bring claims for securities fraud under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78, against the Individual Defendants. (Id. ¶¶ 125−135.) The LLC Plaintiffs bring claims for constructive trust against the Schedule B Defendants, (id. ¶ 160) and claims for accounting against all defendants, (id. ¶ 195). The remainder of the causes of action asserted in the Amended Complaint are brought on behalf of all plaintiffs. Those claims are for cancellation of contracts to sell 583 Lexington Avenue, 657−665 5th Avenue, 618 Lafayette Avenue, and 1078 Dekalb Avenue, (id. ¶ 136); common law fraud against the Individual Defendants, (id. ¶ 136); breaches of fiduciary duty, (id. ¶¶ 168−181); unjust enrichment against all defendants besides the Schedule B and John Doe defendants, (id. ¶¶ 182−194) and, constructive trust over proceeds derived from the Schedule B properties, (id. ¶¶ 201−204).

On April 25, 2017 and May 2, 2017, plaintiffs filed notices of pendency on all of the Schedule B Properties and four Schedule A Properties. (D.E. # 196-Exs. 21−22.) The four Schedule A Properties are: 1078 Dekalb Avenue; 853 Lexington Avenue; 618 Lafayette Street, and; 657−665 5th Avenue. (Am. Compl. ¶¶ 88−94.) These properties were allegedly sold by defendants without the consent of plaintiffs. (Id.)

### E. Procedure Posture

Currently pending before the Court are two motions to compel arbitration, or in the alternative, dismiss filed by two sets of defendants: (1) the Individual Defendants, the Construction Management Defendants, all of the Schedule A Defendants, and certain Schedule B Defendants (D.E. # 198 ("Schedule A Defs. Mem.")); and (2) the remaining Schedule B Defendants (D.E. # 200 ("Schedule B Defs. Mem.")).[5] Both sets of defendants have also moved to vacate notices of pendency attached to several of the Schedule A properties and all of the Schedule B Properties. (Id.) Plaintiffs filed the Amended Complaint in response to defendants' motions, (D.E. # 192) and also filed a brief in opposition, (D.E. # 201). Both the Schedule A Defendants, (D.E. # 197 "Schedule A Defs. Reply"), and Schedule B Defendants, (D.E. # 203 ("Schedule B Defs. Reply")), filed reply briefs targeted at the Amended Complaint. The Court granted plaintiffs a supplemental opposition to respond to new arguments raised therein, (D.E. dated Aug. 3, 2017), and plaintiffs subsequently filed their supplemental opposition, (D.E. # 223 ("Supp. Opp.")).

The Court has carefully considered all of the parties' submissions with respect to each of the motions. Because there is substantial overlap in the arguments in support of and in opposition to these motions, the Court will address them together in this omnibus opinion. As explained below, the Court grants and denies in part defendants' motions to compel arbitration, holding that only the LLC Plaintiffs and Individual Plaintiffs who signed a Holding Company Agreement must litigate their claims in arbitration. Additionally, because the Court holds that the non-signatory Individual Plaintiffs cannot interpose claims for securities fraud for securities that they did not

---

[5] Following oral argument, Defendant Oberlander joined the Schedule A Defendants' moving brief (D.E. # 228), and other Schedule B Defendants (100 Jefferson Realty LLC, 1125-1133 Greene Ave LLC, 834 Metropolitan Avenue LLC, 92 South 4th Street, LLC, Gold Cliff LLC., Stagg Studios LLC., and Willtrout Realty LLC) joined in the arguments made by the Schedule B Defendants, (D.E. # 229).

purchase, this Court declines to exercise supplemental jurisdiction over the remainder of the Individual Plaintiffs' state law causes of action.

## STANDARD OF REVIEW

On a motion to compel arbitration, "the court applies a standard similar to that applicable for a motion for summary judgment." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016) (quoting Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)). The summary judgment standard requires a court to "consider all relevant, admissible evidence submitted by the parties and contained in the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits." Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002) (internal quotation marks omitted). In doing so, the Court must draw all reasonable inferences in favor of the non-moving party. Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 171–72 (2d Cir. 2011).

"If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." Bensadoun, 316 F.3d at 175 (citing 9 U.S.C. § 4 ("If the making of the arbitration agreement . . . [is] in issue, the court shall proceed summarily to the trial thereof.")). But "where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, we may rule on the basis of that legal issue and 'avoid the need for further court proceedings.'" Wachovia Bank, 661 F.3d at 172 (quoting Bensadoun, 316 F.3d at 175).

In considering defendants' motion to dismiss, the Court must "construe the Complaint liberally, accepting all factual allegations in the Complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." Galiano v. Fid. Nat'l Title Ins. Co., 684 F.3d 309, 311 (2d Cir. 2012). Nevertheless, the "[f]actual allegations must be enough to raise a right of relief above the

speculative level," and the complaint must plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [plaintiff's claim]." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007). Put differently, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 555).

In applying these principles, the Court "must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Tarshis v. Riese Org., 211 F.3d 30, 39 (2d Cir. 2000) (citing Allen v. WestpointPepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991)). "Factual allegations contained in legal briefs or memoranda are also treated as matters outside the pleading for purposes of Rule 12(b)," Fonte v. Bd. of Managers of Cont'l Towers Condo., 848 F.2d 24, 25 (2d Cir 1988), and thus "[n]ew facts and allegations, first raised in a Plaintiffs' opposition papers, may not be considered," Simone v. United States, No. 09-CV-3904 (TCP), 2012 WL 4891617, at *6 (E.D.N.Y. Oct. 9, 2012).

## DISCUSSION

### I.  Defendants' Motion to Compel Arbitration

When considering whether to compel arbitration, courts in this Circuit must resolve two questions: 1) whether there is a valid agreement to arbitrate under the contract in question, and, if so, 2) whether the particular dispute at issue falls within the scope of the arbitration agreement. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Belco Petroleum Corp., 88 F.3d 129, 135 (2d Cir.

1996). In answering these questions, the Court is mindful that there is a "strong federal policy—manifested in the Federal Arbitration Act—favoring arbitration." Gold v. Deutsche Aktiengesellschaft, 365 F.3d 144, 147 (2d Cir. 2004). However, even though federal policy favors arbitration, it is well-established that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [it] has not agreed to so submit." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (internal quotation marks omitted).

The question of whether the parties have agreed to arbitrate, i.e., the "question of arbitrability," is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise. Id. "This principle 'flow[s] inexorably from the fact that arbitration is simply a matter of contract between the parties.'" Wachovia Bank, 661 F.3d at 171 (quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995)). To find a valid agreement to arbitrate, a court must apply the "generally accepted principles of contract law." Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 845 (2d Cir. 1987). "[A] party is bound by the provisions of a contract that [it] signs, unless [it] can show special circumstances that would relieve [it] of such obligation." Id.

Here, in support of their motion to compel arbitration, defendants have produced the twenty two operating agreements between the LLC Plaintiffs, members of the LLC Plaintiffs, Defendant CSRE, and the Holding Company Defendants, each of which contains an identical arbitration clause. (See D.E. # 198-Exs. 1–71.)[6] The applicability of the foregoing principles differs as to the plaintiffs who signed the Holding Company Agreements and those who did not sign one or more of those agreements, the analyses below is divided between (A) signatories to the Holding Company Agreements and (B) non-signatories to the Holding Company Agreements.

---

[6] The clauses of the Holding Company Agreements that the arbitration clauses appear in are as follows: Ex. 1, § 14(d); Ex. 2, § 13(d); Ex. 3, § 13(d); Ex. 4, § 13(d); Ex. 5, § 13(d); Ex. 6, § 13(d); Ex. 7, § 13(d); Ex. 8, § 13(d); Ex. 9, § 13(d); Ex. 10, § 13(d); Ex. 11, § 13(d); Ex. 12, § 13(d); Ex. 13, § 13(d); Ex. 14, § 13(d); Ex. 15, § 13(d); Ex. 16, § 13(d); Ex. 17, § 13(d); Ex. 18, § 13(d); Ex. 19, § 13(d). (D.E. # 196.)

### A. Validity of the Holding Company Agreements As To Signatories

Defendants contend that given the plain language of the arbitration clauses, it is "indisputable that the LLC Plaintiffs agreed to arbitrate this dispute via the Holding Company Agreements . . . by way of their managing member Strulovich." (Schedule A Defs. Mem. at 13.) Additionally, defendants also argue the Individual Plaintiffs who signed a Holding Company Agreement is bound by its terms. (Schedule A. Defendants Reply Br. at 20.) Plaintiffs raise two arguments seeking to overcome the presumption of arbitration: (1) the Holding Company Agreements are not binding contracts because the agreements were never fully formed, and (2) even if they were fully formed, the arbitration clauses cannot be enforced because they were the product of defendants' fraud. (Opp. at 7–15.) These two arguments are considered in turn below.

### 1. Formation of the Holding Company Agreements

Plaintiffs' challenges to the validity of the Holding Company Agreements are arguments for this Court to consider, not the arbitrator. Although most challenges to contracts containing arbitration clauses must be decided by the arbitrator, the Second Circuit had held that "a limited exception to the requirement of arbitration for general contract challenges may be available where a party questions . . . whether a contract was ever made." Ipcon Collections LLC v. Costco Wholesale Corp., 698 F.3d 58, 61 (2d Cir. 2012); Telenor Mobile Commc'ns AS v. Storm LLC, 584 F.3d 396, 406 n.5 (2d Cir. 2009) ("[Q]uestions about whether a contract was ever made . . . are presumptively to be decided by the court even without a specific challenge to the agreement to arbitrate."); McCaddin v. Se. Marine Inc., 567 F. Supp. 2d 373, 378 (E.D.N.Y. 2008) (recognizing "that under well-settled Second Circuit law any triable issues of fact regarding fraud in the execution must be addressed by the court and not the arbitrator"). The Supreme Court confirmed this limited exception in Granite Rock Co. v. Int'l Brotherhood of Teamsters, 561 U.S. 287 (2010). See id. at 296 ("It is similarly well settled that where the dispute at issue concerns contract

14

formation, the dispute is generally for courts to decide."); Dedon GmbH v. Janus et Cie, 411 F.

App'x 361, 363 (2d Cir. 2011) ("Granite Rock reconfirms this circuit's well-established precedent

that where a party challenges the very existence of the contract containing an arbitration clause, a

court cannot compel arbitration without first resolving the issue of the contract's existence.").

       To determine whether an agreement to arbitrate exists, courts apply state contract law.

Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 45–46 (2d

Cir. 1993) ("When deciding whether parties agreed to arbitrate a certain matter . . . courts generally

should apply ordinary state-law principles that govern the formation of contracts.");; see also

Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62–63 (1995); Volt Info. Scis. v. Bd.

of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 475–76 (1989).  There appears to be no

dispute that New York law governs the construction of the contracts at issue in this case.

Accordingly, this Court will apply New York contract law to determine whether an agreement to

arbitrate was made.

       Here, plaintiffs seek to invalidate the Holding Company Agreements on three grounds: (a)

not all parties to those agreements signed them; (b) estoppel bars Strulovich from relying upon the

Holding Company Agreements because he allegedly represented to third parties that the Holding

Company Agreements did not exist, and; (c) discrepancies in some of the Holding Company

Agreements bar the arbitration clauses' enforceability.  As explained more fully below, plaintiffs'

arguments are insufficient to overcome defendants' motions to compel arbitration as to the LLC

Plaintiffs and the members of the LLC Plaintiffs who signed the Holding Company Agreements.

Thus, the LLC Plaintiffs must arbitrate against the Individual Defendants and the Schedule A

Defendants, and the Individual Plaintiffs who signed the agreements must arbitrate claims against

15

the Individual Defendants and the Schedule A Defendants with respect to each Holding Company
Agreement he or she signed.

### (a) Execution of the Holding Company Agreements

Plaintiffs advance two arguments regarding the purported lack of execution of the Holding
Company Agreements: that the LLC Plaintiffs are not bound because Strulovich could not sign on
their behalf and that the agreements are invalid because defendants have not produced the signature
of each individual member of the LLC Plaintiffs.  The Court finds neither argument persuasive.

Plaintiffs' first argument fails because as the alleged manager of the limited liability
corporations, Strulovich had the authority to bind corporations he managed to contracts with third
parties under New York law.[7]  The New York Liability Company Law (the "LLC Law") provides
in relevant part that "the act of every manager, including the execution in the name of the limited
liability company of any instrument, for apparently carrying on in the usual way the business of
the limited liability company binds the limited liability company."  N.Y. Ltd. Liab. Co. Law §
412(b)(2); see also JMM Properties, LLC v. Erie Ins. Co., 548 F. App'x 665, 666 (2d Cir. 2013)
(holding manager of LLC acted with requisite authority to bind the LLC to a contract with a third
party under § 412(b)(2) of the LLC Law).

Here, the Amended Complaint alleges that Strulovich and Oberlander were "managers of
the LLC Plaintiffs." (Am. Compl. ¶ 27.)  Plaintiffs also allege that Strulovich and Oberlander
"convinced the Investors to make [them] managers of the LLC Plaintiffs so that the[y] could ensure
the Investors did not receive accurate financial information and so the[y] could maintain full
control over the distributions made thereunder." (Id. ¶ 28; see also id. ¶ 183 (alleging Strulovich

---

[7] The Holding Company Defendants and the LLC Plaintiffs were incorporated in New York and conduct
business in New York.  Accordingly, there is no dispute that New York corporate law governs this
dispute.  See Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) ("Under New York choice of law
principles, the law of the state of incorporation determines" [authority to bind corporations to contracts.]).

and Oberlander "were managers" of the LLC Plaintiffs).)[8]   Thus, plaintiffs' assertions that Strulovich "needed the consent of a majority of the members of the LLC Plaintiffs before he could execute [the Holding Company Agreements]" is contradicted by their own pleadings, which repeatedly allege that Strulovich was the manager of each LLC Plaintiff.  Accordingly, as manager, Strulovich had the requisite authority to bind the LLC Plaintiffs to the terms of the Holding Company Agreements, including the arbitration clauses contained therein.  See, e.g., New York Cmty. Bank v. Woodhaven Assocs., LLC, 137 A.D.3d 1231, 1233 (2d Dep't 2016) ("Chitrik as [the LLCs'] manager, had the authority to bind [the LLC].)"

Despite the clear terms of § 412(b)(2) and their allegations that Strulovich was manager of the LLC Plaintiffs, Plaintiffs contend that the LLC Law § 402(c)(3) controls this dispute because the Holding Company Agreements also contained terms that appear to be articles of operation for the LLC Plaintiffs.  (Opp. at 23.)  It is correct, as plaintiffs contend, that § 402(c)(3) requires a majority vote "to adopt, amend, restate or revoke the articles of organization or operating agreement . . ."  However, nothing in § 402(c)(3) requires the assent of a majority of the members of the LLC in order for the LLC to contract with another party.  Instead, as explained above, § 412(b)(2) of the LLC Law grants a manager of an LLC the authority to bind the LLC to agreements with third parties.  Although the parties dispute whether the Holding Company Agreements also provided for some articles of organization for the LLC Plaintiffs and thus whether the specific terms of the Holding Company Agreements governing the internal management of the LLC Plaintiffs are effective, it is unnecessary for the Court to resolve that dispute.  Regardless of whether the terms governing the *internal* management of the LLC Plaintiffs contained in the

---

[8] Plaintiffs even go so far as to base their cause of action for accounting against the Individual Defendants on the allegation that they "are the managers, and are in possession of the books and records of the LLC Plaintiffs."  (Id. ¶ 197.)

Holding Company Agreements were operative under § 402(c)(3), plaintiffs' allegations that Strulovich was the manager of the LLC Plaintiffs gave him with the authority to bind the LLC Plaintiffs to the *external* agreement with the Holding Company Defendants under § 412(b)(2). Indeed, at oral argument, counsel for plaintiffs conceded that it was "true" that "nothing requires the assent of the majority in order the LLC to contract with another party." (D.E. dated Aug. 23, 2017 ("Tr.") at 32:5−9.) Accordingly, as the alleged "manager" of each of the twenty two LLC Plaintiffs, Strulovich had the requisite authority to bind the LLC Plaintiffs to the terms of the Holding Company Agreements governing their contractual relationship with the Holding Company Defendants, including the arbitration clauses.

Plaintiffs argue "even if [Strulovich] had the right to execute an operating agreement on their behalves, he did not have the right to unilaterally impose an arbitration agreement on the LLC Plaintiffs without obtaining the express authority and consent of the investors who were members of the LLC Plaintiffs." (Opp. at 19.) Relying on a case decided under California law, Abbey v. Fortune Drive Assocs., No. A124684, 2010 WL 1553616, at *6 (Cal. App. 1st Dist. Apr. 10, 2010), plaintiffs contend that the arbitration clause must be declared unenforceable against the LLC Plaintiffs because all of the individual members of the LLC Plaintiffs did not consent to the arbitration clause. (Id.) This argument fails for at least two reasons

As an initial matter, Abbey has little relevance to the present case as that court was concerned with changes the defendants made to a limited liability company's internal operating agreement that imposed an arbitration clause—long after the investors originally signed that agreement. Id. at 4. Under those circumstances, the court held that "while the members of an LLC are free to adopt arbitration as a method of dispute resolution at the outset of the LLC, that does not necessarily mean they can subsequently impose arbitration on unwilling members through

18

a majority-supported amendment." Id. at 8.  Here, unlike Abbey, there is no allegation the arbitration clauses were inserted at any point in time other than when the Holding Company Agreements were adopted.  Moreover, unlike the agreement at issue in Abbey, which governed internal LLC disputes, the arbitration clauses in the Holding Company Agreements govern disputes between the LLC Plaintiffs and the Holding Company Defendants.  Thus, Abbey does not support plaintiffs' position.

Plaintiffs' second argument on the issue of the validity of the Holding Company Agreements is that because each of those agreements state that the parties include the individual members of the respective LLC Plaintiff, and defendants have failed to produce the signature for all of the individual members of LLC Plaintiffs, there is no agreement among any of the parties to those agreements.  (Opp. at 10–13.)  In support of their argument, plaintiffs contend that the Holding Company Agreements "mandates" that there be signatures from "each signature of the individual investor . . . to evidence a meeting of the minds" and by failing to demonstrate that each individual investor signed the arbitration agreement, defendants have failed to show that there was a meeting of the minds.  (Id. at 10.)  Contrary to plaintiffs' position, the Court finds a valid agreement among the parties who executed the Holding Company Agreements because those agreements do not reflect an intent by the signatories to not be bound if one party does not sign.

"A written agreement to submit any controversy thereafter arising or any existing controversy to arbitration is enforceable without regard to the justiciable character of the controversy and confers jurisdiction on the courts of the state to enforce it and to enter judgment on an award."  SG Cowen Sec. Corp. v. Messih, 224 F.3d 79, 84 (2d Cir. 2000) (citing N.Y. C.P.L.R. § 7501).  "Courts have consistently interpreted this rule to require that an agreement to arbitrate be in writing but not necessarily be signed by the party to be bound."  Nat'l City Golf Fin.

v. Higher Ground Country Club Mgmt. Co., LLC, 641 F. Supp. 2d 196, 203 (S.D.N.Y. 2009). Indeed, "it is well-established that a party may be bound by an agreement to arbitrate even absent a signature." Genesco, 815 F.2d at 846 (citing McAllister Bros. v. A & S Transp. Co., 621 F.2d 519, 524 (2d Cir. 1980)); see also Washington Heights–West v. Dist. 1199, 748 F.2d 105, 107–09 (2d Cir. 1984) (holding that arbitration can be compelled without a formally executed arbitration agreement if arbitration was the intent of the parties); Carr v. Credit One Bank, No. 15-CV-6663 (LAK), 2015 WL 9077314, at *2 (S.D.N.Y. Dec. 16, 2015) ("The absence of the signature of a contracting party is not necessarily inconsistent with the formation of a binding contract." (quoting Aim v. Sun Taiyang Co., Ltd., 964 F. Supp. 762, 775 (S.D.N.Y. 1997) (collecting cases))). In Deloitte Noraudit A/S v. Deloitte Haskins & Sells, 9 F.3d 1060 (2d Cir. 1993), the Second Circuit held that a party that had received a contract, made no objections to its terms, and proceeded to benefit from it, was estopped from avoiding arbitration despite having never signed the contract. Id. at 1064; see also Genesco, 815 F.2d at 846 ("We focus not on whether there was subjective agreement as to each clause in the contract, but on whether there was an objective agreement with respect to the entire contract."). Accordingly, this Court must determine whether the intent of the parties was to not bind themselves to the Holding Company Agreements absent the signature of all of the parties to those agreements, including members of the LLC Plaintiffs.

Here, the LLC Plaintiffs and some of their respective members, the Holding Company Defendants, and CSRE signed the Holding Company Agreements. Therefore, to avoid this otherwise clear intent to form a contract between the parties who signed the Holding Company Agreements, plaintiffs must demonstrate that the Holding Company Agreements evidence a clear intent to not be bound if all parties did not sign, including every investor in the LLC Plaintiffs. See Stonehill Capital Mgmt., LLC v. Bank of the W., 28 N.Y.3d 439, 451 (2016) (holding that

20

"formulaic language that the parties are subject to some future act or event is insufficient" and that "[l]ess ambiguous and more certain language is necessary to remove any doubt of the parties' intent not to be bound"); Kowalchuk v. Stroup, 61 A.D.3d 118, 125 (1st Dep't 2009) ("[A]n unsigned contract may be enforceable, provided there is objective evidence establishing that the parties intended to be bound unless, of course, the parties have agreed that their contract will not be binding until executed by both sides."). This rule is strictly enforced. In Kowalchuk, for example, the court held an agreement containing the phrase "this agreement is complete and binding upon its execution by all signatories [was] simply insufficient to be treated as an explicit reservation that the parties should not be bound by the terms of their agreement until the written agreement is fully executed." 61 A.D.3d at 126.

Here, contrary to plaintiffs' contention, the Holding Company Agreements do not contain any clause that reflects an intent of the parties to require the signatures of each individual investor in the LLC Plaintiffs in order for the Holding Company Agreements to be binding on the parties that signed them. The clauses plaintiffs rely on in the Holding Company Agreements merely state that the signatures of the investors in the LLC Plaintiffs "are to be . . . annexed hereto," (e.g., D.E. # 198-2, at 8), and thus do not reflect an express intention by the parties who did sign the Holding Company Agreements to not be bound absent the attachment of each signature of the individual investors to the Holding Company Agreements. The cases cited by plaintiffs are inapplicable because each involved circumstances where the parties expressly reserved forming a contract until each party signed. For example, the court in Farago Advert., Inc. v. Hollinger Int'l, Inc., 157 F. Supp. 2d 252 (S.D.N.Y. 2001), held that the contract was invalid because "the contract expressly requested a signature as the mode of assent" by stating that "[t]his Settlement Agreement and General Release shall not become effective . . . until it is signed by [each of the three parties]." Id.

at 259.   Here, unlike the contract in <u>Farago</u>, the Holding Company Agreements simply call for the signatures of the investors in the LLC Plaintiffs to be attached to Schedule B of the Holding Company Agreements, but do not state that there is to be no agreement among the signatories absent the attachment of those signatures.   Consequently, <u>Farago</u> does not support plaintiffs' argument.

Equally inapplicable is a case heavily relied upon by plaintiffs in their supplemental opposition brief, <u>Dreyfuss v. eTelecare Glob. Sols.-US, Inc.</u>, No. 08-CV-1115 (RJS), 2008 WL 4974864 (S.D.N.Y. Nov. 19, 2008), <u>aff'd</u>, 349 F. App'x 551 (2d Cir. 2009).   Plaintiffs contend <u>Dreyfuss</u> stands for the proposition that courts deny motions to compel arbitration where an agreement "was meant to be signed by everyone, but instead was signed by a tiny fraction of those parties . . . ." (Supp. Opp. at 9.)   Specifically, plaintiffs assert the <u>Dreyfuss</u> court declined to "compel arbitration where only 6 of the 29 individuals allegedly . . . executed an arbitration agreement." (<u>Id.</u>)   Plaintiffs misread the <u>Dreyfuss</u> opinion.   In <u>Dreyfuss</u>, there were only two parties to the arbitration agreement, the plaintiff and defendant, and the other supposed "27 individuals" were, in actuality, parties to completely separate contracts that were submitted by the defendant as purported "standard agreements" that the defendant hoped to fill in the blanks of the "missing pages" in the plaintiff's agreement.   <u>Dreyfuss</u>, 2008 WL 4974864, at *8.   Consequently, <u>Dreyfuss</u> is inapplicable to this issue because it did not involve circumstances where, as here, some, but not all, parties to contracts executed agreements containing arbitration clauses. Accordingly, for the signing parties, it is of no moment that defendants have not come forward with evidence that all of the individual investors in the LLC Plaintiffs signed the Holding Company Agreements.   In sum, the Court finds that the Holding Company Defendants, CSRE, LLC Plaintiffs

and the Individual Investors who acknowledged the agreements formed an agreement, including

an agreement to arbitrate all claims relating to the Holding Company Defendants.

### (b) Equitable Estoppel Based Upon Defendants' Post-Signing Conduct

Plaintiffs' equitable estoppel arguments are likewise insufficient to invalidate the Holding

Company Agreements.   Plaintiffs argue that regardless of whether the Holding Company

Agreements were in effect at some point, Strulovich's post-signing conduct, in which he allegedly

represented to banks and other third parties that he was the sole member of the Holding Company

Defendants, "directly confirms that these Sham Operating Agreements do not exist." (Opp. at 16.)

Thus, plaintiffs contend that "[d]efendants cannot make the self-serving statement that these

[Holding Company] Agreements bind [p]laintiffs when Strulovich has already derived . . . benefits

and advanced his fraudulent scheme by confirming that they are ineffective." (Id.) Defendants

argue that Strulovich's post-signing representations to lenders and other third parties are irrelevant

to whether an agreement to arbitrate any claims arising out of the Holding Company Agreements.

(Schedule A Defs. Reply at 21.)  The Court finds the defendants' position persuasive.

After the execution of a contract, equitable estoppel applies only in circumstances when a

party "has induced the other party to rely on an oral modification," the other party has exhibited

conduct in reliance on the modification, and "the conduct claimed to have resulted from the oral

modification . . . is inconsistent with the agreement as written." AT&T Corp. v. Publ'g Concepts

L.P., No. 08-CV-7658 (DC), 2010 WL 1191380, at *4 (S.D.N.Y. Mar. 29, 2010) (quoting Towers

Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516, 521 (2d Cir. 1990)).  Strulovich's

purported misrepresentations to third parties, some of which are alleged in the Amended

Complaint, could not, as a matter of law, unwind or terminate the Holding Company Agreements,

particularly in circumstances where, as here, plaintiffs were unaware of those misrepresentations.

See, e.g., Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 192 (2d Cir. 2001) ("We see no inference favorable to [plaintiff] that can be drawn from [defendant's] post-contract behavior . . . . It would contradict the actual terms of the written contracts and override the written allocation of risks agreed to by the parties."). Moreover, Section 11 of the Holding Company Agreements expressly provides that the agreement "may be amended only . . . by written instrument," (e.g., D.E. # 196-2 at 4), and there is no allegation that such a writing occurred here.[9] Consequently, Strulovich's post-signing representations to third parties are insufficient to terminate the Holding Company Agreements.

### (c) Discrepancies in the Holding Company Agreements Submitted by Defendants

Plaintiffs next contend that "material and significant discrepancies [in the Holding Company Agreements] serve as an independent basis to deny Strulovich's motion to compel arbitration." (Supp. Opp. at 11.) Specifically, plaintiffs point to four Holding Company Agreements and the Individual Plaintiffs' signatures attached thereto and argue that defendants have submitted versions that are at odds with one another. (Id.) Plaintiffs argue that this inconsistency is exhibited by differing effective dates on the Holding Company Agreement for 980 Atlantic Avenue LLC and that one copy of the holding company agreement for 348 St. Nicholas Avenue contains only signatures of the members of the LLC Plaintiffs—not the actual

---

[9] Plaintiffs contend that Strulovich's tax returns, in which he purportedly asserted that he held a personal interest in the Holding Company Defendants, bars defendants from relying on the Holding Company Agreements because "Courts have regularly found that quasi-estoppel bars a party from adopting a factual position in court that is contrary to a position previously taken on a tax return." (Opp. at 17.) Because this allegation is not contained in the Amended Complaint and because plaintiffs make this assertion without including any evidence, the Court declines to consider it at this stage. See Lazaro v. Good Samaritan Hosp., 54 F. Supp. 2d 180, 184 (S.D.N.Y. 1999) ("[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition.").

agreement.[10]  (Id.)  Plaintiffs' argument fails because of their inability to dispute three critical things: (1) defendants have submitted full agreements for each of the twenty two Holding Company Defendants, (2) each fully submitted Holding Company Agreement contains an arbitration clause and those clauses each cover any disputes arising out of the agreement, and; (3) at least the Holding Company Defendants, CSRE, and the LLC Plaintiffs signed each of the twenty two Holding Company Agreements.

There can be no dispute that "an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration . . . and that it is not necessary that there be a simple integrated writing or that a party sign the writing containing the arbitration clause." Dreyfuss, 2008 WL 4974864, at *7 (internal citations and quotations omitted).  New York courts enforce arbitration clauses even where there are disputes about the contents of the broader contract so long as there is prima facie evidence that the contract contained an arbitration clause and the arbitration clause's terms are unmistakable. Matter of Barone (M & K Realty Co.), 533 N.Y.S.2d 611, 612 (N.Y. 1988) ("Since M & K has not come forward with any . . . evidence [that the arbitration clause was invalid], the document which it signed subjects it to the arbitration clause contained in the 1985 agreement.").  Thus, without identifying any discrepancies as to the arbitration clauses themselves, plaintiffs cannot avoid having the signatories to the Holding Company Agreements arbitrate merely because they contend some of the other terms contained therein are unclear, disputed, or ambiguous.

Plaintiffs again rely on Dreyfuss in seeking to avoid the well-settled rule that a complete arbitration clause is sufficient to compel arbitration, regardless of whether there are disputes over

---

[10] Plaintiffs' contention that the operating agreement for 348 St. Nicholas consists only of an Individual Plaintiff's signature, is without merit in light of D.E. # 198-17, which is the entire 348 St. Nicholas LLC Operating Agreement.

25

other terms.  Once again, their reliance on Dreyfuss is misplaced.  Plaintiffs contend that the Dreyfuss opinion stands for the proposition that where there are "discrepancies and missing pages between different agreements to arbitrate . . . denial of motions to compel arbitration is mandated." (Supp. Opp. 12.)  The Dreyfuss court, however, expressly recognized the difference between circumstances where, as here, there were "missing pages" of "a broader contract" but the arbitration clause itself was submitted in full, and circumstances where pages were missing from the "arbitration agreement . . . itself."  2008 WL 4974864, at *7.  Dreyfuss concerned the latter circumstances as the agreement missing pages in that case was an agreement to arbitrate and thus contained no other terms.  Id. (distinguishing "cases [that] involved complete arbitration provisions [and] the present case, [which] involves not the enforceability of an arbitration provision within a broader contract, but the enforceability of an arbitration agreement that is itself the contract.")  As explained above, plaintiffs do not contend any Holding Company Agreement is missing its arbitration clause or that any arbitration clause is incomplete in any way.  Thus, Dreyfuss fails to support plaintiffs' argument.  Put differently, even if all that was submitted by defendants was the clause of the Holding Company Agreements providing for arbitration, plaintiffs' argument would still fail.  See Dreyfuss, 2008 WL 4974864, at *7 ("'[I]t [is] not necessary that there be a simple integrated writing or that a party sign the writing containing the arbitration clause . . . [a]ll that is required is that the arbitration provision be in writing.'" (quoting Durkin v. CIGNA Prop. & Cos. Corp., 942 F. Supp. 481, 487 (D. Kan. 1996)).  Accordingly, because defendants have submitted complete arbitration clauses for each Holding Company Agreement, plaintiffs' argument that some of the other terms differ between the versions submitted by defendants is immaterial.

### 2.  Fraud in the Inducement

Plaintiffs contend that where "the arbitration clauses were part and parcel of defrauding [p]laintiffs, they are unenforceable." (Opp. at 27.)   To support their argument, plaintiffs argue that "defendants circulated complicated Sham Operating Agreements to unsophisticated investors, many of whom do not even speak English . . . and the arbitration clauses were inserted for fraudulent purpose because [they] were designed to avoid discovery." (Id. at 29.)  Defendants argue that plaintiffs miss the predicate step of alleging that the arbitration clause itself was procured by fraud and thus any arguments regarding the invalidity of the Holding Company Agreements should be decided by the arbitrator.  (Schedule A Defs. Reply at 25.)  As explained below, because plaintiffs appear to be arguing, at least in part, that the arbitration clauses themselves were induced by fraud, this Court has jurisdiction to decide this issue.  However, the Amended Complaint does not contain sufficient plausible allegations that the arbitration clauses themselves were procured by the Individual Defendants' alleged fraud.

"[T]he Second Circuit has made clear that 'challenges to a contract containing an arbitration clause fall into two categories: those that challenge the contract as a whole, and those that challenge the arbitration clause in particular.'" Cypress v. Cintas Corp., No. 16-CV-2478 (ADS), 2017 WL 564492, at *3 (E.D.N.Y. Feb. 11, 2017) (quoting Ipcon, 698 F.3d at 61).  When the latter is at issue, "the federal court may proceed to adjudicate" the issue because it "goes to the making of the agreement to arbitrate." Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445 (2006).  However, where a party challenging the arbitrability of a dispute contends that "the contract as a whole [was the product of fraud], that does not prevent a court from enforcing a specific agreement to arbitrate." Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 70 (2010); see Buckeye Check Cashing, Inc., 546 U.S. at 444 (describing this category of challenges as attacking

27

"the contract as a whole, either on a ground that directly affects the entire agreement . . . or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid"); see also Ipcon, 698 F.3d at 61("The Federal Arbitration Act . . . does not permit the federal court to consider claims of fraud in the inducement of the contract generally; rather, such claims must be decided by the arbitrator."). Here, because plaintiffs' contend that the arbitration clause itself was "foist[ed]" upon unsophisticated and unsuspecting investors, (Opp. at 20) this Court may decide whether plaintiffs' allegations adequately allege that the arbitration clauses were obtained through fraudulent inducement.

However, plaintiffs' efforts to escape the arbitration clauses by maintaining that defendants inserted them into the LLC Agreements "to prevent investors from inquiring into the defendants' scheme," (Opp. at 19) are inadequate to demonstrate that the arbitration clauses were themselves produced through fraudulent means. Indeed, similar arguments were rejected by the Second Circuit in Ipon Collections LLC. In that case, the plaintiffs argued that they had "specifically alleged the instances and magnitude of Costco's fraud that had clearly evidenced Costco's intent to cause [plaintiff] to enter an arbitration agreement specifically for the purposes of preventing [plaintiff] from seeking redress against Costco after Costco had bankrupted it." Ipcon, 698 F.3d 58, 61 n.3. The Second Circuit rejected those arguments as "meritless" and held that they had no bearing on the arbitrability of the dispute and instead were "for the arbitrator to determine." Id. at 61 n.4. Plaintiffs' arguments here are even weaker than those made in Ipcon. Indeed, as part of plaintiffs' effort to minimize the significance of the Holding Company Agreements, the Amended Complaint "never mention[] any of these [Holding Company] Agreements—not even once," (Opp. at 24) let alone specifically allege the arbitration clauses contained therein were the product of fraudulent inducement. Accordingly, because the Complaint is devoid of allegations that the

arbitration clauses themselves were the product fraudulent inducement, plaintiffs' argument is insufficient to overcome the motion to compel arbitration.

Even under the most searching review of the Amended Complaint for allegations relating to potential fraudulent inducement of the arbitration clauses, its allegations regarding potential disparities in the bargaining power between the parties (e.g., Individual Plaintiffs are largely Israeli and do not speak English) are plainly insufficient to be construed as adequately alleging that the arbitration clauses were the product of fraud in the inducement. See, e.g., Torres v. Major Auto. Grp., No. 13-CV-0687 (NGG), 2014 WL 4802985, at *6 (E.D.N.Y. Sept. 25, 2014) (rejecting as insufficient the plaintiff's efforts to avoid a contract on the grounds that "because he was not educated in the United States and English is not is primary language, Plaintiff did not fully comprehend the Commission Agreement"); Carr, 2015 WL 9077314, at *2 (describing plaintiff's argument that she did not understand the arbitration clause's terms as "dead in the water . . . one 'who signs or accepts a written contract, in the absence of fraud or other wrongful act on the part of another contracting party, is conclusively presumed to know its contents and to assent to them.'" (quoting Metzger v. Aetna Ins. Co., 227 N.Y. 411, 416 (N.Y. 1920)).

Plaintiffs' citation to a Ninth Circuit decision, Hullum v. Sherbondy, 931 F.2d 60, 60 (9th Cir. 1991) does not alter this conclusion. In Hullum, the Court affirmed the district court's opinion denying a motion to compel arbitration based upon "overwhelming[]" evidence that the arbitration provisions were the product of fraud and furthered defendants' fraudulent scheme. Id. Here, unlike Hullum where there was "overwhelming" evidence that the arbitration clauses were the product of fraud, plaintiffs allege virtually nothing regarding the Holding Company Agreements

29

or the arbitration clauses contained therein.[11]   Accordingly, plaintiffs' efforts to avoid arbitration on the basis of fraud in the inducement fails.   Since none of plaintiffs' arguments overcome the plain terms of the Holding Company Agreements mandating arbitration, the LLC Plaintiffs and the Individual Plaintiffs who executed a Holding Company Agreement must arbitrate their claims against the Individual Defendants and the Holding Company Defendants for each agreement signed.

## B. Arbitrability of the Claims Brought by Non-Signatories

### 1. Non-Signatory Individual Plaintiffs

Having found that signatories to the Holding Company Agreements are bound by the arbitration clauses contained therein, the Court now considers the Schedule A Defendants' argument that non-signatory plaintiffs are bound by the agreements' terms under principles of estoppel.  Generally, "arbitration is a matter of contract, and therefore a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit." Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 126 (2d Cir. 2010) (quoting JLM Indus., Inc. v. Stolt–Nielsen SA, 387 F.3d 163, 171 (2d Cir. 2004)).  Nevertheless, the Second Circuit has "recognized a number of common law principles of contract law that may allow non-signatories to enforce an arbitration agreement, including equitable estoppel." Ross v. Am. Express Co., 478 F.3d 96, 99 (2d Cir. 2007).  Under principles of estoppel, "[a] nonsignatory may be estopped from avoiding arbitration where it knowingly accepted the benefits of an agreement with an arbitration clause.'" Bank of

---

[11] The Court further notes that in the nearly thirty years since Hullum was decided, it has been cited only by one court, which declined to adopt its reasoning and described "Hullum as an unpublished case in the Ninth Circuit and holds no precedential value." Livingston v. Assocs. Fin., Inc., No. 01-CV-1659 (JM), 2001 WL 709465, at *4 (N.D. Ill. June 25, 2001), report and recommendation adopted, No. 01-CV-1659, 2002 WL 424352 (N.D. Ill. Mar. 6, 2002).

Am. Natl. Assn. v. Sopher, No. 10-CV-8870 (LTS), 2011 WL 2419872, at *3 (S.D.N.Y. June 8, 2011) (quoting MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 61 (2d Cir. 2001)). "The benefits must be direct—which is to say, flowing directly from the agreement." Id. (citing Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995)). "By contrast, the benefit derived from an agreement is indirect where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." MAG Portfolio Consultant, 268 F.3d at 61.

Plaintiffs argue that the non-signatories to the Holding Company Agreements should not be required to litigate their claims in arbitration because they expressly withheld their signatures from those agreements and "solely seek to exploit the promises" the Individual Defendants made to them in the prospectuses. (Opp. at 24.) Defendants respond by arguing that the non-signatory Individual Plaintiffs "derived a direct benefit from the Holding Company Agreements in that these agreements acknowledged their investments, and provided the framework by which the Individual Plaintiffs' investments would be used." (Schedule A Defs. Reply at 22–23.) The Court agrees with plaintiffs that non-signatories cannot be compelled to arbitrate their claims under these circumstances because plaintiffs do not contend that the benefits of their investments flowed directly from the Holding Company Agreements.

As an initial matter, defendants' arguments are contradicted by the Amended Complaint's allegations and by the fact that only a small minority of Individual Plaintiffs "acknowledged" the Holding Company Agreements. For example, plaintiffs expressly allege they invested pursuant to promises that the Individual Defendants made in the prospectuses, not the Holding Company Agreements. (Am. Compl. ¶ 37.) Moreover, the Amended Complaint alleges that at the time the Individual Plaintiffs transferred their money, "no operating agreement was presented to the

31

members." (Id. ¶ 38.)  Indeed, as plaintiffs correctly note, the Amended Complaint does not "mention the Holding Company Agreements and thus do not seek relief or benefits thereunder." (Opp. at 23.)  Thus, contrary to the Schedule A Defendants' argument, it is hardly the case that the Holding Company Agreements were the "direct source of the benefit" or that plaintiffs "knowingly exploited [one or more of them]," MAG Portfolio Consultant, 268 F.3d at 62, because plaintiffs allege they invested long before those agreements were circulated pursuant to a separate understanding, see Thomson–CSF, 64 F.3d at 779 ("The benefit which E & S asserts . . . derives directly from [a different agreement], and not from the [agreement containing the arbitration clause] itself."); Lang v. First Am. Title Ins. Co., No. 12-CV-266 (WMS), 2012 WL 5221605, at *4 (W.D.N.Y. Oct. 22, 2012) (holding that the plaintiffs ability to secure a refinanced mortgage from a lender was not a "direct benefit" compelling arbitration of a claim for excessive premiums against the defendant title insurer, because the purported benefit came from a separate "contractual relationship").  Accordingly, because the Individual Plaintiffs expressly disclaim the benefits of the Holding Company Agreements and seek recovery only pursuant to the prospectuses, their claims do not flow directly from the Holding Company Agreements.

Defendants' reliance on Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1064 (2d Cir. 1993), is misplaced.  Deloitte concerned an agreement containing an arbitration clause governing the terms of use of a trade name. Id.  The Second Circuit held that a nonsignatory who had received a copy of the agreement, raised no objections to it, and made use of that trade name pursuant to the agreement was estopped from arguing that it was not bound by the arbitration clause in the agreement. Id. at 1064.  Here, by contrast, there is no evidence that the non-signatory Individual Plaintiffs ever received a final copy of the Holding Company Agreements or made use of their benefits.  Instead, the Holding Company Agreements, at best,

have the type of "attendant circumstances that [does] . . . not constitute the type of direct benefits justifying compelling arbitration by a nonparty to the underlying contract." <u>Belzberg v. Verus Investments Holdings Inc.</u>, 21 N.Y.3d 626, 633 (N.Y. 2013).   Therefore, the non-signatory Individual Plaintiffs cannot be compelled to litigate their claims in arbitration.

### 2.  Claims Asserted Against the Non-Signatory Defendants

The Court must then determine whether the claims asserted by the parties that the Court has determined are subject to the arbitration clauses fall within the scope of those clauses. Plaintiffs contend that their second, fourth and eighth causes of action—each of which arises under state law—should not be referred to arbitration because these claims are against defendants who are non-parties to the Holding Company Agreements (<u>i.e.</u>, the Schedule B Defendants, the "John Doe" Defendants and "the other Strulovich-owned entities through which Strulovich diverted funds") and the arbitration clauses plainly state they cover only disagreements "among the parties to this agreement." (Opp. at 27.)

As discussed above, in some circumstances, the Second Circuit has held that a non-signatory may compel arbitration under a theory of equitable estoppel.  In circumstances where a non-signatory seeks to compel arbitration, courts in this Circuit apply a two part test in "determining whether the signatory's claims are intertwined with the underlying contract obligations . . . [analyzing] whether (1) the signatory's claims arise under the 'subject matter' of the underlying agreement, and (2) whether there is a 'close relationship' between the signatory and the non-signatory party." <u>Ragone</u>, No. 07-CV-6084 (JGK), 2008 WL 4058480, at *8 (S.D.N.Y. Aug. 29, 2008), <u>aff'd</u>, 595 F.3d 115 (2d Cir. 2010); <u>see also</u> <u>Ross</u>, 478 F.3d at 480–85.  The party seeking to compel arbitration bears the burden of proving that equitable estoppel applies.  <u>See</u>

Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Custom Air Sys., Inc., 357

F.3d 266, 268 (2d Cir. 2004).

Here, the non-party defendants to the Holding Company Agreements, (i.e., the Schedule B

Defendants and other Strulovich-controlled entities) have not offered any arguments concerning

why estoppel should compel plaintiffs to arbitrate their claims against them. Instead, they merely

state that non-signatory defendants "consent to arbitration." (Schedule A Defs. Mem. at 15.)

Indeed, the Schedule B Defendants do not make any arguments as to estoppel; instead they argue

that the "Schedule B Defendants action should be stayed to spare these defendants the enormous

costs and undue burden of litigating secondary claims against unrelated parties where primary

disputes must be first resolved in arbitration." (Schedule B Defs Mem. at 17). Because these non-

signatory defendants have failed to meet their burden, their motion to compel arbitration pursuant

to the Holding Company Agreements is denied.

## II.     Motions to Stay Non-Arbitrable Claims

Where, as here, the Court concludes that some, but not all, of the claims in the case are

arbitrable, "it must then decide whether to stay the balance of the proceedings pending arbitration."

JLM Indus., 387 F.3d at 169 (quoting Oldroyd v. Elmira Sav. Bank, FSB, 134 F.3d 72, 75–76 (2d

Cir. 1998)).[12] Only the Schedule B Defendants have moved for the Court to stay non-arbitrable

claims. (See Schedule B Defs. Mem. at 16–17).

The Court's power to grant a stay flows from its inherent power to control its docket, see

Citrus Mktg. Bd. of Israel v. J. Lauritzen A/S, 943 F.2d 220, 225 (2d Cir. 1991), and the decision

---

[12] Contrary to the Schedule A Defendants' request for dismissal of the claims that are compelled to arbitration, the Court must stay the claims that it has deemed arbitrable. See Katz v. Cellco P'ship, 794 F.3d 341, 346 (2d Cir. 2015) (holding that a "mandatory stay comports with the FAA's statutory scheme and pro-arbitration policy"). However, even though the Schedule A Defendants sought the incorrect relief in their moving papers, that is not fatal to their motion to compel arbitration. See, e.g., Favors v. Triangle Servs., Inc., 207 F. Supp. 3d 197, 205 (E.D.N.Y. 2016) ("Although Defendants request complete dismissal instead of a stay, the Court finds that the same policy reasons relied on in Katz support a stay of the case.").

is committed to the Court's discretion, <u>Genesco</u>, 815 F.2d at 856. As one court explained, "[w]hen there are several arbitrable issues that are central to the overall matter and only one closely related non-arbitrable issue, it seems more reasonable for the court to stay the proceedings. On the other hand, if there is one small arbitrable issue that will not affect several non-arbitrable issues, a court could conclude that the proceedings should continue." <u>F.D. Import & Export Corp. v. M/V REEFER SUN</u>, 248 F. Supp. 2d 240, 251 (S.D.N.Y. 2002). A discretionary stay is particularly appropriate "where there is significant factual overlap between the remaining claims and the arbitrated claims." <u>Winter Invs., LLC v. Panzer</u>, No. 14-CIV-6852 (KPF), 2015 WL 5052563, at *11 (S.D.N.Y. Aug. 27, 2015). In such cases, a stay is warranted in part because the arbitration proceedings are likely to have preclusive effect over some or all of the claims not subject to arbitration. <u>See</u> <u>Bear, Stearns & Co. v. 1109580 Ont., Inc.</u>, 409 F.3d 87, 91 (2d Cir. 2005) (explaining that, under certain conditions, "[a]n arbitration decision may effect collateral estoppel in a later litigation or arbitration if the proponent can show with clarity and certainty that the same issues were resolved" (internal quotation marks omitted)).

The Court must also consider factors such as "the desirability of avoiding piecemeal litigation" and "the degree to which the cases necessitate duplication of discovery or issue resolution." <u>Admin. Comm. of the Time Warner, Inc. Benefit Plans v. Biscardi</u>, No. 99-CV-12270 (DLC), 2000 WL 565210, at *2 (S.D.N.Y. May 8, 2000) (quoting <u>Rattner v. Bd. of Trustees of Vill. of Pleasantville</u>, 611 F. Supp. 648, 653 (S.D.N.Y. 1985)). Broad stay orders are appropriate if the stay will "promote judicial economy, avoidance of confusion and possible inconsistent results" without working an undue hardship or prejudice against the plaintiff. <u>See</u> <u>Louis Berger Grp., Inc. v. State Bank of India</u>, 802 F. Supp. 2d 482, 490 (E.D.N.Y. 2011) (quoting <u>Birmingham Assocs. Ltd. v. Abbott Labs.</u>, 547 F. Supp. 2d 295, 302 (S.D.N.Y. 2008)). Still, "no hard-and-fast

35

rules . . . provide resolution of this discretionary decision." Martima de Ecologia, S.A. de C.V. v.

Sealion Shipping Ltd., No. 10-CV-8134 (DLC), 2011 WL 1465744, at *5 (S.D.N.Y. Apr. 15,

2011) (quoting Biscardi, 2000 WL 565210, at *2).

 The Court finds that a stay would not be appropriate here. The only group of defendants

seeking a stay is the Schedule B Defendants and none of the claims against them will be arbitrated.

Accordingly, the Court sees no reason to grant a stay in favor of a party who will not be subject to

the type of concerns that motivate stays, such as piecemeal litigation. Thus, the Court declines to

grant a stay of non-arbitrable claims in this action.

*   *   *

 To summarize, the LLC Plaintiffs and the Individual Plaintiffs who signed a Holding

Company Agreement must arbitrate their claims with respect to the Holding Company Agreement

they signed. Having found that the Individual Plaintiffs who did not sign the Holding Company

Agreements are not bound to litigate their claims before the arbitrator, and that plaintiffs need not

arbitrate against the Schedule B Defendants and the other Strulovich-controlled entities, this Court

will consider defendants' grounds for dismissal only as to the remaining claims not referred to

arbitration. Those claims are the non-signatory Individual Plaintiffs' claim for securities fraud,

(Am. Compl. ¶¶ 125–35), cancellation of contracts, (id. ¶¶ 125–35), common law fraud, (id. ¶¶

146–59), unjust enrichment, (id. ¶¶ 182–94), breach of fiduciary, (id. ¶¶ 168–81), the LLC

Plaintiffs' claims for constructive trust against the Schedule B Defendants, (id. ¶¶ 160–65), and

accounting against defendants not bound by the arbitration clauses, (id. ¶¶ 195–200).

### III. Non-Signatory Individual Plaintiffs Cannot Interpose Federal Securities Claims for Securities They Did Not Purchase

 The Court finds that because the Individual Plaintiffs do not allege they purchased the

securities that were manipulated, the non-signatory Individual Plaintiffs' federal securities claim

36

is dismissed.  "It is axiomatic that in order to have standing, a 10b–5 plaintiff in a private damages action must have been either a purchaser or seller of the securities that form the basis of the deceptive conduct."  In re Van der Moolen Holding N.V. Sec. Litig., 405 F. Supp. 2d 388, 404 (S.D.N.Y. 2005).  In adopting a bright-line rule, the Supreme Court in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975), recognized that the rule would exclude certain classes of potential plaintiffs who may have legitimate claims of injury from Rule 10b–5 violations, including "shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to . . . activities . . . which violate Rule 10b–5."  Id. at 739. The "purchaser or seller only" rule of Blue Chip Stamps has been reaffirmed hundreds, if not thousands, of times in the nearly thirty years since it was decided, and remains the rule in this Circuit and few, if any, exceptions have been created.  See, e.g., In re Kingate Mgmt. Ltd. Litig., 784 F.3d 128, 149 (2d Cir. 2015).  For the reasons set forth below, the Court sees no reason—and plaintiffs have not provided any—to depart from the "purchaser or seller only" rule in this case.

As an initial matter, the Court notes that after having been granted a supplemental opposition brief to respond to defendants' reply briefs, (see D.E. dated August 3, 2017), plaintiffs failed respond to defendants' argument that the "entire premise" of plaintiffs' securities claim as amended "fails because . . . the Individual Plaintiffs never purchased membership interests in the Holding Company Defendants."  (Schedule A Defs. Reply at 32.)  "A court 'may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.'"  Martinez v. City of N.Y., No. 11-CV-7461 (JMF), 2012 WL 6062551, at *1 (S.D.N.Y. Dec. 6, 2012) (citing Lipton v. Cty. of Orange, N.Y., 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004)); see also Avola v. LA. Pac. Corp., 991 F. Supp. 2d 381, 390 (E.D.N.Y. 2013) (collecting cases, and ruling that "plaintiffs' failure to acknowledge, let alone address,

[certain] claims in opposing the Motion signals the abandonment of these claims"). Here, plaintiffs responded to the other Rule 12(b)(6) arguments made by defendants to dismiss their securities claim, but did not address this argument. However, given the somewhat cursory treatment defendants gave this argument, plaintiffs' failure to respond to this portion of defendants' argument is not fatal.[13]

Nevertheless, this Court finds that the Individual Plaintiffs do not have a federal securities claim because "[p]ermitting [them] to sue as a purchaser would subject the bright-line rule of <u>Blue Chip Stamps</u> to the type of 'case-by-case erosion'" it was meant to guard against. <u>Peltz v. D'Urso</u>, No. 92-CV-6457 (LLS), 1993 WL 664621, at *1 (S.D.N.Y. Oct. 7, 1993). Plaintiffs allege that the securities forming the basis of their § 10(b) claim are the "membership interests in the Holding Company Defendants," (Am. Compl. ¶ 126), yet, as the Amended Complaint concedes, the only purchaser of those securities are the LLC Plaintiffs, (<u>id.</u> ¶ 21 ("Each of the LLC Plaintiffs has a membership interest in one of the Holding Company Defendants and holds all of the Investor Plaintiffs' interests in the Investment Properties.").[14] At oral argument, when asked what "the basis of your individual plaintiffs' 10(b)(5) claim" was, counsel for plaintiffs effectively

---

[13] The Court further notes that at oral argument, after counsel for defendants repeatedly made the point that the Individual Plaintiffs' cannot recover for securities they expressly disclaim purchasing, (Tr. 8:6–12; <u>id.</u> 9:1–6), plaintiffs again offered no direct rebuttal, arguing only that the Individual Plaintiffs own "an indirect membership interest in the holding companies," (<u>id.</u> 39:4–5).

[14] It is unclear from the Amended Complaint whether the LLC Plaintiffs have interposed federal securities claims in this action or whether only the Individual Plaintiffs seek relief under the federal securities laws. For example, plaintiffs ambiguously allege that the claim is brought on behalf of "investors," which the Amended Complaint sometimes refers to as Individual Investors and other times refers to a broader set of plaintiffs. (<u>Compare</u> Am. Compl. ¶ 20, <u>with id.</u> ¶ 24.) Additionally, in the cause of action for securities fraud, plaintiffs appear to have included the LLC Plaintiffs. For example, plaintiffs allege that "[b]ut for these misrepresentations, the Plaintiffs would not have purchased the aforementioned securities," (<u>id.</u> ¶ 134) and also seek a money judgment in "favor of the Individual Plaintiffs and the LLC Plaintiffs" for violations of the federal securities law, (<u>id.</u> ¶ 204). In light of the procedural posture and the accompanying mandate that all reasonable inferences be construed in favor of plaintiffs, the Court assumes that plaintiffs have brought their securities claims on behalf of the LLC Plaintiffs and the Individual Plaintiffs.

admitted they are not the direct purchasers, stating that "they have indirect interest in the holding companies through the LLC plaintiffs." (Tr. at 39:2–12.) Purchasing an "indirect interest" in the legal entity that actually purchased the security is not enough to satisfy the "purchaser or seller only" rule.  See City Nat'l Bank of Fort Smith, Ark. v. Vanderboom, 422 F.2d 221, 228 (8th Cir. 1970) (concluding plaintiffs were not actually purchasers when they held only an indirect interest in the purchaser of the securities . . . "the proper course of action for these investors was for them to raise their 10b-5 claim by bringing a derivative suit on behalf of [the company who purchased the securities]"), cited with approval in Blue Chip Stamps, 421 U.S. 723 at 731; In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 624 (S.D.N.Y. 2003) ("Plaintiffs fail to identify an analogous case (from this or another circuit) that allows . . . a shareholder of one company to bring a private Section 10(b) or Rule 10b–5 claim against a second company."); Peltz, 1993 WL 664621, at *1 (S.D.N.Y. Oct. 7, 1993) ("The Stock Purchase Agreement, Mortgage, and Mortgage Note were executed not by Peltz.  Accordingly, Peltz is not a purchaser of securities, and does not have standing to assert claims under . . . Rule 10b–5.").[15]  Consequently, because the Individual Plaintiffs concede they never purchased a direct interest in the securities that the Individual Defendants allegedly manipulated, they "lack[] standing because [they] do[] not allege that [they] were either a purchaser or seller of securities."  Sarafianos v. Shandong Tada Auto-Parking Co.,

---

[15] Although this argument was not raised by plaintiffs, the Court notes one exception to the strict Blue Chip Stamps rule that has, on rare, occasions been applied by district courts in this Circuit is inapplicable to this case.  This exception holds that "where an individual or company creates an entity to act as intermediary for investment purposes and where that intermediary is effectively an alter ego of the plaintiff, the plaintiff will have standing." Ashland Inc. v. Morgan Stanley & Co., 700 F. Supp. 2d 453, 467 (S.D.N.Y. 2010).  Even if plaintiffs had argued this exception, Ashland is applicable here because there is no contention that the LLC Plaintiffs are the "alter egos" of the Individual Plaintiffs.  See Vanderboom, 422 F.2d at 228 ("This doctrine has no application in the instant case the . . . investors do not comprise all of the shareholders of ITC . . . the proper course of action for these investors was for them to raise their 10b-5 claim by bringing a derivative suit on behalf of ITC.").  Nor could Individual Plaintiffs argue the LLC Plaintiffs are their alter egos: the vast majority of the members of the LLC Plaintiffs are not plaintiffs before this Court.

No. 13-CV-3895 (SAS), 2014 WL 7238339, at *4 (S.D.N.Y. Dec. 19, 2014); see also MBIA Ins.

Corp. v. Spiegel Holdings, Inc., No. 03-CV-10097 (GEL), 2004 WL 1944452, at *4 (S.D.N.Y.

Aug. 31, 2004) ("[T]hese multi-step leaps of analogy are simply incompatible with Blue Chip

Stamps and its progeny, and granting standing to MBIA as a de facto purchaser or seller under

these circumstances would embrace precisely the sort of 'endless case-by-case erosion' of the

[purchaser or seller only] rule that the Supreme Court rejected in Blue Chip Stamps.").[16]

## IV.    State Law Claims

Since this Court has either dismissed or referred to arbitration plaintiffs' federal securities'

claim—the sole federal cause of action in the Amended Complaint, the Court declines to retain

supplemental jurisdiction over plaintiffs' remaining state law claims.  Federal district courts have

supplemental jurisdiction over state law claims "that are so related to claims in the action within

such original jurisdiction that they form part of the same case or controversy under Article III of

the United States Constitution."  The doctrine of supplemental jurisdiction is traditionally "a

doctrine of discretion, not of plaintiff's right." Kolari v. N.Y. Presbyterian Hosp., 455 F.3d 118,

122 (2d Cir. 2006) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)). Subsection

(c) of § 1367 enumerates circumstances in which a district court "may decline to exercise

supplemental jurisdiction over a claim under subsection (a)."  28 U.S.C. § 1367(c).  Section

1367(c)(2) provides that a district court may decline to exercise supplemental jurisdiction where

"the claim substantially preponderates over the claim or claims over which the district court has

original jurisdiction." It is appropriate to decline supplemental jurisdiction where the federal

---

[16] Moreover, now that plaintiffs have submitted evidence that the members of the LLC Plaintiffs have authorized them to bring this suit, there is no barrier whatsoever to the actual purchaser of the securities at issue to interposing those claims against defendants.  Because this Court holds that the LLC Plaintiffs must arbitrate their claims pursuant to the Holding Company Agreements and the claims arise (and indeed were created) by those documents, those claims are properly brought before an arbitrator.

claims constitute "an appendage" to the state claims forming the "real body of the case," and where

litigating the case in district court "can accurately be described as allowing a federal tail to wag

what is in substance a state dog." City of New Rochelle v. Town of Mamaroneck, 111 F. Supp.

2d 353, 371 (S.D.N.Y. 2000) (internal quotation omitted).

The Court finds that plaintiffs' remaining state law claims against defendants are a mere

"appendage" to their state law claims because "[t]he only action [this Court] would be able to take

on [their securities] claim would be to hear a motion to confirm, vacate, modify or correct the

arbitrator's award, which would only allow [the Court] a minimal opportunity to revisit the matter

submitted to arbitration." Nichols v. Washington Mut. Bank, No. 07-CV-3216 (JG), 2007 WL

4198252, at *10 (E.D.N.Y. Nov. 21, 2007) (dismissing state law claims where federal claims

referred to arbitration); see also ESAB Grp., Inc. v. Zurich Ins. PLC, 685 F.3d 376, 394–95 (4th

Cir. 2012) ("[W]hen those claims falling within a court's original jurisdiction are no longer in the

case—here, because they have been referred to arbitration—the court has authority under §

1367(c) to decline to exercise such supplemental jurisdiction and inherent authority to remand the

remaining claims to state court."); Town of Mamaroneck, 111 F. Supp. 2d at 372 (dismissing state

law claims for lack of supplemental jurisdiction where federal causes of action were stayed); cf.

Simoni v. Diamond, No. 10-CV-6798 (PGS), 2017 WL 82470, at *6 (D.N.J. Jan. 9, 2017)

(retaining supplemental jurisdiction over state law claims after federal cause of action referred to

arbitration on the grounds that the "case . . . has endured through an elongated litigation track—

more than six years . . . [i]t would be inefficient to refer the remaining claims to State court after

this Court's long involvement").  Accordingly, given the fact that discovery has yet to commence

and the Court has dismissed the sole federal cause of action, the Court declines to exercise

supplemental jurisdiction over plaintiffs' remaining state law claims.[17]  These claims are dismissed

without prejudice for refiling in state court.[18]

## V.    Cancellation of Notices of Pendency

Plaintiffs have attached notices of pendency on four of the Schedule A properties and all

of the Schedule B Properties.  The notices of pendency on the four Schedule A properties are

"based upon the Second Cause of Action, which seeks to cancel the equitable title conveyed by

Strulovitch," and is asserted against the four Holding Company Defendants that allegedly held title

to those properties. (Opp. at 30.) The notices of pendency on the Schedule B properties are "based

upon the Fourth Cause of Action for a constructive trust, which seeks to reconvey and vest title to

the Schedule B properties from the present owners . . . to the names of the LLC Plaintiffs." (Id.)

As explained above, the Court has determined that all of the LLC Plaintiffs and signatory

Individual Plaintiffs must arbitrate their claims against the Individual Defendants and the Holding

Company Defendants. This includes their second cause of action for cancellation of contracts

asserted against the four Holding Company Defendants that allegedly improperly conveyed title

to a third party.  Those claims are not dismissed, but stayed, while the claims are litigated in

arbitration.  See Katz v. Cellco P'ship, 794 F.3d 341, 346 (2d Cir. 2015).  Because those claims

technically remain pending, the Court must therefore determine whether the Amended

---

[17] At oral argument, plaintiffs that conceded if the Court dismissed their federal securities claim, it was "correct" that "there is no subject matter jurisdiction." (Tr. at 53:22–24.)

[18] Nor does this Court have jurisdiction based on diversity of citizenship.  As applicable here, a district court has diversity jurisdiction over an action if the parties are "citizens of different States." 28 U.S.C § 1332(a)(1).  "An individual's citizenship for diversity purposes is determined by his or her domicile, as opposed to residence." Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 42 (2d Cir. 2000).  "The rule of complete diversity—that no plaintiff and no defendant may be a citizen of the same state—applies to alienage cases as well as to ordinary diversity cases.'" Ergowerx Int'l, LLC v. Maxell Corp. of Am., 18 F. Supp. 3d 453, 455 (S.D.N.Y. 2014), aff'd, 615 F. App'x 689 (Fed. Cir. 2015) (quoting F. & H.R. Farman–Farmaian Consulting Engineers Firm v. Harza Eng'g Co., 882 F.2d 281, 284 (7th Cir. 1989)). Here, at the very least, the Individual Plaintiffs, who are alleged to be domiciled in Israel, (Am. Compl. ¶ 15), are not diverse from Defendant Oberlander, who is also alleged to be domiciled in Israel, (id. ¶ 25).

Complaint's claim for cancellation of contracts on behalf of the LLC Plaintiffs and the signatory Individual Plaintiffs against the four Holding Company Defendants sets forth a valid basis for notices of pendency on the four Schedule A properties. The Court must next determine whether the notices of pendency filed based upon claims not subject to arbitration, i.e., plaintiffs' claims for constructive trust against the Schedule B Defendants and the claim for cancellation of contracts asserted by the non-signatory Individual Plaintiffs, should be vacated.

Under New York law, a plaintiff who brings a lawsuit claiming interest in real property may file a notice of pendency with respect to the property. See N.Y. Civil Practice Law & Rules ("CPLR") §§ 6501–16. "New York's notice of pendency has been described as an 'extraordinary privilege,' and a 'unique provisional remedy,' principally because it may be filed without advance notice or prior judicial review, and does not depend upon a showing that the plaintiff is likely to prevail on the merits." Diaz v. Paterson, 547 F.3d 88, 91 (2d Cir. 2008). Courts use a "narrow" approach "in reviewing whether an action is one affecting the title to, or the possession, use or enjoyment of, real property." 5303 Realty Corp. v. O & Y Equity Corp., 64 N.Y.2d 313, 321 (1984) (citation omitted). That is, courts do not "investigate the underlying transaction in determining whether a complaint comes within the scope of CPLR 6501"; rather, a "court's analysis is to be limited to the pleading's face." Id. Whether to cancel a notice of pendency under § 6515 is a matter entirely within the discretion of the Court. See Purchase Real Estate Grp., Inc. v. Jones, 489 F. Supp. 2d 345, 348 (S.D.N.Y. 2007). For the reasons stated below, the Court concludes that the notices of pendency should be cancelled in all respects.

## A. Notices of Pendency Filed on Arbitrable Claims

A notice of pendency may, in some circumstances, be filed in an action to cancel contracts where plaintiff alleges that the real estate transaction was improper. See, e.g., Resnick v. Doukas,

43

261 A.D.2d 375, 379 (2d Dep't 1999).   The Schedule A Defendants contend that the proper circumstances are not present here because plaintiffs allege only either an interest in the LLC Plaintiffs or the Holding Company Defendants; thus their claim for cancellation of contracts does not "directly" impact the underlying real properties.  (Schedule A Defs. Mem. at 45.)  Plaintiffs counter that their cancellation of contracts claim meets the test of CPLR § 6501 because if their specific performance requested is granted, their suit would necessarily impact underlying real property. (Opp. at 33.)

"The cases hold that a notice of <u>lis pendens</u> cannot be filed where the party who has filed it claims no right, title or interest in or to the real estate against which it is filed." <u>Braunston v. Anchorage Woods, Inc.</u>, 10 N.Y.2d 302, 305 (1961); <u>Yonaty v. Glauber</u>, 40 A.D.3d 1193, 1194 (3d Dep't 2007) (vacating notice of pendency where plaintiff sought imposition of a constructive trust on real property as well as other relief related to the property because plaintiff "never assert[ed] an interest in the real property itself but, rather, claims only an interest in the LLC which acquired the real property").   Thus, to be afforded a notice of pendency, not only must plaintiff allege that the action would directly impact the title or interest to real property, but plaintiff must also allege that they have, or would have following a judgment in their favor, a direct interest in the property.  See <u>Richard J. Zitz, Inc. v. Pereira</u>, 965 F. Supp. 350, 355 (E.D.N.Y. 1997) ("The subject litigation must be one where the relief requested is 'directly related' to the title, possession, use or enjoyment of the real property . . . . The plaintiff filing the notice of pendency must claim some 'interest . . . in the land of a defendant which might be lost under the recording acts in the event of a transfer of the subject property during the litigation.'" (quoting <u>Braunston</u>, 10 N.Y.2d at 305)); <u>5303 Realty Corp.</u>, 64 N.Y.2d at 323 (cancelling notices of pendency where "[i]t is apparent from the allegations that the true action is to enforce a contract to sell stock").

44

In <u>Yonaty</u>, for example, the appellate court cancelled a notice of pendency because it found that the true action behind the plaintiff's complaint was "to enforce defendants' promise to give the plaintiff a 20% interest in the LLC which acquired the property, not an ownership interest in the real property itself." 40 A.D.3d at 1194. Moreover, the <u>Yonaty</u> court noted that a realty-owning corporation, such as an LLC, "itself owns its assets, and a shareholder merely owns an interest in the corporation, and does not have a direct claim on its real property." <u>Id.</u> Thus, the court in <u>Yonaty</u> cancelled the notices of pendency because "plaintiffs never had or claimed a direct interest in real property," they had only an interest in the LLC. <u>Id.</u>; <u>see also</u> <u>Diaz</u>, 547 F.3d at 98 ("New York <u>lis</u> <u>pendens</u> procedure . . . is available only to claimants asserting a defined interest in the property.").

Here, although plaintiffs' claim for cancellation of contracts implicates real property, there is no allegation that plaintiffs have any "direct interest in the defendants' real property." <u>Ostad v. Nehmadi</u>, 929 N.Y.S.2d 201, 208 (Sup. Ct. N.Y. Cty. Apr. 8, 2011). Indeed, even if successful, their claim would not result in any direct interest in the four Schedule A Properties because they hold only membership interests in the Holding Company Defendants or the LLC Plaintiffs. <u>See</u> <u>Felske v. Bernstein</u>, 173 A.D.2d 677, 678 (2d Dep't 1991) ("At bar, even if the [plaintiffs] were granted specific performance in the underlying action, that fact alone would not give them an interest in the subject realty because their interest in the joint venture would be an interest in personal property, not an interest in the realty."). Moreover, the Amended Complaint belies plaintiffs' assertion that they would have a direct interest in the underlying properties because it requests only that the Court issue an order that the four Schedule A Properties are owned by the respective Holding Company Defendant—not by any plaintiff in this action. (<u>Id.</u> ¶ 145.) Accordingly, the analysis in <u>5303 Realty Corp.</u>, <u>Yonaty</u>, <u>Felske</u>, and <u>Ostad</u> is dispositive because

45

plaintiffs do not allege a direct interest in the underlying properties or allege they would have a direct interest in those properties if they were successful on their claim for cancellation of contracts. Thus, defendants' motion to vacate the notices of pendency attached to the Schedule A Properties is granted.

### B. Non-Arbitrable Claims Forming the Basis of Notices of Pendency

With regard to the non-arbitrable claims used to attach notices of pendency—plaintiffs' claim for constructive trust against the Schedule B Defendants and the non-signatory Individual Plaintiffs' claim for cancellation of contracts against the four Holding Company Defendants, the Second Circuit instructs that "if the underlying complaint [fails to] set [] forth a claim . . . the Court should cancel the notice." Diaz, 547 F.3d at 91; see also DLJ Mort. Cap., Inc. v. Kontogiannis, No. 08-CV-4607 (ENV), 2009 WL 1652253, *5 (E.D.N.Y. June 4, 2009). Because the Court has declined to exercise supplemental jurisdiction over these claims, the notices of pendency on the Schedule B properties and the four Schedule A properties should be cancelled. See Done v. Wells Fargo, N.A., No. 12-CV-04296 (JFB), 2013 WL 3785627, at *8 (E.D.N.Y. July 18, 2013) ("Where, as here, the complaint is dismissed for lack of subject matter jurisdiction, the notice of pendency should be canceled.") (citing Peddie v. 2436 Marion Ave. Assoc., No. 01-CV-1239 (LTS), 2001 WL 995337, *2 (S.D.N.Y. Aug. 30, 2001)). Accordingly, because all of the non-arbitrable claims have been dismissed, the notices of pendency attached to the Schedule B Properties and the four Schedule A properties should be cancelled.

### CONCLUSION

For these reasons, the Court grants in part and denies in part defendants' motions to compel arbitration. The Court grants the Schedule A defendants' motion to compel arbitration for the following claims asserted by the LLC Plaintiffs and Signatory Individual Plaintiffs in the

Amended Complaint: federal securities fraud, (Am. Compl. ¶¶ 125−35); cancellation of contracts, (id. ¶¶ 136−45); common law fraud, (id. ¶¶ 146−59); breach of fiduciary duty against the Individual Defendants and CSRE, (id. ¶¶ 168−80); unjust enrichment against the Individual Defendants and CSRE, (id. ¶¶ 180−94); and constructive trust against the Individual Defendants and CSRE, (id. ¶¶ 201−04). The LLC Plaintiffs' claim for accounting against the Individual Defendants and CSRE is also referred to arbitration. (Id. ¶¶ 195−200.) The Court grants the Schedule A Defendants' motion to dismiss the non-signatory Individual Plaintiffs' claim for securities fraud against the Individual Defendants. (Id. ¶¶ 125−35.) The Court declines to exercise supplemental jurisdiction over the remaining state law claims against the moving defendants. Those claims are dismissed without prejudice to refile in state court. The Court further concludes that the notices of pendency should be cancelled and directs the Clerks of the Court for the counties of Kings, Manhattan, and Suffolk County to cancel the notices of pendency.

     SO ORDERED.

Dated: November     /     , 2017          s/Carol Bagley Amon
     Brooklyn, New York

                                             Carol Bagley Amon
                                           United States District Judge

## CERTIFICATE OF SERVICE

I certify that on November 30, 2017, I served the within

**NOTICE OF APPEAL WITH ANNEXED COPY OF THE ORDER**

By electronic means by filing with the Court's ECF system.

Dated:   New York, New York
         November 30, 2017

_____/s/_____

Edward C. Wipper, Esq.