UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| JACOB SCHONBERG, BINYOMIN SCHONBERG, BINYOMIN HALPERN AND RAPHAEL BAROUCH ELKAIM, et al, | :   Case No: 17-cv-2161 |
| | :   (CBA)(RML) |
| | : |
| *Plaintiffs,* | : |
| | : |
| -against- | : |
| | : |
| YECHEZKEL STRULOVICH a/k/a CHASKIEL STRULOVITCH, YECHIEL OBERLANDER a/k/a MICI OBERLANDER a/k/a MIHAY OBERLANDER, et al | : |
| | : |
| | : |
| | : |
| *Defendants.* | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' <u>MOTION FOR LEAVE TO AMEND</u>

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................. 4

    1.    The Investments In The Schedule A Properties .................................................. 4

    2.    The Holding Company Agreements ..................................................................... 5

    3.    By The Order, The Court Compelled The LLC Plaintiffs And
           Signatory Individual Plaintiffs To Arbitration, Dismissed The
           Non-Signatory Individual Plaintiffs' Federal Securities Fraud Claim,
           And Declined To Exercise Supplemental Jurisdiction ......................................... 5

    4.    Arbitration Is Deliberately Blocked By The Cunning Efforts Of Plaintiffs ......... 6

           a.    Step 1 - In April 2018, Plaintiffs Hired New Counsel To
                    Initiate Their Plan To Sneak In The Backdoor To Federal
                    Court ............................................................................................. 7

           b.    Step 2 – Ignore Communications From The Appointed
                    Arbitrator ..................................................................................... 9

           c.    Step 3 – Plaintiffs Attempt To Manufacture A Record So
                    As To Convince The Court That Arbitration Failed ..................... 10

           d.    Step 4 - File A Pre-Motion To Amend, Claiming That
                    Arbitration Failed ....................................................................... 10

           e.    Step 5 - Ignore Defendants' Communications................................ 11

    5.    Decision on the Pre-Motion To Amend .............................................................. 11

    6.    Plaintiffs' History Of Arbitration Phobia ........................................................... 11

ARGUMENT ..................................................................................................................... 12

1.    Plaintiffs Come Before This Court In Bad Faith And, As A Result, Should Not Be
    Permitted To File A *Third* Amended Complaint............................................... 12

2.    The Motion To Amend Should Be Denied Because It Is Based On Changed
    Legal Theories That Could Have Been Raised At The Time The Original
    Complaint, First Amended Complaint, And Second Amended Complaint
    Were Filed .......................................................................................................... 15

3.      The Securities Fraud Claim Was Dismissed Pursuant to FRCP 12(b)(6),
        And Cannot Be Amended ........................................................................... 16

4.      The Motion To Amend Must Be Denied Because The Claims Are Arbitrable ............ 17

        a.      The Amended Securities Fraud Claims Must Be Referred
                To Arbitration ................................................................................ 17

        b.      The Alternative RICO Claims Are Arbitrable .......................................... 21

        c.      The Amended Common Law Claims Must Also Be Referred
                To Arbitration ................................................................................ 21

                1.      The Signatory Individual Plaintiffs' common law claims
                        are arbitrable. ........................................................................ 21

                2.      The LLC Plaintiffs' common law claims are arbitrable. ................ 22

                3.      The Derivative Plaintiffs' common law claims against
                        the Individual Defendants are arbitrable. ............................... 23

                4.      The claims against the Secret LLC Defendants and
                        Defendants' Affiliated Entities are arbitrable ......................... 25

5.      The Proposed Amended Securities Fraud Claims Would Not Survive A Motion To
        Dismiss, And Are Therefore Futile ................................................................. 27

        a.      The proposed amended securities fraud claims are common law
                claims dressed up as federal claims .................................................. 27

        b.      The Individual Plaintiffs did not acquire a "security" when
                obtaining an interest in the LLC Plaintiffs ......................................... 29

        c.      The securities fraud claims fail for all of the reasons stated
                in the motion to dismiss the SAC ..................................................... 32

6.      The Proposed RICO Claims Would Not Survive A Motion To Dismiss And Are
        Therefore Futile ........................................................................................ 33

        a.      The RICO Claims are time barred ..................................................... 34

        b.      The RICO Claims Fail Because There Is Not An Enterprise .................... 42

        c.      The predicate acts are not well-pled ................................................ 44

CONCLUSION ........................................................................................................ 47

**<u>TABLE OF AUTHORITIES</u>**

**Page**

**<u>Federal Cases</u>**

*4 K & D Corp. v. Concierge Auctions, LLC*,
  2 F. Supp. 3d 525 (S.D.N.Y. 2014) ..................................................................41

*Agency Holding Corp. v. Malley-Duff Assocs., Inc.*,
  483 U.S. 143, 156 (1987) ...............................................................................34

*Arnold v. Arnold Corp.*,
  920 F.2d 1269 (6th Cir. 1990) ........................................................................20

*Arrigo v. Blue Fish Commodities, Inc.*,
  704 F. Supp. 2d 299 (S.D.N.Y. 2010), *aff'd*, 408 F. App'x 480 (2d Cir. 2011) ...................17

*Arutyunyan v. Fields*,
  No. 17-CV-5009 (AMD), 2018 WL 3966239 (E.D.N.Y. Aug. 17, 2018) ............................16

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
  995 F. Supp. 2d 291 (S.D.N.Y. 2014), *aff'd sub nom. SRM Glob. Master Fund
  Ltd. P'ship v. Bear Stearns Cos.*, 829 F.3d 173 (2d Cir. 2016)..............................46

*Bentley v. Dennison*,
  852 F. Supp. 2d 379 (S.D.N.Y. 2012), *aff'd*, 519 F. App'x 39 (2d Cir. 2013) ....................35

*Berns v. EMI Pub., Inc.*,
  No. 95 Civ. 8130(KTD), 1999 WL 1029711 (S.D.N.Y. Nov. 12, 1999) ..............................15

*Black Radio Network, Inc. v. NYNEX Corp.*,
  44 F. Supp. 2d 565 (S.D.N.Y.1999) ...................................................................44

*Boule v. Credit One Bank*,
  No. 15-CV-8562(RJS), 2016 WL 3015251 (S.D.N.Y. May 11, 2016)..................................17

*Butala v. Agashiwala*,
  916 F. Supp. 314 (S.D.N.Y. 1996) ..................................................................40, 46

*C.A. Westel de Venezuela v. Am. Tel. & Tel. Co.*,
  No. 90 Civ. 6665 (PKL), 1994 WL 558026 (S.D.N.Y. Oct. 11, 1994),
  *aff'd*, 54 F.3d 766 (2d Cir. 1995)...................................................................34

*Cedar Swamp Holdings, Inc. v. Zaman*,
  487 F. Supp. 2d 444 (S.D.N.Y. 2007) .................................................................42

*Chiacchia v. Schitkedanz*,
  No. 111CV00837-MAT-HKS, 2016 WL 3024167 (W.D.N.Y. May 25, 2016) ..................16

*Church of Scientology Int'l v. Time Warner, Inc.*,
    No. 92 Civ. 3024(PKL), 1998 WL 575194 (S.D.N.Y. Sept. 9, 1998),
    *aff'd sub nom., Church of Scientology Int'l v. Behar*, 238 F.3d. 168
    (2d Cir. 2001) ....................................................................................................................15

*Church of Scientology v. Siegelman*,
    94 F.R.D. 735 (S.D.N.Y. 1982) ......................................................................................15

*Ciresi v. Citicorp*,
    782 F. Supp. 819 (S.D.N.Y. 1991), *aff'd without opinion*,
    956 F.2d 1161 (2d Cir. 1992) ..........................................................................................27

*City of N.Y. v. Chavez*,
    944 F. Supp. 2d 260 (S.D.N.Y. 2013), *vacated on other grounds*,
    579 F. App'x 15 (2d Cir. 2014) ......................................................................................42

*Coppola v. Applied Elec. Corp.*,
    No. 98 CV 3149, 1998 WL 667934 (E.D.N.Y. Aug. 3, 1998) ..........................................27

*Crawford v. Franklin Credit Mgmt. Corp.*,
    758 F.3d 473 (2d Cir. 2014) ............................................................................................34

*Dassero v. Edwards*,
    190 F. Supp. 2d 544 (W.D.N.Y. 2002) ............................................................................20

*DeFalco v. Bernas*,
    244 F.3d 286 (2d Cir. 2001) ............................................................................................45

*Denney v. BDO Seidman, L.L.P.*,
    412 F.3d 58 (2d Cir. 2005) ..............................................................................................26

*Dresner v. Utility.com, Inc.*,
    371 F. Supp. 2d 476 (S.D.N.Y. 2005) ............................................................................46

*Elwell v. Google, Inc.*,
    No. 05 Civ. 6498 (DLC), 2006 WL 217978 (S.D.NY Jan 30, 2006) ..................................20

*FD Prop. Holding, Inc. v. U.S. Traffic Corp.*,
    206 F. Supp. 2d 362 (E.D.N.Y. 2002) ..............................................................................41

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004) ....................................................................................41, 42

*Foman v. Davis*,
    371 U.S. 178 (1962) ........................................................................................................14

*Frankel v. Cole*,
   313 F. App'x 418 (2d Cir. 2009) ..................................................................... 34

*Garber v. Legg Mason, Inc.*,
   537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009) ................... 46

*In re Global Crossing, Ltd. Sec. Litig.*,
   313 F. Supp. 2d 189 (S.D.N.Y. 2003) ............................................................. 39

*Great Lakes Chem. Corp. v. Monsanto Co.*,
   96 F. Supp. 2d 376 (D. Del. 2000) ............................................................... 32

*Gross v. Waywell*,
   628 F. Supp. 2d 475 (S.D.N.Y. 2009) ............................................................ 45

*Grunwald v. Borenfreund*,
   No. 85 CV 3338, 1986 WL 176367 (E.D.N.Y. Nov. 26, 1986) ........................................ 47

*In re Integrated Res., Inc. Real Estate Ltd. P'ships Sec. Litig.*,
   851 F. Supp. 556 (S.D.N.Y. 1994) .............................................................. 34

*Katzman v. Victoria's Secret Catalogue*,
   167 F.R.D. 649 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997) ........................... 33

*Keith v. Black Diamond Advisors, Inc.*,
   48 F. Supp. 2d 326, 333 (S.D.N.Y. 1999) ....................................................... 32

*Knoll v. Schectman*,
   275 F. App'x 50 (2d Cir. 2008) ................................................................ 44

*Koch v. Christie's Int'l PLC*,
   699 F.3d 141 (2d Cir. 2012) ................................................................... 35

*Mackin v. Auberger*,
   59 F. Supp. 3d 528 (W.D.N.Y. 2014) ............................................................ 44

*Martinez v. Paramount Country Club*,
   No. 18 CV 4668 (VB), 2019 WL 4450552 (S.D.N.Y. Sept. 17, 2019) ................................ 19

*In re Mautner v. Alvin H. Glick Irrevocable Grantor Tr.*,
   No. 19 CIV. 2742 (NRB), 2019 WL 6311520 (S.D.N.Y. Nov. 25, 2019) .............................. 30

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*,
   No. 91-CV-2923 CSH, 1994 WL 88129 (S.D.N.Y. Mar. 15, 1994) ................................... 45

*Mills v. Polar Molecular Corp.*,
   12 F.3d 1170 (2d Cir. 1993) ............................................................... 44, 45

*Mosca v. Doctors Assocs., Inc.*,
    852 F. Supp. 152 (E.D.N.Y. 1993) ...................................................................... 20

*Mutual Shares Corp. v. Genesco, Inc.*,
    384 F.2d 540 (2d Cir. 1967) ............................................................................... 28

*NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*,
    262 F. Supp. 2d 134 (S.D.N.Y. 2003) ............................................................... 14

*Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*,
    420 F. Supp. 2d 253 (S.D.N.Y. 2006) ............................................................... 41

*Nelson v. Stahl*,
    173 F. Supp. 2d 153 (S.D.N.Y. 2001) ...................................................... 29, 30, 32

*Phaneuf v. Tenneco, Inc.*,
    938 F. Supp. 112 (N.D.N.Y. 1996) ................................................................... 16

*Pross v. Katz*,
    784 F.2d 455 (2d Cir. 1986) ............................................................................... 28

*Ragone v. Atl. Video at Manhattan Ctr.*,
    No. 07 CIV. 6084 (JGK), 2008 WL 4058480 (S.D.N.Y. Aug. 29, 2008)
    *aff'd*, 595 F.3d 115 (2d Cir. 2010) ................................................................... 26

*Raymond v. Mid-Bronx Haulage Corp.*,
    No. 15-CV-5803 (RJS), 2017 WL 9882601 (S.D.N.Y. June 10, 2017) ........................ 18, 19

*Roby v. Corp. of Lloyds*,
    996 F.2d 1353 (2d Cir. 1993) ............................................................................. 20

*Rosenshein v. Meshel*,
    688 F. App'x 60 (2d Cir. 2017) .......................................................................... 40

*Rotella v. Wood*,
    528 U.S. 549 (2000) .......................................................................................... 34

*Sanchez v. ASA Coll., Inc.*,
    No. 14-CV-5006 JMF, 2015 WL 3540836 (S.D.N.Y. June 5, 2015) ..................... 33

*Sanders v. Thrall Car Mfg. Co.*,
    582 F. Supp. 945, 953 (S.D.N.Y.1983) ............................................................. 15

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977) .......................................................................................... 27

*Scher v. Bear Stearns & Co.*,
    723 F. Supp. 211 (S.D.N.Y. 1989) .................................................................... 20

*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479 (1985) ................................................................................... 33

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*,
  198 F.3d 88 (2d Cir. 1999) ........................................................................ 18

*State of N.Y. v. Cedar Park Concrete Corp.*,
  741 F. Supp. 494 (S.D.N.Y. 1990) ............................................................ 14

*Stechler v. Sidley, Austin Brown & Wood, L.L.P.*,
  382 F. Supp. 2d 580 (S.D.N.Y. 2005) ................................................. 17, 20

*Szabo v. Reilly*,
  No. 91 CIV. 5209 (JFK), 1994 WL 38684 (S.D.N.Y. Feb. 4, 1994) ...................... 27

*Tatintsian v. Vorotyntsev*,
  No. 1:16-CV-7203-GHW, 2018 WL 2324998 (S.D.N.Y. May 22, 2018) ............... 24

*Town of Mamakating v. Lamm*,
  No. 15-CV-2865 KBF, 2015 WL 5311265 (S.D.N.Y. Sept. 11, 2015),
  *aff'd*, 651 F. App'x 51 (2d Cir. 2016) ............................................. 39, 41

*Turkenitz v. Metromotion, Inc.*,
  No. 97CIV.2513(AJP)(JGK), 1997 WL 773713 (S.D.N.Y. Dec. 12, 1997) ............ 16

*United States v. Turkette*,
  452 U.S. 576 (1981) .......................................................................... 42, 44

*VanBrocklen v. Dep't of Homeland Sec.*,
  No. 1:12–CV–003, 2012 WL 2873373 (N.D.N.Y. July 12, 2012) ..................... 16

*Winters v. Alza Corp.*,
  690 F. Supp. 2d 350 (S.D.N.Y. 2010) ........................................................ 16

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
  328 F. App'x 695 (2d Cir. 2009) ............................................................... 34

*Wrenn v. N.Y. City Health & Hosps. Corp.*,
  104 F.R.D. 553 (S.D.N.Y. 1985) ............................................................... 15

*Zirvi v. Flatley*,
  No. 18-CV-7003 (JGK), 2020 WL 208820 (S.D.N.Y. Jan. 14, 2020) ............... 39

## State Cases

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
  98 N.Y.2d 144, 746 N.Y.S.2d 131 (2002) ................................................... 13

*Hirschfeld Prods., Inc. v. Mirvish*,
    88 N.Y.2d 1054, 651 N.Y.S.2d 5 (1996)...................................................................19

*King ex rel. Massey Knakal Realty of Brooklyn, LLC v. Massey Knakal Realty
    Holdings LLC*,
    24 Misc. 3d 1242(A), 2009 WL 2712172 (Sup. Ct. N.Y. Cty. 2009)...................24

*Maresca v. La Certosa*,
    172 A.D.2d 725, 569 N.Y.S.2d 111 (2d Dep't 1991)............................................24

## **Statutes**

18 U.S.C. § 1961(4).......................................................................................................42

FRCP 9(b)..........................................................................................................44, 45, 46

FRCP 10(b)......................................................................................................3, 27, 29. 32

FRCP 12(b)(6).........................................................................................................1, 2, 6, 16

FRCP 15(a).......................................................................................................................14

N.Y. LLC Law § 401................................................................................................30, 32

N.Y. LLC Law § 401(a)..................................................................................................30

N.Y. LLC Law § 401(b)..................................................................................................30

N.Y. LLC Law § 402.......................................................................................................30

N.Y. LLC Law § 412.......................................................................................................30

N.Y. LLC Law § 414.......................................................................................................30

Defendants Yechezkel Strulovich, CSRE LLC, CS Construction Group LLC, Good Living Management LLC, 908 Bergen Street LLC, 901 Bushwick Avenue LLC, Gates Equity Holdings LLC, 1078 Dekalb LLC, 74 Van Buren LLC, 762 Willoughby LLC, 454 Central Avenue LLC, 855 Dekalb Avenue LLC, 720 Livonia Development LLC, 853 Lexington LLC, 980 Atlantic Holdings LLC, 945 Park Pl LLC, 1301 Putnam LLC, 348 St. Nicholas LLC, CSY Holdings LLC, APC Holding 1 LLC, 53 Stanhope LLC, The Howard Day House LLC, 55 Stanhope LLC, 599-601 Willoughby LLC, 1217 Bedford LLC, 1266 Pacific LLC, 167 Hart LLC, 741 Lexington LLC, and 296 Cooper LLC respectfully submit this memorandum of law in opposition to Plaintiffs' Motion for Leave to File a Third Amended Complaint (the "Motion to Amend").[1]

## PRELIMINARY STATEMENT

By their Motion to Amend, Plaintiffs attempt to sneak in the back door to Federal Court years after this Court issued an order in November 2017 (the "Order"): (i) compelling arbitration with respect to the claims of the Plaintiffs who signed arbitration agreements; (ii) dismissing the non-signatory plaintiffs' securities fraud claim pursuant to FRCP 12(b)(6); and (iii) dismissing the non-signatory plaintiffs' common law claims, without prejudice to refiling in State Court. The Motion to Amend should be denied because Plaintiffs come before this Court in bad faith, have engaged in undue delay, and assert arbitrable and non-viable claims.

The Plaintiffs come before this Court with their Motion to Amend in bad faith. Indeed, despite Defendants' best efforts to move the ball forward with respect to arbitration, as directed by this Court, Plaintiffs intentionally made that impossible by: (i) ignoring communications from the arbitrator who was appointed in connection with the arbitration agreement; (ii) attempting to

---

[1] The undersigned law firm also represents 73 Empire Development LLC, 325 Franklin LLC, 618 Lafayette LLC, 106 Kingston LLC, 1213 Jefferson LLC, 657-665 5th Avenue LLC, and Willoughby Estates LLC.  These entities are

force non-litigants in this action to participate in arbitration; (iii) attempting to force a rabbinical panel to enforce the Federal Rules of Civil Procedure; and (iv) ignoring communications from Defendants as recently as October 2019 in which Defendants reiterated their willingness to arbitrate as directed by this Court.  It is now clear that since April 2018, Plaintiffs have deliberately sabotaged arbitration by retaining a new law firm – **who they are presently suing to avoid arbitration of a legal fee dispute** – to "deal with" the direction from this Court to arbitrate and putting Plaintiffs "in position" to file a new Complaint.  In so doing, Plaintiffs violated the covenant of good faith and fair dealing implied into the arbitration agreements, and deliberately violated the Order.  Therefore, the Plaintiffs come before this Court in bad faith and the Motion to Amend should be denied on that ground alone.

Moreover, any claims brought by the LLC Plaintiffs, Derivative Plaintiffs and Individual Plaintiffs who signed the arbitration agreements are arbitrable.  Plaintiffs attempt to plead around the Order by asserting that their claims arise from investments that occurred before the Holding Company Agreements were circulated.  However, the "Second Circuit generally presumes retroactive application of broad arbitration provisions absent explicit temporal limitations."  Moreover, Plaintiffs cannot avoid arbitration by asserting claims only against the Individual Defendants.  Indeed, Second Circuit law is clear that the benefit of arbitration agreements extends to individual agents of the party to the arbitration clause because to hold otherwise would subvert the federal policy favoring arbitration.

Furthermore, the proposed amended claims are futile as they will be dismissed on a FRCP 12(b)(6) motion.  The Individual Plaintiffs' amended securities fraud claim is "for the purchase of a direct interest in the membership interests of the LLC Plaintiffs."  A membership interest in the LLC Plaintiffs, in which the Individual Plaintiffs have managerial authority (in

---

not named in the Proposed Third Amended Complaint because they are currently in bankruptcy.

addition to Strulovitch), is not a security.  Moreover, the securities fraud claims are dressed up common law claims.  Indeed, the alleged misrepresentations and omissions are "merely restated legal duties already owed" which are not actionable under § 10(b).  Accordingly, the securities fraud claims would not survive a motion to dismiss.

Likewise, Plaintiffs should not be permitted to amend their complaint to allege Federal RICO violations, where the claims arise from a routine commercial dispute.  For starters, the RICO claims are time barred since Plaintiffs failed to file their original complaint within four years of being on inquiry notice of the alleged fraudulent misrepresentations and omissions. Additionally, Plaintiffs did not and cannot allege a viable RICO enterprise.  All Plaintiffs have alleged is the existence of a series of independent frauds.  There are no non-conclusory allegations that there was a "continuing unit" working together to defraud Plaintiffs.  Nor are there any allegations of a continuing unit that exists separate and apart from the alleged racketeering activity.  Moreover, Plaintiffs fail to meet the heightened pleading standards required to properly assert the predicate acts under RICO.  While the Plaintiffs seek the recovery of $30,000,000 for the alleged RICO violations, Plaintiffs fail to allege how much each Individual Plaintiff invested and when they invested that money.  That is critical because the only non-arbitrable RICO claims are those brought by the non-signatory Individual Plaintiffs. Accordingly, the RICO claims would not survive a motion to dismiss.

Thus, because there is no federal question jurisdiction, the Court should continue to decline to exercise supplemental jurisdiction with respect to the amended common law claims and should also dismiss this action.  Thus, the Motion to Amend should be denied in its entirety.

# BACKGROUND

The relevant background is drawn from the proposed Third Amended Complaint ("TAC"), the Court's Memorandum and Order, dated November 1, 2017 (the previously defined "Order"), the Declaration of Binyomin Halpern, dated February 6, 2019 ("Halpern Decl."), the Declaration of Mendel Brach, dated February 20, 2019 ("Brach Decl."), the Declaration of Rabbi Ahron Bentzion Mandel, dated February 20, 2019 ("Bentzion Decl."), and the Declaration of Scott C. Ross, dated January 27, 2020 ("Ross Decl.")  The Order is attached as Exhibit 1 to the Brach Decl.

## 1. The Investments In The Schedule A Properties

Strulovitch and Oberlander, the Individual Defendants, allegedly persuaded 180 investors to invest in twenty-two separate properties (the "Schedule A Properties").  Order at 4.  The Schedule A Properties are owned by the Holding Companies, some of which are now Derivative Plaintiffs in the TAC. Order at 3.[2]  To arrive at their interests in the Holding Companies, the Individual Plaintiffs – who comprise 38/180 investors[3] – first received interests in the twenty-two LLC Plaintiffs,[4] which then received a 45% percent interest in one of the Holding Companies, through the Holding Company Agreements.  Order at 5.  Defendant CSRE owns 55% percent of each of the Holding Companies. Order at 5.  Strulovitch is the manager of the LLC Plaintiffs, CSRE, and the Holding Companies.  Order at 5.

---

[2] The Holding Companies are identified in ¶ 33 of the TAC.  All of them, with the exception of 73 Empire Development, LLC, 325 Franklin LLC, 618 Lafayette LLC, 106 Kingston LLC, 1213 Jefferson LLC, 657-665 5th Avenue LLC, and Willoughby Estates LLC are now derivative plaintiffs and nominal defendants in this action.  Not all of the Holding Companies are parties to this action due to certain bankruptcy actions.

[3] It was 47 in the SAC.

[4] The LLC Plaintiffs are identified in ¶ 28 of the TAC.

The Individual Plaintiffs allegedly made investments based on prospectuses provided to them between February 2012 and September 2014.  Order at 7.  The Individual Defendants allegedly diverted the investment funds to purchase and develop the Schedule B Properties.  Order at 8.  Plaintiffs now contend that "[s]ome of the funds were diverted before they even reached LLC Plaintiffs' accounts…." Motion to Amend at 4 (citing Halpern Decl. ¶ 18).

## 2.   The Holding Company Agreements

The Holding Company Agreements are signed by Strulovitch on behalf of CSRE, the LLC Plaintiffs, and the Holding Company Defendants.  Order at 5.[5]  Certain of the Individual Plaintiffs also signed the Holding Company Agreements.  Order at 5-6; *see also* Brach Decl. Ex. 5 at 3-4 for a list of the signatory Individual Plaintiffs.

The Holding Company Agreements contain arbitration provisions that state:

> In case of any doubt, question or other disagreement among the parties to this agreement about anything pertaining to this Agreement, all of the parties to the disagreement shall choose a third party that is acceptable to all of them as Arbitrator (the "Arbitrator") and ask for his ruling on point, and his ruling shall be accepted by all the parties to the disagreement.  If, however, the parties do not reach agreement within forty-five (45) days as to who is to be the Arbitrator, then HaRav Avrohom Baruch Rosenberg of Monsey, New York shall choose the arbitrator for the parties and that Arbitrator's ruling shall be binding on all the parties.  In any case, however, all the parties to this agreement agree not to bring any matter relating to this Agreement to a secular court for resolution unless instructed to do so by the Arbitrator or to enforce the Arbitrator's ruling.

Order at 6; *see also e.g.* Brach Decl. Ex. 2, § 13.d.

---

[5] The Holding Company Agreements can be found in the record at D.E. 198.  One sample is attached to these papers.  *See* Brach Decl. Ex. 2.

**3.   By The Order, The Court Compelled The LLC Plaintiffs And Signatory Individual Plaintiffs To Arbitration, Dismissed The Non-Signatory Individual Plaintiffs' Federal Securities Fraud Claim, And Declined To Exercise Supplemental Jurisdiction**

In the SAC, all Plaintiffs – the Individual Plaintiffs and LLC Plaintiffs – asserted federal securities fraud claims against the Individual Defendants. Order at 9, 38 n.14.  Plaintiffs also asserted claims for breach of fiduciary duty against the Individual Defendants and CSRE, amongst other common law claims. Order at 9.

With respect to the motion to compel arbitration, the Court held as follows:

> the LLC Plaintiffs and the Individual Plaintiffs who signed a Holding Company Agreement must arbitrate their claims with respect to the Holding Company Agreement they signed. Having found that the Individual Plaintiffs who did not sign the Holding Company Agreements are not bound to litigate their claims before the arbitrator, and that plaintiffs need not arbitrate against the Schedule B Defendants and the other Strulovich-controlled entities, this Court will consider defendants' grounds for dismissal only as to the remaining claims not referred to arbitration. Order at 36.

With respect to the motion to dismiss, the Court recognized that the LLC Plaintiffs, not the Individual Plaintiffs, were the "actual purchaser of the securities at issue" (Order at 40 n.16), and, as a result, the non-signatory Individual Plaintiffs' securities fraud claim was dismissed pursuant to FRCP 12(b)(6) (without specifying whether dismissal was with or without prejudice).  Order at 36-40.  The Court declined to exercise supplemental jurisdiction over the remaining state law claims filed by the non-signatory Individual Plaintiffs and dismissed them "without prejudice for refiling in state court."  *Id.* at 42.  No Plaintiff filed any related claims in State Court.  Brach Decl. ¶ 6.

**4.   Arbitration Is Deliberately Blocked By The Cunning Efforts Of Plaintiffs**

In accordance with the Order and Holding Company Agreements, on November 9, 2017, Defendants sent a letter to Darren Oved, former counsel for Plaintiffs, giving notice that pursuant

to the Holding Company Agreements, Defendants identified Rabbi Zalmen Grauz as their chosen arbitrator for the claims referred to arbitration.  Defendants further advised, in accordance with the Holding Company Agreements, that if they cannot reach agreement on an arbitrator within 45 days "then HaRav Avrohom Baruch Rosenberg of Monsey, New York shall choose the arbitrator for the parties." Brach Decl. ¶ 8, Ex. 3.

Thereafter, the parties began negotiating selection of an arbitrator and arbitration rules "for a determination of all claims, including those not subject to the arbitration provisions."  *See* Halpern Decl. ¶ 3 (i.e., a *global* arbitration).[6] Notably, nothing in the Holding Company Agreements require the negotiation of arbitration rules, which makes sense since arbitrators typically provide the rules.

During the period of negotiation, Defendants gave Plaintiffs multiple extensions to respond to the November 9 letter. Brach Decl. ¶ 9.  In December 2017, Plaintiffs and Defendants agreed on the appointment of the Honorable David Schmidt as arbitrator for a *global* arbitration. Brach Decl. ¶ 10.  However, shortly thereafter, the parties learned that Judge Schmidt was ill and would not be able to preside.  Brach Decl. ¶ 10.

Thereafter, Plaintiffs engaged in a series of opportunistic maneuvers designed to purportedly put them in position to re-file a complaint in Federal Court.

### a.  Step 1 - In April 2018, Plaintiffs Hired New Counsel To Initiate Their Plan To Sneak In The Backdoor To Federal Court

In April 2018, Plaintiffs retained the law firm Wilson Sonsini Goodrich and Rosati, P.C. ("WSGR"), "in connection with a dispute over investments made with Yechezkel Strulovitch

---

[6] *Global*, when used herein, refers not just to the claims and the parties referred to arbitration, but also the individual plaintiffs who did not sign arbitration agreements, the Schedule B Defendants, and other entities allegedly controlled by Strulovitch.

and his companies." Ross Decl. Ex. 3 (the "WSGR Engagement Agreement").[7] The WSGR

Engagement Agreement provides for a $100,000 initial retainer and:

> this Initial Retainer will be used to cover fees and costs incurred by
> WSGR for approximately the first month of engagement **prior to
> the filing of any lawsuit**.   During this first stage of the
> engagement, WSGR will assess the various factual and legal issues
> relevant to this Dispute and make recommendations to Clients
> concerning the viability of a potential lawsuit and the appropriate
> forum for any lawsuit… If, after receiving such legal advice, it is
> agreed between [Plaintiffs] and WSGR that WSGR will **file a
> lawsuit** on [Plaintiffs'] behalves, a Permanent Retainer in the
> amount of $250,000 (minus any unused portion of the Initial
> Retainer) shall be due and payable before any **lawsuit is filed**.
> Said Permanent Retainer shall be increased to $350,000 **should
> any litigation proceed to discovery** and increased to $750,000
> **should any litigation proceed to trial**…

*Id.*, Ex. 3 at 3 (emphasis added).  The WSGR Engagement Agreement is silent on arbitrating the

dispute with Strulovitch as ordered by this Court, and rather has specific success payments if,

after Plaintiffs file a new lawsuit, Plaintiffs "proceed to discovery" and "proceed to trial."

Notably, at the initial meeting between Plaintiffs and WSGR, which took place on April

25, 2018, Plaintiffs and WSGR "spen[t] many hours discussing an arbitration provision invoked

by a federal court against [Plaintiffs] and how to deal with the arbitration provision in any further

litigation." Ross Decl. Ex. 4 at ¶ 8; *see also id.* ¶ 11 (Plaintiffs noting that they had just spent

"many hours discussing how to address a different arbitration provision that had caused much

trouble for [Plaintiffs] in a federal action").

The way "to deal with the arbitration provision" was not to comply with the Court's

Order and proceed to arbitration; rather, according to a June 25, 2018 publicly filed email, the

---

[7] The WSGR Engagement Agreement is effective "retroactive to the date WSGR first performed services."
Ross Decl. Ex. 3, § 19.  Per the WSGR Petition (defined below), Plaintiffs first met with WSGR on April 25, 2018.
Ross Decl. Ex. 4, ¶ 7.

Plaintiffs, through WSGR, planned to "file a complaint, which we expect to be in a position to do in next few weeks."  Ross Decl. Ex. 5.

### b.  *Step 2 – Ignore Communications From The Appointed Arbitrator*

After nearly six months of negotiating, and multiple extensions given to respond to the November 9, 2017 letter, and with the parties at an impasse with respect to terms for a *global* arbitration, on April 23, 2018, Plaintiffs' counsel sent a:

> formal response to [Herrick, Feinstein's] November 9, 2017 Letter to our firm (to the extent a formal response is necessary).  As we have stated many times, Rabbi Zalmen Grauz, the individual your clients proposed in your Letter, is not acceptable to our clients as an arbitrator of the claims enumerated in Judge Amon's Order.

Brach Decl. ¶ 11, Ex. 4.

Thus, on April 26, 2018, Defendants wrote to Rabbi Rosenberg "request[ing] that pursuant to the [Holding Company Agreements], you appoint an Arbitrator to hear the dispute between the parties identified on pages 3-4 of this letter." Brach Decl. ¶ 12, Ex. 5.[8]  Thereafter, Rabbi Ahron Bentzion Mandel, Defendants' Toen, spoke directly with Rabbi Rosenberg, who stated that he would appoint himself as Arbitrator if Plaintiffs and Defendants would agree to it. Mandel Decl. ¶ 2.  Rabbi Rosenberg also informed Rabbi Mandel that he had informed Plaintiffs' counsel, Darren Oved, of the same.  Mandel Decl. ¶ 2.

On May 11, 2018, Defendants' counsel followed up by email with Rabbi Rosenberg, with a copy to Plaintiffs' counsel, informing him that "if our adversaries would agree to it, we would agree to you serving as the arbitrator."  Brach Decl. Ex. 6.[9]  Plaintiffs did not respond to Rabbi

---

[8] The parties identified on the letter are only those parties whose claims who were compelled to arbitration by the Court.

[9] The first sentence of Defendants' counsel's email to Rabbi Rosenberg states: "I am writing to follow up on the below email and letter as we have not yet heard from you."  Herrick, Feinstein LLP, Defendants' counsel, had not heard from Rabbi Rosenberg.  Clearly, as established by the declaration of Rabbi Mandel, Rabbi Mandel had spoken directly to Rabbi Rosenberg and so had Plaintiffs' counsel Darren Oved.

Rosenberg, leading Defendants to reasonably conclude that Plaintiffs had abandoned their claims.  Brach. Decl. ¶ 15.

### c.   Step 3 – Plaintiffs Attempt To Manufacture A Record So As To Convince The Court That Arbitration Failed

In August 2018, Plaintiffs attempted to manufacture a record so as to eventually convince the Court that arbitration failed.  It started when Mr. Halpern, the apparent "lead" plaintiff, contacted a representative of Defendants and proposed that a Beth Din of three rabbinical arbitrators – the identity of whom Plaintiffs and Defendants agreed – conduct a *global* arbitration.  Brach. Decl. ¶ 16.  Defendants signed an arbitration agreement prepared by the Rabbinical panel (after certain revisions to the form agreement were agreed upon).  Brach Decl. ¶¶ 16-19. Ex. 9.

However, on September 5, 2018, Mr. Halpern sent Defendants' representative an email giving him "2 attachments [that] are 2 options" for a *global* arbitration.  Brach Decl. ¶ 21, Ex. 10.  The proposals circulated by Plaintiffs name individuals who were not even parties in the subject litigation and for whom Defendants cannot even speak, and purport to require the rabbinical panel to abide by the Federal Rules of Civil Procedure, in violation of Jewish law. Brach Decl. ¶ 22.  Naturally, Defendants were forced to reject the "proposals."  Brach Decl. ¶ 23.

### d.   Step 4 - File A Pre-Motion To Amend, Claiming That Arbitration Failed

With the self-serving record created, Plaintiffs represented to the Court that "[s]ince the parties once again could not agree on an arbitrator and arbitration rules to determine all claims," they wished to amend their complaint to "proceed with the litigation of their viable, non-arbitrable claims."  D.E. 267.  On January 22, 2019, the Court issued a scheduling order:

> The Court does not see a need to have a pre-motion conference at this time. In November 2017, the Court granted defendants' motion to compel arbitration for the majority of plaintiffs' claims and dismissed the claims not referred to arbitration. Plaintiffs are

> directed to provide the Court with briefing, not to exceed 15 pages,
> as to why they should be granted permission to amend the Second
> Amended Complaint

Plaintiffs then bizarrely filed a "pre-motion brief" in support of their motion for leave to amend the SAC, without attaching a proposed amended pleading (the "Pre-Motion").

### e.   *Step 5 - Ignore Defendants' Communications*

On October 16, 2019, while the Pre-Motion was pending, Defendants again sent a letter to counsel for Plaintiffs indicating that the "Defendants directed to arbitrate remain ready, willing and able to participate in an arbitration.  We again seek your client's cooperation with the same."  Ross Decl. Ex. 1; *see also id.* Ex. 2 (transmittal email).  At the end of this letter, the "Defendants directed to arbitrate suggest that the Plaintiffs directed to arbitrate jointly write a letter to Rabbi Rosenberg, substantially in the form annexed hereto as Exhibit 6, notifying him that the parties compelled to arbitrate agree that Rabbi Rosenberg should either appoint himself or some other third party to arbitrate this dispute."  *Id.*  **Plaintiffs did not respond to this letter**.

### 5.   Decision on the Pre-Motion To Amend

On November 26, 2019, oral argument was held on the Pre-Motion, after which the Court ordered Plaintiffs to submit a proposed amended complaint and rescheduled oral argument for February 25, 2020.

### 6.   Plaintiffs' History Of Arbitration Phobia

This lawsuit is not the only case in which the Plaintiffs have desperately tried to avoid signed agreements requiring them to arbitrate disputes.

Section 15 of the WSGR Engagement Agreement requires resolution of "all disputes or claims between us … by binding arbitration before the American Arbitration Association or JAMS in the County of New York."  Ross Decl. Ex. 3, ¶ 15.  A dispute concerning legal fees

arose between Plaintiffs and WSGR, and, in March 2019, a Demand for Arbitration was served on Plaintiffs by WSGR.  Ross Decl. Ex. 4, ¶ 1.

Did arbitration follow?  Of course not.  Plaintiffs filed a petition to permanently stay arbitration because they were allegedly "fraudulently induced … to enter into the Engagement Agreement, including specifically with respect to the Engagement Agreement's arbitration provision."  Ross Decl. Ex. 4, ¶ 4.  Sound familiar?  Plaintiffs made the same argument in their opposition to Defendants' Motion to Dismiss the SAC.  *See* D.E. 205, at 27-29.

## ARGUMENT

### 1.  Plaintiffs Come Before This Court In Bad Faith And, As A Result, Should Not Be Permitted To File A *Third* Amended Complaint

Plaintiffs come before this Court in bad faith and, as a result, should not be permitted to file a *third* amended complaint.  Plaintiffs are solely responsible for arbitration not happening. Plaintiffs' retention of WSGR at the same time Rabbi Rosenberg appointed himself as arbitrator, in accordance with the Holding Company Agreements, makes that clear.  Indeed, at the late April 2018 meeting with WSGR, Plaintiffs discussed how to "deal with" the requirement to arbitrate for "many hours." Ross Decl. Ex. 4, ¶¶ 8, 11.  Plaintiffs and WSGR then concocted a plan to put them in a "position" to file a new Complaint.  Ross Decl. Ex. 5.

That plan included: (i) ignoring communications from Rabbi Rosenberg; (ii) creating a self-serving record of Plaintiffs' insincere efforts to arbitrate, including requiring: (a) non-parties to this lawsuit, for whom Defendants' do not speak, to participate in the arbitration and (b) requiring a rabbinical panel to abide by the Federal Rules of Civil Procedure – Brach Decl. ¶¶ 16-23, Ex. 10; and (iii) misrepresenting to this Court that arbitration failed because the parties "could not agree on an arbitrator and arbitration rules to determine all claims."  D.E. 267.

Contrary to Plaintiffs' misrepresentations, an arbitrator was properly appointed three separate times.  First, Arbitrator Schmidt, who unfortunately passed away.  Second, Rabbi Rosenberg who, in April 2018, appointed himself in accordance with the Holding Company Agreements, and who Plaintiffs deliberately ignored.  Third, in August 2018, the three-person Rabbinical Panel.

Furthermore, there is no requirement in the Holding Company Agreements that Plaintiffs and Defendants agree upon the rules for arbitration.  The Rabbinical Panel circulated arbitration agreements in accordance with Jewish law (with agreed-upon revisions approved by the panel). Brach Decl. ¶¶ 16-20.  Defendants signed and returned it to the panel. Brach Decl. ¶ 19, Ex. 9. Plaintiffs instead circulated "2 attachments [that] are 2 options" for a *global* arbitration.  Brach Decl. Ex. 10.  Plaintiffs contend that these "two proposed version of arbitration agreements [were] more befitting [of a] rabbinical arbitration panel."  Motion to Amend at 7.  Plaintiffs fail to explain how complex English-language arbitration agreements prepared by Plaintiffs, which incorporate the Federal Rules of Civil Procedure and broad discovery devices, is more befitting of a rabbinical arbitration panel than Hebrew arbitration agreements prepared by the agreed-upon rabbinical panel.  *Compare* Brach Decl. ¶¶ 21-23, Exs. 7-9.  Plaintiffs cannot force the Federal Rules of Civil Procedure on a Rabbinical Panel or Defendants.  If the "rules" could not be agreed upon, then it was up to the Rabbinical Panel to supply the rules.

Finally, if the parties could not agree on arbitration to "determine all claims" then, at a minimum, the claims referred to arbitration by the Order were still required to be arbitrated before Rabbi Rosenberg.  By failing to respond to Rabbi Rosenberg, arbitration could not go forward, thereby depriving Defendants of the fruits of the Holding Company Agreements, in violation of the covenant of good faith and fair dealing. *See 511 W. 232nd Owners Corp. v.*

*Jennifer Realty Co.*, 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 135 (2002) ("This covenant embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'") (Citation omitted).

Defendants remain ready, willing, and able to arbitrate in accordance with the Holding Company Agreements and the Order.  But it takes two to tango.  As recently as October 2019, Plaintiffs ignored correspondence from Defendants in which Defendants reiterated their willingness to arbitrate in accordance with the Order.  Ross Decl. Exs. 1-2.  Through the above machinations and acts of subterfuge – which is further evidenced by the fact that not a single non-signatory Individual Plaintiff filed an action against Defendants in State Court – Plaintiffs are attempting to sneak through the back door of Federal Court more than two years after the Court issued the Order.

Because there has been undue delay in seeking leave to amend, in addition to bad faith on Plaintiffs' part, the Motion to Amend should be denied.  *See, e.g., State of N.Y. v. Cedar Park Concrete Corp.*, 741 F. Supp. 494, 496-97 (S.D.N.Y. 1990) (denying motion to amend damage claim "on behalf of state subdivisions a full two years after this Court dismissed the damages claim asserted by plaintiffs…."); *id.* (noting that "leave to amend may be denied where there has been undue delay, the movant has acted in bad faith or with a dilatory motive, the opposing party would be unduly prejudiced, or the amendment would be futile") (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*, 262 F. Supp. 2d 134, 151 (S.D.N.Y. 2003) (delay of "nearly two years" before the plaintiffs sought leave to file an amended complaint was "sufficient to constitute prejudice so as to deny [the] motion to amend, even under the Rule 15(a) liberal 'freely given' standard") (citations omitted).

2.   **The Motion To Amend Should Be Denied Because It Is Based On Changed Legal Theories That Could Have Been Raised At The Time The Original Complaint, First Amended Complaint, And Second Amended Complaint Were Filed**

More than two years after the securities fraud claim was dismissed, Plaintiffs are changing legal theories based on old facts.  Indeed, they admit as much.  Motion to Amend at 11.  This is not a basis to grant leave to amend.  *See Wrenn v. N.Y. City Health & Hosps. Corp.*, 104 F.R.D. 553, 559 (S.D.N.Y. 1985) (denying leave to amend where proposed amendment "asserts new theories only and was not offered because any new facts came to plaintiff's attention"); *Church of Scientology v. Siegelman*, 94 F.R.D. 735, 739 (S.D.N.Y. 1982) (denying motion to amend where only justification for three-year delay was counsel's overlooking legal theory); *Sanders v. Thrall Car Mfg. Co.*, 582 F. Supp. 945, 953 (S.D.N.Y. 1983) (noting that "the liberality with which a court grants leave to amend does not impart to litigants the privilege of re-shaping their legal theories endlessly, even where there is no evidence of improper motive or dilatory objectives."), *aff'd*, 730 F.2d 910 (2d Cir. 1984); *Church of Scientology Int'l v. Time Warner, Inc.*, No. 92 Civ. 3024(PKL), 1998 WL 575194, at *2 (S.D.N.Y. Sept. 9, 1998) (denying Plaintiff's request to amend the Complaint after a new attorney identified a new legal theory), *aff'd sub nom., Church of Scientology Int'l v. Behar*, 238 F.3d. 168 (2d Cir. 2001); *Berns v. EMI Pub., Inc.*, No. 95 Civ. 8130(KTD), 1999 WL 1029711, at *5 (S.D.N.Y. Nov. 12, 1999) ("Moreover, a change in counsel, or the dissatisfaction with the manner in which previous counsel pleaded claims, as Plaintiffs suggest is the reason for their delay, cannot excuse undue delay in moving to amend.").

The TAC asserts an abundance of new legal theories based on the singular "new" allegation that "[s]ome of the funds were diverted before they even reached LLC Plaintiffs' accounts….." Motion to Amend at 4 (citing Halpern Decl. ¶ 18).  That self-serving "fact" was certainly within the scope of knowledge of the Plaintiffs at the time they filed their first three

complaints.  Indeed, there has been no discovery in this action (or any other action).  That is another basis for denial of the Motion to Amend.  *See Phaneuf v. Tenneco, Inc.*, 938 F. Supp. 112, 116 (N.D.N.Y. 1996) (finding that moving party failed to provide convincing reason for delay where "nothing new has come to light in between the time that the original complaint was filed and the time the motion to amend was made" and movant's "attorney had all the information that was needed to bring a [particular] cause of action ... in the original complaint or within a reasonable time thereafter"); *Chiacchia v. Schitkedanz*, No. 111CV00837-MAT-HKS, 2016 WL 3024167, at *3 (W.D.N.Y. May 25, 2016) (denying motion to amend where "the allegations set forth in the Amended Complaint are based on Chiacchia's personal knowledge of past dealings with the individual defendants, and thus these allegations could have been made at the time of filing the original Complaint or within a reasonable time thereafter."); *Turkenitz v. Metromotion, Inc.*, No. 97CIV.2513(AJP)(JGK), 1997 WL 773713, at *9 (S.D.N.Y. Dec. 12, 1997) ("However, the Court may deny a motion to amend when the movant knew or should have known of the facts upon which the amendment is based when the original pleading was filed.").

### 3.  The Securities Fraud Claim Was Dismissed Pursuant to FRCP 12(b)(6), And Cannot Be Amended

By the Order, the Court dismissed the common law claims "without prejudice to refile in state court" but the securities fraud claim was dismissed pursuant to FRCP 12(b)(6), and thus **with prejudice**. *See VanBrocklen v. Dep't of Homeland Sec.*, No. 1:12–CV–003 (GTS/ATB), 2012 WL 2873373, at *3 (N.D.N.Y. July 12, 2012); *Winters v. Alza Corp.*, 690 F. Supp. 2d 350, 357 (S.D.N.Y. 2010) ("A dismissal pursuant to Rule 12(b)(6) is, of course, a dismissal with prejudice.").  As such, the "plaintiff will not be able to file another amended complaint." *Arutyunyan v. Fields*, No. 17-CV-5009 (AMD), 2018 WL 3966239, at *4 (E.D.N.Y. Aug. 17, 2018).

**4.   The Motion To Amend Must Be Denied Because The Claims Are Arbitrable**

The arbitration clause in the Holding Company Agreements is broad, requiring arbitration of any "disagreement" "pertaining to" the Holding Company Agreements.  "Where, as here, 'the contract's arbitration clause is a broad one, 'the strong presumption in favor of arbitrability applies with even greater force.'"  *Boule v. Credit One Bank*, No. 15-CV-8562(RJS), 2016 WL 3015251, at \*4 (S.D.N.Y. May 11, 2016) (Citation omitted).  "Even if there were ambiguity as to the scope of the claims that fall within the Arbitration Provision, 'the Supreme Court has instructed that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration....'"  *Arrigo v. Blue Fish Commodities, Inc.*, 704 F. Supp. 2d 299, 303 (S.D.N.Y. 2010), *aff'd*, 408 F. App'x 480 (2d Cir. 2011).  As such, courts "will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *Id.*   "The Second Circuit has recently 'emphasized that a broad arbitration clause may extend to a collateral issue even where the collateral issue involves no 'issue of contract interpretation [or] construction, or application of any provision of the charter,' if the collateral issue 'touches matters' covered by the parties' contracts."  *Stechler v. Sidley, Austin Brown & Wood, L.L.P.*, 382 F. Supp. 2d 580, 589 (S.D.N.Y. 2005) (Citation omitted).

### a.   The Amended Securities Fraud Claims Must Be Referred To Arbitration

Despite Plaintiffs' artful pleading, the amended securities fraud claims are arbitrable.  In the Motion to Amend, Plaintiffs assert "[t]he proposed amended complaint would plead a claim for securities fraud based upon the Individual Plaintiffs' purchase of membership interests in the LLC Plaintiffs, rather than membership interests in the Holding Company Defendants as previously pleaded."  Motion to Amend at 11.  The Fourth Cause of Action in the TAC is, in fact, a claim for securities fraud by the Individual Plaintiffs against Strulovitch and Oberlander.

The Fifth Cause of Action in the TAC, however, is a claim for securities fraud brought by the LLC Plaintiffs against Strulovitch and Oberlander.  The Motion to Amend does not discuss the Fifth Cause of Action.  We will address each claim.

The Fourth Cause of Action must be arbitrated, despite the Individual Plaintiffs' efforts to plead around the arbitration clause of the Holding Company Agreements.  As stated by Plaintiffs, "[t]he sole purpose of the LLC Plaintiffs was to invest in the Schedule A Properties, albeit indirectly."  Motion to Amend at 13.  However, Plaintiffs contend that this "new securities fraud claim is not within the scope of the parties' arbitration agreement as it does not 'relat[e] to this [Holding Company] Agreement.'"  *Id.*  The "albeit indirectly" in the penultimate sentence can be replaced with "through the Holding Company Agreements."  That is how the LLC Plaintiffs and Individual Plaintiffs indirectly invested in the Schedule A Properties.  The signatory Individual Plaintiffs' investment in the LLC Plaintiffs clearly "pertains" to and touches upon the Holding Company Agreements, and therefore any securities fraud claim arising from an investment in the LLC Plaintiffs is arbitrable.

Plaintiffs argue that this cause of action is not within the scope of the arbitration agreement because the Individual Plaintiffs allege they invested before the Holding Company Agreements were circulated.  Motion to Amend ¶ 13.  However, that argument ignores that the "Second Circuit generally presumes retroactive application of broad arbitration provisions absent explicit temporal limitations."  *Raymond v. Mid-Bronx Haulage Corp.*, No. 15-CV-5803 (RJS), 2017 WL 9882601, at *4 (S.D.N.Y. June 10, 2017); *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98-99 (2d Cir. 1999) (compelling arbitration even though claims accrued before the agreement was entered because the agreement required arbitration of "any dispute, disagreement, controversy or claim arising under ... this agreement"

since the "relevant inquiry is whether SCI's claims 'relat[e] to any obligation or claimed obligation under' the 1994 Agreement, not when they arose").

In any event, the question of whether an arbitration provision should be applied retroactively is "properly decided by the arbitrator, not the Court" since the Court has already found that the signatory Individual Plaintiffs are bound by the arbitration agreements. *Raymond*, 2017 WL 9882601, at *4; *Martinez v. Paramount Country Club*, No. 18 CV 4668 (VB), 2019 WL 4450552, at *5 (S.D.N.Y. Sept. 17, 2019) ("This issue is for the arbitrator to decide. Whether the arbitration agreement applies to plaintiff's claims accruing before September 2016 is a question regarding the time limit of the arbitration agreement and concerns interpretation of the arbitration agreement. It does not concern whether the parties are bound by the arbitration agreement."). Thus, any Individual Plaintiff who executed a Holding Company Agreement must arbitrate this claim as set forth in the Order. With respect to the Individual Plaintiffs who did execute the Holding Company Agreements, the Motion to Amend should be denied for the reasons stated above (bad faith and undue delay) and those stated below (amendment is futile).

The Fifth Cause of Action of the TAC is indisputably arbitrable. It is a claim by the LLC Plaintiffs against Strulovitch and Oberlander for securities fraud. The alleged security is an interest in the Holding Companies. As this Court has already held, such a claim by the LLC Plaintiffs, signatories to the Holding Company Agreements, "pertains to" the Holding Company Agreements and is therefore arbitrable. Order at 46-47.

Notably, Strulovitch signed the Holding Company Agreements on behalf of each of the LLC Plaintiffs, CSRE, and the Holding Companies. As such, he has every right to compel arbitration with respect to this claim. *Hirschfeld Prods., Inc. v. Mirvish*, 88 N.Y.2d 1054, 1056, 651 N.Y.S.2d 5, 6 (1996) ("The Federal courts have consistently afforded agents the benefit of

arbitration agreements entered into by their principals to the extent that the alleged misconduct relates to their behavior as officers or directors or in their capacities as agents of the corporation.") (citing *Roby v. Corp. of Lloyds*, 996 F.2d 1353, 1360 (2d Cir. 1993)); *Elwell v. Google, Inc.*, No. 05 Civ. 6498 (DLC), 2006 WL 217978, at *4 (S.D.NY Jan 30, 2006) (extending "benefit" of arbitration clause to vice president of corporation sued for employment discrimination, retaliation, and tort claims); *Stechler*, 382 F. Supp. 2d at 591 (holding that "although James Haber did not sign the Agreements in his personal capacity, he may take advantage of the arbitration clauses because he was a disclosed agent of DGI"); *Mosca v. Doctors Assocs., Inc.*, 852 F. Supp. 152, 155 (E.D.N.Y. 1993) ("This court will not permit Plaintiffs to avoid arbitration simply by naming individual agents of the party to the arbitration clause and suing them in their individual capacity. To do so would be to subvert the federal policy favoring arbitration and the specific arbitration clause in the instant case."); *see also Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281 (6th Cir. 1990) (if a party "can avoid the practical consequences of an agreement to arbitrate by naming nonsignatory parties as [defendants] in his complaint, or signatory parties in their individual capacities only, the effect of the rule requiring arbitration would, in effect, be nullified"); *Dassero v. Edwards*, 190 F. Supp. 2d 544, 549 (W.D.N.Y. 2002) ("Since plaintiffs' own allegations indicate that, with respect to the underlying transactions, ETS and Edwards were virtually one and the same, I believe that he should therefore be deemed to be covered by the arbitration clause in the Agreement that he signed on ETS's behalf"); *Scher v. Bear Stearns & Co.*, 723 F. Supp. 211, 217 (S.D.N.Y. 1989) ("If this Court were to allow plaintiff to avoid arbitration of claims arising out of the customer agreement, simply by naming individual agents of the institutional party as defendants, it would in effect

ignore both the particular arbitration clause and the explicit federal policy in favor of arbitration.").

Accordingly, the LLC Plaintiffs and signatory Individual Plaintiffs' securities fraud claims remain arbitrable.

### b.   The Alternative RICO Claims Are Arbitrable

The alternative RICO claims are also arbitrable.  Those claims are brought by the "Plaintiffs," which appears to mean the Individual Plaintiffs, LLC Plaintiffs, and Derivative Plaintiffs, against Strulovitch and Oberlander.  TAC, Causes of Action 1-3.  The RICO claims are nearly identical to the securities fraud claims in that they rely on the same alleged misrepresentations by the Individual Defendants which allegedly induced Plaintiffs to invest moneys in the LLC Plaintiffs, who then acquired interests in the Holding Companies or that the Individual Defendants "diverted from moneys invested by Plaintiffs for the acquisition and development of [the Schedule A Properties]."  *See* TAC ¶¶ 307, 309; *see also id.* ¶¶ 312, 314, 316, 318, 322, 330.  All such claims brought by the signatory Individual Plaintiffs, the LLC Plaintiffs, and Holding Companies, derivatively, are arbitrable as they pertain to and touch upon the Holding Company Agreements.

### c.   The Amended Common Law Claims Must Also Be Referred To Arbitration

The proposed amended common law claims brought by the signatory Individual Plaintiffs, LLC Plaintiffs, and Derivative Plaintiffs are arbitrable.

#### 1.   The Signatory Individual Plaintiffs' common law claims are arbitrable.

The Individual Plaintiffs' common law claims against the Individual Defendants are arbitrable.  Count 6 of the TAC is for fraud brought by the Individual Plaintiffs against the Individual Defendants.  This claim allegedly arises from "misrepresentations and omissions …

by the Individual Defendants to induce the Individual Plaintiffs to invest in the [Schedule A Properties]." TAC ¶ 356.  As already held by this Court, the signatory Individual Plaintiffs must arbitrate this claim.  Order at 36.  The same goes for the signatory Individual Plaintiffs' claims for unjust enrichment against all Defendants.  TAC, Cause of Action 13; Order at 46-47.

### 2.   The LLC Plaintiffs' common law claims are arbitrable.

The LLC Plaintiffs' common law claims against the Individual Defendants are arbitrable. Count 7 of the TAC is for fraud brought by the LLC Plaintiffs against the Individual Defendants arising from "misrepresentations and omissions … by the Individual Defendants to induce the LLC Plaintiffs to invest in the [Schedule A Properties]."  As already held by this Court, the LLC Plaintiffs must arbitrate this claim.  Order at 36, 47.  The same for Count 14 of the TAC, which is the LLC Plaintiffs' claim for unjust enrichment against the Individual Defendants and Count 16 of the TAC, which is unjust enrichment by the LLC Plaintiffs against CSRE.  *Id.*

Count 9, which is for breach of fiduciary duty by the LLC Plaintiffs against the Individual Defendants as Managers of the LLC Plaintiffs, is also arbitrable.  Since "[t]he sole purpose of the LLC Plaintiffs was to invest in the Schedule A Properties" (Motion to Amend at 13), any alleged breach of fiduciary duty arose with respect to the LLC Plaintiffs' investment in the Schedule A Properties, through the Holding Company Agreements.  Indeed, the TAC makes that clear as the asserted breach occurred when the Individual Defendants allegedly "engage[d] in self-dealing with money intended for the Holding Companies…" TAC ¶ 390. Strulovitch signed the Holding Company Agreements on behalf of each of the LLC Plaintiffs, CSRE, and the Holding Companies.  *See, e.g.*, Brach Decl. Ex. 2.  As such, he has every right to compel arbitration with respect to this claim.  *See supra* § 4(a).

Plaintiffs make the nuanced argument that the breach of fiduciary duty claim by the LLC Plaintiffs against the Individual Defendants is an internal matter that cannot be governed by the Holding Company Agreement.  This Court has already found otherwise.  In their eighth cause of action of the SAC, the LLC Plaintiffs sought an accounting from the Individual Defendants because the "Individual Defendants are the managers, and are in possession, of the books and records of the LLC Plaintiffs."  Order at 17 n. 8.  The Court held that "[t]he LLC Plaintiffs' claim for accounting against the Individual Defendants … is also referred to arbitration."  Order at 47.  Likewise, the Court referred the LLC Plaintiffs' claim for fraud and unjust enrichment against Strulovitch to arbitration.  Order at 47.  Thus, Plaintiffs' argument fails.[10]

The same goes for Count 11 which is the conversion claim by the LLC Plaintiffs against the Individual Defendants.  The alleged conversion took place "before the transfer of funds to the Holding [Companies]."  Motion to Amend at 19.  Even if the Court were to accept this new allegation as true, the claim is arbitrable as it is a "doubt, question or other disagreement … pertaining to [the Holding Company] Agreement."  When the purported illegal transfer happened does not render the arbitration agreement inapplicable.  What matters is that the alleged conversion is "anything pertaining" to the arbitration agreement.   In any event, as explained above, the Second Circuit generally presumes retroactive application of broad arbitration provisions absent explicit temporal limitations. *See supra* § 4(a)

3. *The Derivative Plaintiffs' common law claims against the Individual Defendants are arbitrable.*

The Derivative Plaintiffs' common law claims against the Individual Defendants are arbitrable.  Counts 8, 10, 15, and 19 of the TAC are for breach of fiduciary duty, conversion,

---

[10] Naturally, in light of the law of the case, LLC Plaintiffs' claim for an accounting against the Individual Defendants must also me referred to arbitration.  TAC, Count 18.

unjust enrichment, and accounting, respectively, by the Derivative Plaintiffs – i.e., the Holding Companies – against the Individual Defendants, stemming from the allegations that the Individual Defendants diverted the Holding Companies' moneys, usurped corporate opportunities, withheld rent proceeds, failed to make loan payments, and failed to develop the Schedule A Properties. TAC ¶ 386.  Besides the fact that Plaintiffs are hopelessly conflicted in asserting such claims,[11] these claims are "anything pertaining" to the Holding Company Agreements, and are therefore arbitrable.

Plaintiffs assert that these claims are not arbitrable because the Individual Defendants "were not parties to the Holding Company Agreements, nor were they appointed managers by the agreements themselves."  Motion to Amend at 20.  However, as set forth above, the case law is legion that a plaintiff cannot avoid arbitration by simply naming agents of a company in their individual capacity.  *See* § 4(a).   And, notably, managers and/or agents can compel arbitration of derivative claims.  *See Maresca v. La Certosa*, 172 A.D.2d 725, 725, 569 N.Y.S.2d 111, 111 (2d Dep't 1991) (compelling arbitration of derivative claims brought against company president who was accused of committing waste and diversion of corporate assets); *King ex rel. Massey Knakal Realty of Brooklyn, LLC v. Massey Knakal Realty Holdings LLC*, 24 Misc. 3d 1242(A), 2009 WL 2712172, at *3 (Sup. Ct. N.Y. Cty. 2009) ("Thus, a claim of a breach of fiduciary duty to an LLC is inherently a breach of contract cause of action as among the members of the LLC and is

---

[11] *See Tatintsian v. Vorotyntsev*, No. 1:16-CV-7203-GHW, 2018 WL 2324998, at *3 (S.D.N.Y. May 22, 2018) ("An actual conflict may exist where 'substantial recovery on the [direct] claim may reduce the potential recovery on behalf of the corporation on the derivative claim.'") (Citation omitted). Indeed, the Individual Plaintiffs appear to assert claims against the Holding Companies. TAC, Count 13.  Bizarrely, the Derivative Plaintiffs assert claims against themselves.  TAC, Count 17.  A recent proof of claim filed by the Plaintiffs confirms that they are asserting claims against the Holding Companies. Ross Decl. Ex. 18, ¶ 7 ("Claimants have a claim against [one of the Holding Companies] for conversion of their funds."); *Id.* ¶ 8 ("Claimants have a claim against [one of the Holding Companies] for unjust enrichment."); *Id.* ¶ 11 ("LLC Claimant … has a claim against [one of the Holding Companies] for securities fraud.").  Further, if the Derivative Plaintiffs were to prevail on their claims against the Individual Defendants, recovery on the derivative claim would be reduced to zero in light of the fact that the

properly resolved in arbitration where the operating agreement contains an arbitration provision.").  Accordingly, Counts 8, 10, 15, and 19 are arbitrable.

> *4. The claims against the Secret LLC Defendants and Defendants' Affiliated Entities are arbitrable*

The claims against the Secret LLC Defendants (TAC ¶ 49) and Defendants Affiliated Entities (TAC ¶ 47) are arbitrable.  Count 12 asserts a claim for constructive trust over title to the Secret Properties against the Secret LLC Defendants, Count 13 asserts a claim for unjust enrichment against all of the Defendants, and Count 17 asserts a claim for unjust enrichment against the Secret LLC Defendants and some of the Defendants' Affiliated Entities.  It is correct that the Secret LLC Defendants and the Defendants' Affiliated Entities (with the exception of CSRE) are not parties to the Holding Company Agreements.  But, as recognized by this Court, a

> non-signatory may compel arbitration under a theory of equitable estoppel.  In circumstances where a non-signatory seeks to compel arbitration, courts in this Circuit apply a two part test in "determining whether the signatory's claims are intertwined with the underlying contract obligations . . . [analyzing] whether (1) the signatory's claims arise under the 'subject matter' of the underlying agreement, and (2) whether there is a close relationship' between the signatory and the non-signatory party.'" *Ragone*, No. 07-CV-6084 (JGK), 2008 WL 4058480, at *8 (S.D.N.Y. Aug. 29, 2008), *aff'd*, 595 F.3d 115 (2d Cir. 2010); see also Ross, 478 F.3d at 480-85. The party seeking to compel arbitration bears the burden of proving that equitable estoppel applies. See Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Custom Air Sys., Inc., 357 F.3d 266, 268 (2d Cir. 2004).

Order at 33-34.  It is indisputable that Plaintiffs' claims arise under the subject matter of the Holding Company Agreements.  Indeed, the claims are that the Individual Defendants procured investments from the Individual Plaintiffs and the LLC Plaintiffs and fraudulently removed and

---

Holding Company Agreements have an indemnification provision.  *See, e.g.*, Brach Decl. Ex. 2, § 6.  Clearly, Plaintiffs are conflicted in asserting derivative claims on behalf of the Holding Companies.

diverted those moneys to the Secret LLC Defendants and/or the Secret Properties and Additional

Secret Properties. *See* TAC, Counts 12, 13, 17.

The second prong is also satisfied as there exists, as alleged, a close relationship between

the signatories to the Holding Company Agreements, the Secret LLC Defendants, and the

Defendants' Affiliated Entities. "[T]he requisite close relationship for equitable estoppel could

be established by the plaintiff's allegations of 'substantially interdependent and concerted

misconduct' by the signatory and non-signatory defendants." *Ragone v. Atl. Video at Manhattan*

*Ctr.*, No. 07 CIV. 6084 (JGK), 2008 WL 4058480, at *9 (S.D.N.Y. Aug. 29, 2008), *aff'd*, 595

F.3d 115 (2d Cir. 2010) (citing *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005)).

In *Denney*, the court found:

> [h]aving alleged in this RICO action that the Deutsche Bank and
> BDO defendants acted in concert to defraud plaintiffs ... plaintiffs
> cannot now escape the consequences of those allegations by
> arguing that the Deutsche Bank and BDO defendants lack the
> requisite close relationship, or that plaintiffs' claims against the
> Deutsche Bank defendants are not connected to Deutsche Bank's
> relationship with BDO.

Here, the gist of the constructive trust and unjust enrichment claims is that the Individual

Defendants, in their fiduciary relationship with the Individual Plaintiffs, LLC Plaintiffs, and

Holding Companies, procured significant sums of moneys from the Plaintiffs that were supposed

to go toward the purchase and development of the Schedule A Properties but instead transferred

those monies to the Secret LLC Defendants to the benefit of themselves, the Secret LLC

Defendants, and Defendants' Affiliated Entities. Although Plaintiffs fail to properly plead the

existence of an "enterprise" under RICO law (discussed below), they do allege, in conclusory

fashion, that the Individual Defendants, Secret LLC Defendants, and Defendants Affiliated

Entities worked together to defraud Plaintiffs.   TAC ¶¶ 300-02.   Accordingly, the "close

- 26 -

relationship" prong has been established by these conclusory allegations of concerted misconduct by the signatory and non-signatory defendants. Accordingly, the claims against the Secret LLC Defendants and Defendants' Affiliated Entities are arbitrable. [12]

## 5. The Proposed Amended Securities Fraud Claims Would Not Survive A Motion To Dismiss, And Are Therefore Futile

A court may deny leave to amend "if the amendment would be futile." *Szabo v. Reilly*, No. 91 CIV. 5209 (JFK), 1994 WL 38684, at *1 (S.D.N.Y. Feb. 4, 1994). An amendment to a complaint is "futile if the amended portion would not survive a motion to dismiss." *Id.* The amendments to the TAC would not survive a motion to dismiss and therefore the Motion to Amend must be denied. [13]

### a. The proposed amended securities fraud claims are common law claims dressed up as federal claims

The proposed amended securities fraud claims are common law claims dressed up as federal claims. The Supreme Court has found that "Congress by § 10(b) [does] not seek to regulate transactions which constitute no more than internal corporate mismanagement." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 480 (1977); *Ciresi v. Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) ("Even if well-pled, allegations of mismanagement are not actionable under section 10(b) of the federal securities laws"), *aff'd without opinion*, 956 F.2d 1161 (2d Cir. 1992); *Coppola v. Applied Elec. Corp.*, No. 98 CV 3149, 1998 WL 667934, at *3 (E.D.N.Y. Aug. 3, 1998) ("Simply the fact that the converted property comprises securities does not transform plaintiff's claim of conversion to one for securities fraud.").

---

[12] CSRE is defined as one of the Defendants' Affiliated Entities. Obviously, as party to the Holding Company Agreements, all claims against CSRE, as already held by this Court, are arbitrable.

[13] To the extent it is necessary, Defendants reserve the right to seek permission to file a motion to dismiss the TAC if any aspect of the Motion to Amend is granted.

For example, in *Mutual Shares Corp. v. Genesco, Inc.*, 384 F.2d 540 (2d Cir. 1967), the Court of Appeals dismissed a claim similar to the scheme alleged here. Minority shareholders claimed, among other things, that the majority shareholders ran the company in their own interests rather than the company's, by diverting company assets to themselves. *Id.* at 542. The court held that those allegations "are primarily corporate abuse and diversion, claims cognizable under state law but not under the [Exchange] Act." *Id.* at 546.

Likewise, in *Pross v. Katz*, the plaintiff claimed securities fraud based upon the defendant's promise that he would manage a real estate partnership faithfully and on plaintiff's behalf "while secretly intending to carry out a plan to divest Pross of his interests."  784 F.2d 455, 457 (2d Cir. 1986).  The Court held that defendant's promise was not "'in connection with the purchase or sale' of securities" since the promise was not "part of the consideration for a sale of securities."  *Id.* at 456–57. Indeed, it was held that promises which arise from a fiduciaries' already existing obligations, are "not sufficient to make out a federal claim."  *Id.* at 458. Specifically, the Court explained:

> Fiduciary duties thus arise by operation of law, and Katz, as the manager of Pross' investments, owed Pross such a duty whether or not he explicitly promised to perform it. The promises alleged, therefore, were essentially irrelevant because they merely restated legal duties already owed. The explicit promises alleged in the complaint, therefore, were already implicit promises arising from the very nature of the relationship.

*Id.*  Thus, the Court found that "a breach of a promise not to breach that duty also fails to trigger that provision. Were we to hold otherwise, any fiduciary breach could be converted into a federal action by the simple allegation that the fiduciary had promised to perform his duties and then failed to do so." *Id.*

Here, as in *Pross* and *Genesco*, Plaintiffs attempt to stretch common law claims into an actionable federal securities fraud claim. The allegations of misrepresentation in connection with the sale of securities arise from the alleged statements in the prospectuses that the Individual Defendants would "tend to, manage and worry for the project by doing all that is required for the success of the business venture…" TAC ¶ 69. Further, the Individual Defendants allegedly omitted to disclose that they intended to divert Plaintiffs' funds. TAC ¶¶ 70-73. These alleged misrepresentations and omissions, are, as in *Pross*, "irrelevant" because they "merely restated legal duties already owed." Accordingly, the amended securities fraud claims must be dismissed.

### b. The Individual Plaintiffs did not acquire a "security" when obtaining an interest in the LLC Plaintiffs

With respect to Count 4, the Individual Plaintiffs' § 10(b) claim is "for the purchase of a direct interest in the membership interests of the LLC Plaintiffs." Motion to Amend at 11. An interest in an entity will constitute a security "if it represents: (1) an investment in a common venture; (2) premised on a reasonable expectation of profits; (3) to be derived from the entrepreneurial or managerial efforts of others." *Nelson v. Stahl*, 173 F. Supp. 2d 153, 164 (S.D.N.Y. 2001) (the "*Howey* Test"). Plaintiffs' claim fails under the third part of the *Howey* Test.

While Plaintiffs have pled that Strulovitch is the manager of the LLC Plaintiffs (Order at 4-5), "[t]he delegation of rights and duties standing alone does not give rise to the sort of dependence on others which underlies the third prong of the *Howey* Test." *Nelson*, 173 F. Supp. 2d at 165 (citations omitted). "[T]he mere choice by a [member] to remain passive is not sufficient to create a security interest." *Id.* (citations omitted). "The delegation of membership responsibilities, or the failure to exercise membership powers does not 'diminish the investor's

legal right to a voice in partnership matters.'" *Id.* (citations omitted); *In re Mautner v. Alvin H. Glick Irrevocable Grantor Tr.*, No. 19 CIV. 2742 (NRB), 2019 WL 6311520, at *8 (S.D.N.Y. Nov. 25, 2019) (A "member's objective ability to exercise control, not the formal exercise of control … governs the inquiry."). Notably, allegations that someone is too "unsophisticated to assert his rights" or lives far away does not change the analysis under the *Howey* Test. *See, e.g.*, *id.* at *8 (holding that the failure to "exercise his control rights under the Operating Agreement" because he "liv[ed] in Georgia instead of New York City [and] was too unsophisticated to assert his rights" did not convert plaintiff's "membership interests in the Property LLC" into an investment contract.).

Because the LLC Plaintiffs do not have an operating agreement, the LLC Plaintiffs are member-managed, precluding satisfaction of the third element of the *Howey Test*. *See* Order at 4-5; LLC Law § 401. Where there is not an operating agreement for a limited liability company, "management of the limited liability company shall be vested in its members who shall manage the limited liability company.…" LLC Law § 401(a). As such, "any such member exercising such management powers or responsibilities shall be deemed a manager … and such member shall have and be subject to all of the duties and liabilities of a manager provided in this chapter." LLC Law § 401(b). In other words, regardless of whether the Individual Plaintiffs allegedly appointed Strulovitch as a manager of the LLC Plaintiffs, under New York law, they retained significant managerial control over the LLC Plaintiffs. *See* LLC Law §§ 401 (management rights), 402 (voting rights), 412 (agency rights), 414 (replacement of managers), amongst many other rights.

In fact, the Individual Plaintiffs have exercised those powers on several occasions. Indeed, the Court has already recognized that "plaintiffs have submitted evidence that the

members of the LLC Plaintiffs have authorized them to bring this suit…"  Order at 40, n. 16; *see also* Halpern Declaration dated August 10, 2017, Ex. 1 (D.E. 221:1-5) (attaching resolutions, purportedly from the majority of the investors in the LLC Plaintiffs, "hereby consent[ing] to, and adopt[ing], the followed resolutions pursuant to the Limited Liability Act of the State of New York and declare them to be in full force and effect as if they had been adopted at a duly convened meeting of the members of the Company").  If that were not enough, in September 2019, the members of the LLC Plaintiffs purported to vote Strulovitch out as their manager. TAC ¶ 46.

The TAC makes clear that the Individual Plaintiffs expected to have control over the LLC Plaintiffs.  The sole purpose of the LLC Plaintiffs was to invest in the Holding Company Defendants.  Motion to Amend at 13.  Plaintiffs allege that "[b]ut for [the Individual Defendants'] representations and omissions, the LLC Plaintiffs would not have invested any funds with the Individual Defendants and purchased their membership interests in the Holding Companies."  TAC ¶ 76; *see also* ¶ 352 ("But for these misrepresentations, the LLC Plaintiffs would not have purchased the aforementioned securities."); ¶ 370 ("The LLC Plaintiffs reasonably relied on these misrepresentations and omissions in electing to invest with the Individual Defendants and to forgo other investment opportunities."); ¶ 373 ("But for these misrepresentations and omissions, which were material, the LLC Plaintiffs would not have invested any money with the Individual Defendants."); ¶ 378 (same); ¶ 379 ("But for these misrepresentations and omissions, which were material, the LLC Plaintiffs would not have invested further money with the Individual Defendants.").  Obviously, the Individual Plaintiffs have control over the LLC Plaintiffs if the LLC Plaintiffs would not have made investments in the Holding Companies if the Individual Defendants were truthful.

As a result, the Individual Plaintiffs' investments in the LLC Plaintiffs were not a security, and therefore the 10(b) claim fails. *See Nelson,* 173 F. Supp. 2d 153; *see also Keith v. Black Diamond Advisors, Inc.*, 48 F. Supp. 2d 326, 333 (S.D.N.Y. 1999) ("Under the Agreement and N.Y. LLC Law, [members of a member-managed LLC pursuant to an operating agreement and LLC Law § 401] are endowed with a broad range of rights and powers.… This level of control is antithetical to the notion of member passivity required under the fourth prong of [the *Howey* Test]."); *Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376, 392 (D. Del. 2000) (holding that even though LLC agreement vested management in the Board, the plaintiffs' "authority to remove managers gave it the power to directly affect the profits it received from NSC [and t]hus, the court finds that [plaintiffs'] profits from NSC did not come solely from the efforts of others.").

### c. *The securities fraud claims fail for all of the reasons stated in the motion to dismiss the SAC*

The arguments raised in the motion to dismiss the securities fraud claim in the SAC are still applicable and render the proposed amended pleading futile.  While reserving their right to amplify these arguments in a future motion to dismiss in the event the Motion to Amend is granted, Defendants refer the Court to their reply in support of the motion to dismiss the SAC ("Reply MOL"), which explains additional reasons why the securities fraud claims fail.  *See* D.E. 203.

- The Individual Plaintiffs' claims are barred by the applicable statutes of limitation and repose. Reply MOL at 29-31.[14]  This argument is also addressed in the RICO section below.

---

[14] This defense is bolstered by Plaintiffs' acknowledgement that the Individual Plaintiffs "allege they invested long before [those Holding Company Agreements] were circulated…"  Motion to Amend at 13 (citing Order at 32).

- The Individual Plaintiffs failed to plead the nature and amount of securities purchased, and when they were purchased.  Reply MOL at 32-35.  This argument is also addressed in the RICO section below.

- The SAC makes dismissible group pleading allegations.  Reply MOL at 35-36.  This argument is also addressed in the RICO section below.

- Certain of the alleged misrepresentations were true statements.  Reply MOL at 36.

- The Individual Plaintiffs who signed the Holding Company Agreements and the LLC Plaintiffs disclaimed reliance on any alleged misrepresentations.  Reply MOL at 37-41

## 6.  The Proposed RICO Claims Would Not Survive A Motion To Dismiss And Are Therefore Futile

Recognizing that their securities fraud claims are inherently weak, Plaintiffs attempt to plead an alternative RICO claim.  Plaintiffs' RICO claims contain such glaring and fundamental defects that it calls into question Plaintiffs' decision to file it.  This claim should be dismissed before any further harm is inflicted on Defendants.  *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997) ("Because the mere assertion of a RICO claim . . . has almost inevitable stigmatizing effect on those name as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of litigation").

A plaintiff asserting a civil RICO claim must show: "(1) a substantive RICO violation under § 1962; (2) injury to the plaintiff's business or property, and (3) that such injury was by reason of the substantive RICO violation."  *Sanchez v. ASA Coll., Inc.*, No. 14-CV-5006 JMF, 2015 WL 3540836, at *4 (S.D.N.Y. June 5, 2015) (Furman, J.) (internal quotations omitted).  "A violation of § 1962(c) . . . requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

The Second Circuit has cautioned courts to carefully scrutinize RICO claims "because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon

closer scrutiny, do not support it." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014); *C.A. Westel de Venezuela v. Am. Tel. & Tel. Co.*, No. 90 Civ. 6665 (PKL), 1994 WL 558026, at *7 (S.D.N.Y. Oct. 11, 1994) ("Plaintiff has attempted to plead a RICO violation in what is essentially a routine commercial dispute."), *aff'd*, 54 F.3d 766 (2d Cir. 1995).

### a. *The RICO Claims are time barred*

It is well-settled federal law that civil RICO claims are subject to a four-year statute of limitations. *See Rotella v. Wood*, 528 U.S. 549, 552 (2000) (citing *Agency Holding Corp. v. Malley-Duff Assocs., Inc.*, 483 U.S. 143, 156 (1987)). In New York, federal courts have consistently held that "[t]he limitations period begins to run when the plaintiff discovers or should have discovered the RICO injury," irrespective of whether the plaintiff "discovered or should have discovered the underlying pattern of racketeering activity, even if such activity includes fraud." *See Frankel v. Cole*, 313 F. App'x 418, 419-20 (2d Cir. 2009) (internal quotations and citations omitted). Thus, to determine whether a civil RICO claim is time-barred, the Court must conduct a two-step inquiry, determining first "when plaintiffs sustained the alleged injury for which they seek redress," and determining second "when plaintiffs "discovered or should have discovered that injury," at which point in time the four-year statute of limitations begins to run. *See id.* at 419-20 (internal quotations and citations omitted).[15] "The RICO statute of limitations ... runs even where the full extent of the RICO scheme is not discovered until a later date, so long as there were 'storm warnings' that should have prompted an inquiry." *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695, 697 (2d Cir. 2009). Such storm warnings, "need not detail every aspect of the alleged fraudulent scheme…; [r]ather, such storm

---

[15] "In cases like this one—where plaintiffs acquire an interest in a limited partnership in reliance on allegedly fraudulent offering material—the injury to the plaintiffs is the actual purchase of the partnership interest." *In re Integrated Res., Inc. Real Estate Ltd. P'ships Sec. Litig.*, 851 F. Supp. 556, 567 (S.D.N.Y. 1994)

warnings are sufficient where, 'a person of ordinary intelligence would consider it "probable" that fraud had occurred.'" *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 151 (2d Cir. 2012)

Plaintiffs filed their Complaint on April 10, 2017. Therefore, RICO claims related to injuries discovered, or discoverable, by Plaintiffs prior to April 10, 2013 are barred by the statute of limitations. The below is a non-exclusive list of publicly available[16] "storm warmings" that arose prior to April 10, 2013.

According to the TAC, on February 6, 2012, the "Individual Defendants" transmitted to the "Individual Plaintiffs" a prospectus for investments in 908 Bergen Street. TAC ¶ 77. This Prospectus "misrepresented … that the purchase price of this property, including closing costs, was going to be $425,000" and that there were three apartments when the Individual Defendants knew that there were only two. TAC ¶¶ 78-81. The actual price paid, however, was $200,000. TAC ¶ 79. Plaintiffs allegedly transferred money between February 24, 2012 and April 4, 2012 to be used for the purchase and development of this property. TAC ¶ 85. Plaintiffs claim that "[b]ut for the representations and omissions in [this prospectus]," the Individual Plaintiffs would not have transferred this money. TAC ¶ 86. The deed for 908 Bergen Street, which was filed on April 6, 2012, clearly shows that the property was sold for $200,000 and that it is a 2-family building. Ross Decl. Ex. 7.

Likewise, on or about June 21, 2012, the "Individual Defendants" allegedly transmitted to the "Individual Plaintiffs" a prospectus to induce investments in 369 Gates Avenue and 1213 Jefferson Avenue. TAC ¶ 93. This prospectus allegedly misrepresented that the purchase price for 1213 Jefferson Avenue was $420,000, when the actual purchase price was $340,000. TAC

---

[16] "Judicial notice of public records is appropriate—and does not convert a motion to dismiss into a motion for summary judgment—because the facts noticed are not subject to reasonable dispute and are capable of being verified by sources whose accuracy cannot be reasonably questioned." *Bentley v. Dennison*, 852 F. Supp. 2d 379, 382 n.5 (S.D.N.Y. 2012), *aff'd*, 519 F. App'x 39 (2d Cir. 2013).

¶¶ 95-96.  Likewise, the prospectus allegedly misrepresented that the purchase price for 369 Gates Avenue was $595,000 when it was actually $460,000. TAC ¶¶ 97-98.  The prospectus also allegedly misrepresented that 369 Gates had three apartments when it only had one. TAC ¶¶ 99-100.  Prior to the closing on these properties, the Individual Plaintiffs allegedly "transferred a total of $405,000" to the Individual Defendants for the acquisition of these properties, which they would not have done "[b]ut for the representations and omissions in the Fraudulent Prospectus."  TAC ¶¶ 103-04. The deed for 1213 Jefferson Avenue, which was filed on August 13, 2012, clearly shows that the property was sold for $340,000.  Ross Decl. Ex. 8.  The deed for 369 Gates Avenue, which was filed on February 28, 2013, clearly shows that the property was sold for $450,000 and that it is a 1-family building.  Ross Decl. Ex. 9.

Similarly, on or about July 16, 2012, the "Individual Defendants" allegedly transmitted to the "Individual Plaintiffs" a prospectus to induce investments in 853 Lexington Avenue.  TAC ¶ 105.  This prospectus allegedly misrepresented that the purchase price for 853 Lexington Avenue was $1,485,000, when the actual purchase price was $965,000.  TAC ¶¶ 106-07.  "Between July and December, 2012 … at least 32 separate investors … transferred a total of $650,000 in capital" to the Individual Defendants to be used for purchase and development of this Property, which they would not have done "[b]ut for the representations and omissions in the Fraudulent Prospectus."  TAC ¶¶ 109-10.  The deed for 853 Lexington Avenue, which was filed on December 27, 2012, clearly shows that the property was sold for $965,000.  Ross Decl. Ex. 10.

Likewise, on or about August 29, 2012, the "Individual Defendants" allegedly transmitted to the "Individual Plaintiffs" a prospectus to induce investments in 618 Lafayette Avenue and 1078 Dekalb Avenue.  TAC ¶ 117.  This prospectus allegedly misrepresented that the combined purchase price would be $1,320,000 when the actual purchase price was $995,000.

TAC ¶¶ 118-19. "Between August 2013 and December 17, 2012 … at least 19 separate investors … transferred a total of $405,000 in capital" to the Individual Defendants to be used for the purchase and development of these properties, which they would not have done "[b]ut for the representations and omissions in the Fraudulent Prospectus." TAC ¶¶ 123-24. The deed for 618 Lafayette Avenue, which was filed on January 10, 2013, clearly shows that the property was sold for $610,000. Ross Decl. Ex. 11. The deed for 1078 Dekalb Avenue, which was filed on December 31, 2012, clearly shows that the property was sold for $558,.000. Ross Decl. Ex. 12. The combined purchase price was therefore $1,168,000.[17]

Similarly, on or about November 4, 2012, the "Individual Defendants" allegedly transmitted to the "Individual Plaintiffs" a prospectus to induce investments in 74 Van Buren Street. TAC ¶ 125. This prospectus allegedly misrepresented that the purchase price would be $475,000 when the actual purchase price was $315,000. TAC ¶¶ 127-28. "In or about November, 2012 … at least 19 separate investors … transferred a total of $120,000 in capital to the Individual Defendants to be used for the purchase and development of this property" which they would not have done "[b]ut for the representations and omissions in the Fraudulent Prospectus." TAC ¶¶ 132-33. The deed for 74 Van Buren Street, which was filed on December 3, 2012, clearly shows that the property was sold for $315,000. Ross Decl. Ex. 13.

Similarly, on or about December 2, 2012, the "Individual Defendants" allegedly transmitted to the "Individual Plaintiffs" a prospectus to induce investments in 325 Franklin Avenue. TAC ¶ 133. This prospectus allegedly misrepresented that the purchase price would be $1,420,000 when the actual purchase price was $1,350,000. TAC ¶¶ 134-35. "Between December 2012 and February 7, 2013 … at least 38 separate investors … transferred a total of $550,000 in capital to the Individual Defendants to be used for the purchase and development of

---

[17] We cannot explain the discrepancy between the pleading and the facts, perhaps Plaintiffs can.

this property" which they would not have done "[b]ut for the representations and omissions in the Fraudulent Prospectus."   TAC ¶¶ 139-40.   The deed for 325 Franklin Avenue, which was filed on February 21, 2013, clearly shows that the property was sold for $1,350,000.  Ross Decl. Ex. 14.

Likewise, in or about October, 2012, the "Individual Defendants" allegedly transmitted to the "Individual Plaintiffs" a prospectus to induce investments in 578 Union Street.  TAC ¶ 141. In October 2012, 41 separate investors allegedly transferred $600,000 to be used for the purchase and development of this Property.   TAC ¶ 142. In or about December 2012, Individual Defendants "purported to cancel the purchase of this Property stating that the buyer [sic] backed out on the deal" which turned out to be a lie as "Strulovitch and Oberlander purchased this property on December 28, 2012."  TAC ¶¶ 143-44; *see also* Ross Decl. Ex. 6, which is the deed to this property, which was filed on January 11, 2013.

Rather than return the capital for 578 Union Street, "Individual Defendants" transmitted to the "Individual Plaintiffs" a different prospectus to induce them to reinvest the moneys from 578 Union Street into 760-762 Willoughby Avenue.  TAC ¶ 145.  This prospectus allegedly misrepresented that the purchase price would be $1,295,000 when the actual purchase price was $995,000.  TAC ¶¶ 146-47.  "In December 2012 … at least 40 separate investors … transferred a total of $520,000 in capital to the Individual Defendants to be used for the purchase and development of [this property]," which they would not have done "[b]ut for the representations and omissions in the Fraudulent Prospectus."  TAC ¶¶ 151-52.  The deed for 762 Willoughby Avenue, which was filed on January 10, 2013, clearly shows that the property was sold for $995,000.  Ross Decl. Ex. 15.

Similarly, in or about December, 2012, the "Individual Defendants" allegedly transmitted to the "Individual Plaintiffs" a prospectus to induce investments in 348 St. Nicholas Avenue. TAC ¶ 199.   This prospectus allegedly misrepresented that the purchase price would be $1,200,000 and that the Individual Defendants would take out a mortgage loan of $900,000 when the actual purchase price was $1,125,000 and the Individual Defendants took out a loan for $1,100,000.   TAC ¶¶ 200-01.   The deed for 348 St. Nicholas Avenue, which was filed on January 16, 2013, clearly shows that the property was sold for $1,125,000.  Ross Decl. Ex. 16. The mortgage for 348 St. Nicholas Avenue, which was filed on January 16, 2013, clearly shows a mortgage on the property in the amount of $1,100,000.  Ross Decl. Ex. 17.

Assuming Plaintiffs' allegations are true, there were dozens of "storm warnings" that should have put the Individual Plaintiffs on notice of underlying fraud.  A simple review of the deeds to the properties, which any reasonably diligent investor purchasing interests in property would have done, would have put the Individual Plaintiffs on notice of an alleged injury.  Indeed, each of the deeds show that the Schedule A Properties were acquired for less than was allegedly promised in the "fraudulent prospectuses."[18]  Public records are routinely cited by Courts to put Plaintiffs on inquiry notice for RICO and securities fraud purposes.  *See In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 200 (S.D.N.Y. 2003) (inquiry notice arose from Fortune magazine article that "did not merely indicate general financial difficulties at GC; rather, it laid out in detail precisely the transactions at the heart of plaintiffs' allegations of accounting fraud"); *Zirvi v. Flatley*, No. 18-CV-7003 (JGK), 2020 WL 208820, at *6 (S.D.N.Y. Jan. 14, 2020) (RICO claim barred since "the existence of a patent application or a public patent puts parties on notice of their existence and therefore starts the clock on the limitations period"); *Town of*

---

[18] The deeds also indicate how many units are in the buildings, which for a few of the properties were allegedly different than as set forth in the "fraudulent prospectuses."

*Mamakating v. Lamm*, No. 15-CV-2865 KBF, 2015 WL 5311265, at *8 (S.D.N.Y. Sept. 11, 2015) (dismissing RICO claim on statute of limitations grounds where "[e]ven if documents submitted to and acts taken by the Village did not put the Town on actual notice, the Town may properly be charged with inquiry notice of publicly accessible documents"), *aff'd*, 651 F. App'x 51 (2d Cir. 2016).  Accordingly, the RICO claims stemming from the properties acquired prior to April 10, 2013, fail.

Moreover, despite Plaintiffs' efforts to assert allegations of fraudulent concealment so as to toll the statute of limitations, notably absent is any allegation that "defendants prevented them from investigating the fraud in spite of the plaintiffs' exercise of due diligence."  *Butala v. Agashiwala*, 916 F. Supp. 314, 320 (S.D.N.Y. 1996).  There is nothing in this case that could have stopped plaintiffs from investigating the alleged fraud since the publicly filed deeds would have put the plaintiffs on notice that what they claim is the heart of the fraud – overstated purchase prices for the Schedule A Properties in the prospectuses – was easily discovered by any reasonable diligent investor. *Rosenshein v. Meshel*, 688 F. App'x 60, 64 (2d Cir. 2017) ("Rosenshein's duty to investigate is unaltered by defendants' alleged representations and assurances about the investments because the information already in Rosenshein's possession during the relevant period—including numerous defaults, foreclosures, and delays in selling the underlying collateral properties—clearly contradicted such statements to a degree that made it unreasonable for Rosenshein to rely thereon.").

To the extent there were investments made by the Individual Plaintiffs after April 10, 2013 or additional "storm warnings" that arose after that date, because the Plaintiffs were on inquiry notice with respect to the "massive scheme to defraud,"[19] those later investments are not

---

[19] TAC ¶ 1.

separate injuries. *Town of Mamakating*, 2015 WL 5311265, at *8 ("The injuries related to defendants' alleged voter fraud are not new and independent. The Amended Complaint alleges that the voter fraud orchestrated by defendants was part and parcel of one common scheme to promote the completion of Chestnut Ridge without interference."); *Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 266 (S.D.N.Y. 2006) (holding that "this is a case where plaintiff discovered, or could have discovered, the full extent of related, future injuries at the outset of a single, unlawful scheme"). Indeed, at least one of the "lead plaintiffs" – Jacob Schonberg, Binyomin Schonberg, Binyomin Halpern, and Raphael Barouch Elkaim,[20] and syndicating the investments,[21] are allegedly indirectly invested in each of the Schedule A Properties. *See* TAC, Schedule A. As the lead investors and syndicators of other investments, they were certainly on inquiry notice of the "storm warnings" set forth in the deeds. They failed to undertake any reasonably diligent investigation as to the propriety of their prior investments and thus the statute of limitations does not renew for their later investments and the other Individual Plaintiffs whose investments they syndicated.

For the foregoing reasons, the RICO claims are time barred and the Motion to Amend to add RICO claims must be denied.[22]

---

[20] They are the "Original Plaintiffs" in the SAC. Brach Decl. Ex. 2, ¶ 2.

[21] TAC ¶¶ 56-57 (Halpern and Schonberg were allegedly targeted because they "were well-respected and trusted members of their communities" who could "influence others in their communities to invest … as well.").

[22] Because the RICO claims are time barred, the conspiracy to violate RICO claim also fails. *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 164 (2d Cir. 2004) ("And because Plaintiffs' RICO conspiracy claims are entirely dependent on their substantive RICO claims, we also concur in the District Court's dismissal of the RICO conspiracy claim."). Additionally, the conspiracy claim fails for the separate reason that Plaintiffs have only summarily alleged the existence of an agreement between Strulovitch and Oberlander. *FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F. Supp. 2d 362, 373 (E.D.N.Y. 2002) (citations omitted); *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 544–45 (S.D.N.Y. 2014) (dismissing RICO conspiracy claim

### b.  *The RICO Claims Fail Because There Is Not An Enterprise*

The "Strulovitch-Oberlander Enterprise" is not an enterprise under the RICO act.  RICO

enterprise under Section 1961(4) includes "any individual, partnership, corporation, association,

or other legal entity, and any union or group of individuals associated in fact although not a legal

entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise is "a group of persons associated

together for a common purpose of engaging in a course of conduct" which is "proved by

evidence of ongoing organization, formal or informal, and by evidence that the various

associates function as a continuing unit."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).

Where a complaint alleges an association-in-fact enterprise, courts in this Circuit look to the

"hierarchy, organization, and activities" of the association to determine whether "its members

functioned as a unit."  *First Capital Asset Mgmt.*, 385 F.3d at 174–75 (citations and quotations

omitted).

An enterprise does not arise from "a series of similar but essentially separate frauds

carried out by related entities." *City of N.Y. v. Chavez*, 944 F. Supp. 2d 260, 275 (S.D.N.Y.

2013), *vacated on other grounds*, 579 F. App'x 15 (2d Cir. 2014). "If each act of fraud is equally

effective without the perpetration of any other act of fraud – even if perhaps effective to a far

lesser or different magnitude – then there is no RICO enterprise." *Id.*; *see also Cedar Swamp

Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 451 (S.D.N.Y. 2007) ("[A] series of independent

fraudulent transactions ... is insufficient to justify a conclusion that the perpetrator and the

accomplices together constituted an ongoing organization or functioned as a continuing unit.").

The so-called "Strulovich-Oberlander enterprise, allegedly comprised of the Individual

Defendants and the "Secret Defendants" (TAC ¶ 293), is not an enterprise because it is not a

---

where plaintiffs alleged "no facts to show specifically that the defendants had any 'meeting of the minds'" in the
alleged violations").

continuing unit with an ascertainable structure.  For starters, the TAC does not define who the "Secret Defendants" are and fails for that reason alone.  Assuming the Plaintiffs are referring to the "Defendants' Affiliated Entities" and the "Secret LLC Defendants," which each separately hold title to the Secret Properties in Schedule B of the TAC, and are allegedly "owned and controlled by the Individual Defendants," the claims still fail. TAC ¶¶ 47-51.

The alleged purpose of this so-called Enterprise was to "illegally obtain vast sums of money from the Plaintiffs through fraudulent misrepresentations.  Thereafter, the fraudulently obtained money was diverted and deposited into the named accounts and entities constituting a part of the Enterprise that were controlled by and for the benefit of the Individual Defendants." TAC ¶ 299.  **However, there are no non-conclusory allegations as to how each of the members of the "Strulovitch Oberlander Enterprise" worked together as a unit to achieve that purpose**.  Each one of the alleged transactions constitutes, at most, a separate and independent fraud, which does not give rise to a RICO claim.

Further, as explained by the Supreme Court, an alleged enterprise must be distinct from the racketeering activity:

> The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

- 43 -

*Turkette*, 452 U.S. at 583.   Accordingly, "[i]n assessing whether an alleged enterprise has an ascertainable structure distinct from that inherent in a pattern of racketeering, it is appropriate to consider whether the enterprise would still exist were the predicate acts removed from the equation."   *Mackin v. Auberger*, 59 F. Supp. 3d 528, 544 (W.D.N.Y. 2014); *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F. Supp. 2d 565, 580 (S.D.N.Y.1999) ("Plaintiffs have failed to adequately allege the existence of an enterprise for purposes of § 1962(c), for they have failed to allege an enterprise that is separate and distinct from the alleged pattern of racketeering activity.").   Missing from the TAC is any allegation as to how the "Strulovitch-Oberlander Enterprise would exist absent the alleged pattern of racketeering.   At the end of the day, all that would remain are a series of single-purpose entities – whose purpose is to own a parcel of property – whose only common tie is that Individual Defendants are allegedly owners therein.[23]

Accordingly, the RICO claim is futile as it does not plead the existence of a RICO Enterprise.

### c.   *The predicate acts are not well-pled*

The predicate acts constituting the alleged racketeering activity are not well pled.   Federal Rule of Civil Procedure 9(b) requires that fraud allegations be pleaded with particularity.   A party alleging RICO predicate acts involving fraud must satisfy Rule 9(b)'s "heightened pleading requirements."   *Knoll v. Schectman*, 275 F. App'x 50, 51 (2d Cir. 2008).   In the Second Circuit, a plaintiff alleging RICO predicate acts involving fraud must "state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent."   *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993); *see also Knoll*, 275 F. App'x at 51.   This showing "must be established as to each individual defendant."

---

[23] As it relates to the Defendants' Affiliated Entities, CSRE is just an owner of the Holding Companies and there are no independent allegations concerning CS Construction LLC and Good Living Management LLC.

*DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001).   A RICO plaintiff must "indicate individually which of the . . . defendants actually engaged in the particular predicate acts of mail or wire fraud offenses that Plaintiffs allege constitutes a pattern of racketeering."   *Gross v. Waywell*, 628 F. Supp. 2d 475, 495 (S.D.N.Y. 2009) (Marrero, J.) (emphasis added).   "Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to defendants."   *Mills*, 12 F.3d at 1175 (internal quotations omitted).

Rule 9(b)'s prohibition on "group pleading" serves a few purposes in the RICO context. First, it ensures reviewing courts are able to determine "whether substantively each predicate act alleged constitute[s] an offense within the meaning of the underlying wire/mail fraud statutes." *Gross*, 628 F. Supp. 2d at 495.   Second, it provides courts with enough information to determine "whether, as to each defendant, the number, duration and timing of such offenses would be sufficient to satisfy the continuity element of the RICO pattern of racketeering requirement, as well as the statute of limitations."   *Id.*   Thus, "[t]he vice of group pleading in fraud cases is that no single defendant is sufficiently advised of which fraudulent act he is alleged to have committed, where, when, by what means and its specific form and content."   *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91-CV-2923 CSH, 1994 WL 88129, at *20 (S.D.N.Y. Mar. 15, 1994) (Haight, J.).   Here, like the SAC, the TAC does not name Strulovitch individually as the person who transmitted the allegedly fraudulent Prospectuses.   Rather, on each occasion it was the "Individual Defendants" who did so.   TAC ¶¶ 77, 87, 93, 105, 111, 117, 125, 133, 141, 153, 160, 171, 183, 191, 199, 205.   Accordingly, all assertions of fraud against Strulovitch fail.[24]

---

[24] Racketeering predicate act 25-31 is for bank fraud.  The alleged victim in those cases was Signature Bank, First Niagara Bank, and Cathay Bank.  TAC ¶ 316.  Not one of these allegations implicates the Plaintiffs in any way.

Further, while the Plaintiffs seek the recovery of "$30,000,000" for the alleged RICO violations, Plaintiffs fail to allege how much each Individual Plaintiff invested and when they invested that money.  That is critical because the only non-arbitrable RICO claims are those brought by the non-signatory Individual Plaintiffs.  The Individual Plaintiffs comprise only 38 of the 180 Investors, and they do not allege how much they each individually or collectively invested.  Under FRCP 9(b), a plaintiff must "set forth the who, what, when, where and how of the alleged fraud."  *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 614 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009) (emphasis added); *Butala*, 916 F. Supp. at 322 ("Insofar as the Complaint does not identify the specific plaintiffs to whom enumerated communications were made, and fails to state times and places for those communications, or indeed, what was said, it is not pleaded with sufficient particularity. Also, the Complaint does not identify the particular misrepresentations made by the defendants to each of the plaintiffs. Accordingly, because the plaintiffs have failed to plead their RICO claims with particularity pursuant to Rule 9(b), the Complaint is dismissed…").

Additionally, while the Individual Plaintiffs generally plead timeframes as to when their investments were made, they fail to plead exactly when each individual purchase was made. Such information is certainly within the knowledge of each Individual Plaintiff.  Exactly when the Individual Plaintiffs invested their money is particularly important since "Plaintiffs may not maintain a … fraud claim unless they allege that they reasonably relied on a misrepresentation or omission."  *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 491 (S.D.N.Y. 2005).  The failure to plead "when" they actually relied on a misrepresentation by purchasing securities requires dismissal of fraud claims.  *See, e.g.*, *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 313 (S.D.N.Y. 2014), *aff'd sub nom. SRM Glob. Master Fund Ltd.*

*P'ship v. Bear Stearns Cos.*, 829 F.3d 173 (2d Cir. 2016) (dismissing fraud claim on the grounds that reliance was not pled with particularity where "SRM does not allege that it actually purchased any particular Bear Stearns securities on any particular date in reliance on any particular alleged misstatements in the 2006 Form 10–K"); *Grunwald v. Borenfreund*, No. 85 CV 3338, 1986 WL 176367, at *2 (E.D.N.Y. Nov. 26, 1986) (finding that complaint failed to comply with Rule 9(b) where "the complaint—despite its volume—fails to state that on a particular date plaintiff provided specific funds or property to specifically named defendants in reliance upon a particular and stated representation").  There is not a single allegation in the TAC of the details of any specific Individual Plaintiffs' reliance on the alleged misrepresentations.

Because the fraud-based claims are not pled with the requisite particularity, the RICO claims reliant thereon are futile and the Motion to Amend to add RICO claims must be denied. Thus, because there are no non-futile federal claims, the Court should continue to decline to exercise supplemental jurisdiction over any non-arbitrable state law claims.

## CONCLUSION

For all of the reasons stated above, it is respectfully requested that the Court issue an Order denying the Motion to Amend, dismissing this action in its entirety, with prejudice, and granting such other and further relief as this Court deems appropriate.  To the extent the Court grants any aspect of the Motion to Amend, it is respectfully requested that the Court allow Defendants to file a motion to dismiss.

Dated:   New York, New York
         January 27, 2020                    HERRICK, FEINSTEIN LLP


                                      By: /s/ Scott C. Ross
                                             Avery S. Mehlman
                                             Scott C. Ross
                                      2 Park Avenue
                                      New York, NY 10016
                                      212.592.1400
                                      amehlman@herrick.com
                                      sross@herrick.com
                                      *Attorneys for Defendants*

HF 13109173v.2